# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CMC II, LLC,[1] | Case No. 21-10461 (xxx) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF PAUL RUNDELL IN SUPPORT OF
### CHAPTER 11 PETITIONS AND FIRST DAY PAPERS

I, Paul Rundell, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.  I am the Chief Restructuring Officer of Salus Rehabilitation, LLC and certain of its affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2.  I am a Managing Director of Alvarez & Marsal North America Corporate Restructuring ("A&M") in its Restructuring and Turnaround Group in Chicago, Illinois. I have more than twenty (20) years of experience specializing in restructuring, and have assisted clients with financial or operational challenges, including business strategy and planning, financial analysis and support, cash management, crisis management, turnaround consulting, market analysis and operational improvement. I have served as interim chief executive officer, chief

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: CMC II, LLC (6973), Salus Rehabilitation, LLC (4037), 207 Marshall Drive Operations LLC (8470), 803 Oak Street Operations LLC (3900), Sea Crest Health Care Management, LLC (2940), and Consulate Management Company, LLC (5824). The address of the Debtors' corporate headquarters is 800 Concourse Parkway South, Maitland, Florida 32751.

restructuring officer, and held other officer positions in the restructuring context, both in and out of court.

4. To minimize any business disruption caused by the commencement of these Chapter 11 Cases, the Debtors seek various types of relief through "first day" applications and motions filed contemporaneously herewith (collectively, the "**First Day Papers**").[2] I submit this declaration (this "**Declaration**") in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and (b) the First Day Papers. I am authorized to submit this Declaration on behalf of the Debtors.

4. In my capacity as chief restructuring officer of the Debtors, and based upon my review of relevant documents and my discussions with other members of the Debtors' management team, I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, and the information in the First Day Papers. The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge of the Debtors' operations and finances based on information provided by the Debtors, (b) my review of relevant documents, including information provided by other parties, (c) information provided to me by employees of A&M working under my supervision, (d) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and/or (e) my opinion based upon my experience. If called upon to testify, I would testify competently to the facts as set forth in this Declaration.

5. This Declaration is divided into two parts. Part I provides background information about the Debtors, their business operations, their corporate and capital structures, and the

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the applicable First Day Papers.

circumstances surrounding the commencement of the Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Papers.

## PART I

## BACKGROUND

**I.   CHAPTER 11 FILINGS.**

6. On the date hereof (the "**Petition Date**"), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have requested that the Chapter 11 Cases be jointly administered.

7. The Debtors continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

8. To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed a creditors committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

**II.   THE DEBTORS' BUSINESS.**

**A.   Corporate Overview**

9. These Chapter 11 Cases involve six debtor entities that are part of a family of companies owned by non-Debtor LaVie Care Centers, LLC ("**LVCC**"), which does business as Consulate Health Care ("**Consulate**"). The Debtors are Salus Rehabilitation, LLC ("**Salus**"), CMC II, LLC ("**CMC II**"), 207 Marshall Drive Operations LLC ("**Marshall**"), 803 Oak Street Operations LLC ("**Governor's Creek**"), Sea Crest Health Care Management, LLC ("**Sea Crest**"), and Consulate Management Company, LLC ("**CMC I**"). The six Debtors are the only LVCC-owned entities in bankruptcy. As further described below, three Debtors are active, operating

companies (CMC II, Marshall and Governor's Creek), while the remaining three are not (Sea Crest, Salus, and CMC I).

10. The Debtors are part of a group of Consulate corporate affiliates that manage and operate 140 skilled nursing facilities ("**SNFs**", and such managed facilities, the "**Managed SNFs**"), which are subject to various master leases between non-Debtor affiliated master tenants and third-party landlords. Generally, the operators of these SNFs (the "**Managed SNF Operators**") sublease their respective facilities from master tenants; while, in some cases, the SNFs are leased directly from the landlords. At their facilities, the Managed SNF Operators provide a variety of services that include short-term rehabilitation, comprehensive post-acute care, long-term care, and physical, occupational, and speech therapies. The 140 Managed SNFs under the Consulate umbrella are spread across six states in the Mid-Atlantic and Gulf Coast. Importantly, approximately 85-90% of the revenue generated by the Managed SNFs comes from government healthcare programs Medicare, Medicaid, or TRICARE for services provided to residents who rely on such programs for their medical expenses.[3]

**B.    The Debtors**

11. The Debtors in these Chapter 11 Cases are the following:

(i) **CMC II:** Debtor CMC II, also referred to herein as the "**Manager Debtor**," provides centralized back office management and support services to the 140 Consulate Health Care SNFs. CMC II functions as a cost center for the SNFs, charging an at-cost management fee, without markup, pursuant to management agreements that are generally terminable on 60-days' notice.

(ii) **Marshall:** Marshall operates Marshall Health and Rehabilitation Center, a 120-bed SNF located in Perry, Florida. Marshall generated approximately $450,000 in total free cash flow for the twelve month period ending January 31, 2021 (excluding the impact of CARES Act grants).

---

[3] TRICARE is a federal health care program for members of the military, veterans, and certain of their dependents and family members.

    (iii)    **Governor's Creek:** Governor's Creek (together with Marshall, the "**Operator Debtors**") operates Governor's Creek Health and Rehabilitation, a 120-bed SNF located in Green Cove Springs, Florida. Governor's Creek lost approximately $330,000 in total free cash flow for the twelve month period ending January 31, 2021 (excluding the impact of CARES Act grants).

    (iv)    **Salus:** Prior to the corporate transactions discussed in Section II.E below, Salus historically provided rehabilitation services to certain SNFs that are now part of Consulate Health Care, including the Marshall and Governor's Creek SNFs. Salus is no longer operational.

    (v)    **Sea Crest:** Prior to the corporate transactions discussed in Section II.E below, Sea Crest historically provided management and support services in a manner similar to CMC II to certain SNFs that are now part of Consulate Health Care, including the Marshall and Governor's Creek SNFs. Sea Crest is no longer operational.

    **(vi)**    **CMC I:** Prior to the corporate transactions discussed in Section II.E below, CMC I historically provided certain management and support services in a manner similar to CMC II to certain SNFs that are now part of Consulate Health Care, including the Marshall and Governor's Creek SNFs. CMC I is no longer operational.

### C. The Debtors' Operations

12. In the Consulate organizational structure, Operators (both Debtor and non-debtor) operate their respective facilities on a day-to-day basis, while Debtor CMC II provides the Operators with centralized back office managerial support and administrative functions. The Managed SNF Operators are licensed to provide skilled nursing care and employ a staff of caregivers, maintenance workers, and onsite administrative personnel. An executive director and clinical services director oversee operations at each Managed SNF. The Manager Debtor provides the infrastructure for coordination and some management across the Consulate facilities that allows the Managed SNF Operators to capitalize on various economies of scale. This infrastructure functions in a tiered fashion, with regional leadership overseeing groups of eight to ten SNFs, divisional leadership overseeing groups of five to six regions, and corporate leadership

overseeing all divisions. Each successive level of management has greater influence on company-wide matters—such as contracting, financial reporting, facility safety protocols, and training initiatives—and less influence on day-to-day operational matters—such as resident care plans, staffing arrangements, and the execution of company directives, which are implemented at the facility level.

13. The relationship between CMC II and the Managed SNF Operators is typical of the skilled nursing care industry. CMC II is a revenue-neutral "pass-through" entity designed to achieve economies of scale by consolidating certain key functions necessary for operating the Managed SNFs. The fees paid to CMC II by the Managed SNF Operators are designed to offset the SNFs' *pro rata* shares of the expenses, without markup, incurred by CMC II in carrying out these functions.[4]

14. The managerial functions carried out by CMC II include: operational support, regulatory guidance, legal and compliance, finance and accounting, IT services, and human resources. Through CMC II, the Managed SNF Operators are also able to obtain favorable volume-based pricing from suppliers and vendors, allowing them to operate more efficiently and cost-effectively. CMC II and its employees do not provide direct care to residents and do not directly bill any healthcare payor for reimbursement of their services.

15. The 140 Managed SNFs typically have an aggregate census of approximately 14,000 residents, although this number has dropped to approximately 12,000 due to decreased intake volume resulting from the COVID-19 pandemic. To provide management services to these

---

[4] Certain management agreements provide for a potential incentive payment to CMC II based upon dividends or capital transaction proceeds paid up to LVCC's equity investors; however, no incentive fees have been earned or paid to date and none are anticipated.

facilities, CMC II employs approximately 475 individuals based in Alabama, Arkansas, California, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, Minnesota, North Carolina, Ohio, Pennsylvania, South Carolina, Virginia, Tennessee, and West Virginia.

16.     The Operator Debtors (Marshall and Governor's Creek), whose facilities each have a 120-bed capacity, together employ approximately 170 people.  Approximately 80% of these employees perform nursing and nursing administration functions, and others provide local administration, social services and activities, and facility maintenance.  These two Debtors also use the services of a variety of individuals, consultants, and firms engaged as third-party contractors to provide health rehabilitation services, dietary services, housekeeping and laundry services, medical oversight, administrative services, and IT services.

### D.     Ruckh Litigation Background

17.     As a result of a lawsuit filed in June 2011 under the Federal False Claims Act, styled *U.S.A. ex rel. Angela Ruckh v. Salus Rehabilitation et al.*, Case No. 8:11-cv-1303 (M.D. Fla.) (the "**Ruckh Litigation**"),[5] five Debtors are subject to significant monetary judgments (the "**Ruckh Judgments**"), as follows: (i) Sea Crest and CMC II (as successor to Sea Crest), (jointly and severally), $240,914,900; (ii) Salus, $484,000; (iii) Marshall, $6,266,424; and (iv) Governors Creek, $10,055,961.

### E.     Transactional History

18.     The current Consulate organization consists of 140 SNF operators, all of which receive management services for their respective facilities from CMC II.  I understand that

---

[5]  Debtor CMC I was a named defendant for a time in the Ruckh Litigation but was dropped as a defendant through an amendment to the pleadings. Except for the five Debtors noted above that are subject to judgments in the Ruckh Litigation, no other LVCC entity (including the other 138 SNF operators) are defendants therein or have liability therefor. The Ruckh Litigation is discussed in greater detail in Section II.F below.

Consulate was formed through transactions in 2011 and 2012 involving, among others, (i) a group of Florida-based SNF operators owned by Genoa Health Care Group, LLC, which itself was part of a larger group of entities that operated approximately 100 SNFs under the original LaVie brand ("**Legacy LaVie**"); (ii) the acquisition of Legacy LaVie by a group of private investors in December 2011 through the newly-formed LVCC (the "**LaVie Acquisition**"); and (iii) the acquisition by LVCC of Consulate Health Care, a separate and independent company operating approximately 90 SNFs under the Consulate name.

    F.    <u>The Ruckh Litigation</u>

19. While the transactions described above were taking place, Ms. Angela Ruckh ("**Ms. Ruckh**" or the "**Relator**"), a former employee of the Operator Debtors' predecessors-in-interest, initiated the Ruckh Litigation by filing an action under seal in the United States District Court for the Middle District of Florida under the federal False Claims Act (the "**FCA**") and the Florida state law equivalent.[6] Ms. Ruckh's June 10, 2011 sealed complaint alleged that "La Vie Health Care Centers, Inc."[7] defrauded Medicare and the Florida Medicaid program between January 2011 and May 2011 through certain improper billing practices, including by "upcoding" for services provided to residents at the Marshall and Governor's Creek SNFs and artificially timing spikes in treatment to increase Medicare reimbursements.

20. The Ruckh Litigation was brought pursuant to the FCA's *qui tam* provisions, which allow private citizens to bring claims on the federal government's behalf (the "**Government**") as

---

[6] The False Claims Act, 31 U.S.C. §§ 3729 – 3733, subjects government contractors and related parties to statutory damages (including treble damages) in connection with the submission of false claims for reimbursement from government programs such as Medicare.

[7] Although the named entity did not exist, the Relator amended her complaint several times to add and drop defendants.

*qui tam* relators.[8] Pursuant to these provisions, the Relator may be entitled to a portion of any penalties collected by the Government in connection with the Ruckh Litigation, plus attorney's fees. *Qui tam* complaints are filed under seal while the Government determines whether or not it will intervene in the case and take over the litigation. The sealing requirement is meant to protect the Government's interest in maintaining the secrecy (including from the defendants) of any investigation it conducts in relation to the defendants in a *qui tam* action.[9] The Government filed a notice of nonintervention on April 10, 2012, and the Ruckh Litigation was unsealed on April 18, 2012.[10]

21. Following the Government's decision not to intervene in the Ruckh Litigation in April 2012, the Relator continued to prosecute the case[11] and amended her complaint several times. Following a jury trial in January 2017, on February 15, 2017, the jury awarded verdicts against the Debtors for damages in the amount of $115,137,095; after treble damages and penalties were assessed, the court entered judgments in the total amount of $347,864,285 on March 1, 2017. The judgments were allocated[12] as follows:

---

[8] "*Qui tam*" is short for the Latin phrase "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," which means "he who sues in this matter for the king as well as for himself."

[9] *See State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*, 137 S. Ct. 436, 438–39, 196 L. Ed. 2d 340 (2016) (the FCA's sealing requirement "was intended to protect the Government's interests, allaying its concern that a relator filing a civil complaint would alert defendants to a pending federal criminal investigation.").

[10] Notably, when LVCC acquired Marshall, Governor's Creek, Salus, and Sea Crest through the LaVie Acquisition in December 2011 and installed a new corporate management team, the Ruckh Litigation was still under seal.

[11] The FCA permits a *qui tam* relator to continue litigating the case at his or her own expense following the Government's nonintervention. If successful, the relator still received a portion of the damages collected by the Government, plus attorney's fees.

[12] *See Ruckh v. Salus Rehabilitation, LLC*, 963 F.3d 1089, 1098 (11th Cir. 2020).

| Debtor | Judgment Amount (Medicare) | Judgment Amount (Medicaid) | Total Judgment Amount |
|---|---|---|---|
| Sea Crest and CMC II (as successor to Sea Crest) (jointly and severally) | $240,914,900 | $90,143,000 | $331,057,900 |
| Salus | $484,000 | N/A | $484,000 |
| Marshall | $6,266,424 | N/A | $6,266,424 |
| Governor's Creek | $10,055,961 | N/A | $10,055,961 |
| Total | $257,721,285 | $90,143,000 | $347,864,285 |

22. Following entry of the judgments, the Debtors successfully moved for judgment as a matter of law notwithstanding the jury verdicts. The court granted the Debtors' motion on January 11, 2018, reducing the Debtors' liability to zero and vacating the judgments.[13] *Ruckh v. Salus Rehabilitation, LLC*, 963 F.3d at 1098-99. Based on the fact that the federal government and the State of Florida were aware of the Debtor defendants' alleged misconduct and nonetheless continued to make payments under the relevant healthcare programs, the district court found that the Relator failed to offer proof as to the materiality and scienter elements necessary to trigger liability under the FCA. *Id.* at 1099.

23. On appeal, however, the Eleventh Circuit Court of Appeals reversed in part and reinstated a portion of the jury verdicts as to the Relator's Medicare claims totaling $85,137,095, plus statutory penalties and treble damages. In June 2020, the Debtor defendants petitioned for a rehearing *en banc* but that petition was denied in August 2020. On February 9, 2021, the District Court entered the judgments against the Debtor defendants described in Paragraph 17 above.

---

[13] The Relator pursued the Ruckh Litigation in part with the financial backing of ARUS 1705-556 LLC ("ARUS"), a third-party litigation funder that apparently purchased a portion of the claim in exchange for providing litigation funding. 963 F.3d at 1100-01.

III.  **THE DEBTORS' CORPORATE AND CAPITAL STRUCTURES**

A.  <u>**Corporate Structure**</u>

**A simplified corporate organization chart depicting the ownership structure of the Debtors and certain affiliated non-Debtor entities is below.**



B.  <u>**Prepetition Funded Indebtedness**</u>

24.     CMC II was formed as a company in October 2011 and began managing the relevant Managed SNF Operators thereafter.  Prior to the Eleventh Circuit's partial reinstatement of the verdicts in the Ruckh Litigation, CMC II and the Operator Debtors were party to a secured revolving credit facility with MidCap Financial ("**MidCap**", and such facility, the "**MidCap**

**Facility**"). As a result of the Eleventh Circuit's decision, MidCap required the removal of these entities as borrowers or guarantors of the MidCap Facility, which removals were effective as of August 26, 2020.

### C. **Omega Lease**

25. Prior to the Eleventh Circuit's partial reinstatement of the verdicts in the Ruckh Litigation, the Operator Debtors subleased their respective SNFs from affiliated master tenants under a master lease (the "**Original Master Lease**") with certain affiliates of Omega Healthcare Investors ("**Omega**") that covered the Marshall and Governor's Creek SNFs and 42 other facilities. Following the Eleventh Circuit's decision, Omega required removal of the Operator Debtors' SNFs from the Original Master Lease and the creation of a new master lease (the "**New Master Lease**") between the Operator Debtors and the Omega affiliates that own the real estate for the Operator Debtors' SNFs (the "**Omega Landlords**"). Accordingly, the Original Master Lease and certain ancillary documents were amended as of August 26, 2020 to remove the real estate occupied by the Operator Debtors' SNFs from the lease and modify a judgment default provision to ensure that it would not be triggered by entry of a judgment in the Ruckh Litigation. Contemporaneously therewith, the Operator Debtors and the Omega Landlords entered into the New Master Lease.

26. The initial term of the New Master Lease expires on March 31, 2031 and is subject to two successive ten-year renewal options. Annual base rent under the Master Lease is $1,522,066.92. The Operator Debtors granted a security interest to the Omega Landlords as well. As additional security, the Operator Debtors' immediate parent, non-Debtor Epsilon Health Care Properties, LLC, has pledged its membership interests and any other interests it holds in the Operator Debtors to the Omega Landlords. Moreover, each successive parent entity from Epsilon

Health Care Properties up to and including the immediate parent of LVCC has agreed to guarantee the Operator Debtors' obligations under the New Master Lease Agreement.[14]

### D. Vendor Repayment Agreements

27. Certain of the Debtors and non-Debtor affiliates are obligors under promissory notes and payment arrangements with certain vendors and service providers (the "**Vendor Repayment Agreements**"). The Debtors which are parties to one or more Vendor Repayment Agreements include the Operator Debtors, CMC II and CMC I. Each of these vendors provides key services to the SNFs operated by the Debtors and their non-Debtor affiliates, including rehabilitative therapy, facilities maintenance, and pharmaceutical purchasing. Although the amounts owed under the Vendor Repayment Agreements are significant, including approximately $56 million owed to Genesis ElderCare Rehabilitation Services, LLC and approximately $16 million owed to Healthcare Services Group, Inc., payments on the Vendor Repayment Agreements are generally current and are being paid by non-Debtor affiliates that are obligors or guarantors thereof.

## IV. THE CHAPTER 11 CASES.

28. The filing of the Chapter 11 Cases was precipitated by the recent entry of the judgments in the Ruckh Litigation. The Debtors lack the financial capacity[15] to satisfy the Ruckh Judgments and cannot risk an interruption in care to the residents of the Managed SNFs that might result from enforcement of the Ruckh Judgments. Although the Debtors remain open to a

---

[14] The names of these parent guarantors are provided in the Debtors' corporate organizational chart in Section III.A above.

[15] As noted above, CMC II does not charge a mark-up on the services it provides to the Managed SNF Operators, and, thus, does not generate excess free cash flow. The two Operator Debtors generate modest free cash flows, but are well short of the amounts needed to satisfy those entities' respective liability under the Ruckh Judgments. The remaining Debtors are not operational.

constructive dialogue to resolve the Ruckh Judgments, prior efforts have not resulted in a resolution. Accordingly, the Debtors' efforts are focused on continuing to serve residents of the Managed Facilities while implementing a process to market and sell their assets for the highest and best price and distribute the proceeds pursuant to the Bankruptcy Code's priority scheme.

29. To oversee and facilitate the value-maximization process, the Debtors appointed an independent manager, Mr. Alan J. Carr of Drivetrain, LLC (the "**Independent Manager**"), with authority to review, approve and implement strategic alternative transactions, including strategic restructuring alternatives, and appointed me as Chief Restructuring Officer. Meanwhile, to ensure the continued delivery of safe and reliable services to the Debtors' residents, as well the non-Debtors managed by the Manager Debtor, the Debtors' senior management team remains in day-to-day control of the Debtors' operational affairs. The Debtors will continue to prioritize the safety of residents in their care while maximizing the value of their estates and distributions to creditors. The Debtors likewise remain ready and willing to work with the Government and the Relator towards a consensual resolution.

30. Prior to the Petition Date, the Debtors engaged Evans Senior Investments ("**ESI**") to act as their broker for purposes of procuring financing for the Chapter 11 cases and in connection with a potential sale of the Debtors' assets. In seeking to procure post-petition financing, ESI solicited forty (40) different third-party lenders. Although this process did not yield any indications of interest for financing the Debtors during these Chapter 11 Cases from third parties, the Debtors received a proposed DIP term sheet from an affiliate of the Debtors (the "**Proposed DIP Lender**") for a multi-draw term loan facility with a maximum credit amount of $5 million.

31. Ultimately, the Debtors, in conjunction with their advisors, determined that the terms and conditions of the proposed DIP financing was and remains the best available under the

circumstances and adequately addresses the Debtors' financing needs during these Chapter 11 Cases. Importantly, the DIP financing was negotiated at arms' length among the Proposed DIP Lender, the Debtors' proposed counsel, and the CRO, and was vetted and approved by the Independent Manager. The proposed DIP financing provides the best and only path forward to address the Debtors' immediate liquidity needs to ensure that they are able to continue operating their businesses and provide for the care, welfare and safety of their residents.

32. With assistance from ESI, the Debtors have also conducted a thorough market analysis in connection with the potential sale of the Debtors' assets. ESI created marketing information concerning the Debtors and their assets and a data room with diligence information for prospective purchasers. ESI contacted more than 100 entities regarding potential interested in acquiring the Debtors' assets. Many of these parties entered into confidentiality agreements with the Debtors. ESI engaged with prospective purchasers and responded to various inquiries from such parties.

33. The process has been successful, and has resulted in multiple term sheets from different prospective purchasers. One term sheet provides for the sale of assets of the Operating Debtors to a third party, while the other term sheet, signed shortly prior to the commencement of these cases, provides for the sale of assets of the Manager Debtor and certain other assets to an affiliate of the Debtors. The Debtors are negotiating stalking horse agreements with each purchaser and expect to file motions in the coming days to approve bidding procedures and schedule hearing dates relating to each of these transactions.

## PART II: FIRST DAY PLEADINGS

34. Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings in these Chapter 11 Cases seeking orders granting various forms of relief intended to

facilitate the efficient administration of these Chapter 11 Cases and pursue and consummate a joint plan of reorganization and liquidation.

35. I have reviewed each of the First Day Pleadings listed on Exhibit A, and the facts set forth therein are true and correct to the best of my knowledge, information and belief.

36. I believe that the relief requested in the First Day Pleadings is necessary to avoid immediate and irreparable harm and to allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases.

37. Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety.

Dated:       March 1, 2021
             Chicago, Illinois

                                    By:    /s/ Paul Rundell
                                    Name: Paul Rundell
                                    Title: Chief Restructuring Officer
                                           Alvarez & Marsal North American
                                           Corporate Restructuring

# EXHIBIT A

# List of First Day Pleadings

1. **Joint Administration**: Motion of Debtors for Entry of Order (I) Directing Joint Administration of Cases and (II) Waiving Certain Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rule 2002(n)

2. **Consolidated Creditors**: Motion of Debtors for Entry of Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor List of Creditors in Lieu of Submitting a Separate Creditor Matrix for Each Debtor, (B) File a Consolidated List of Top 30 Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information for Individual Creditors; and (II) Granting Related Relief

3. **Confidentiality**: Motion of Debtors for Entry of Order Authorizing the Implementation of Procedures to Maintain and Protect Confidential Health Information

4. **Claims Agent Retention**: Application of Debtors for Order Appointing Stretto as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and Del. Bankr. L.R. 2002-1(f), *Nunc Pro Tunc* to the Petition Date

5. **Cash Management**: Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System, Bank Accounts, and Business Forms; (II) Modifying Certain Requirements of 11 U.S.C. § 345(b); and (III) Authorizing Continuance of Intercompany Transactions and Honoring Certain Related Prepetition Obligations

6. **Employee**: Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Prepetition Employee Obligations and (B) Continue Employee Benefit Programs and (II) Granting Related Relief

7. **Insurance**: Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to (I) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, (II) Continue to Honor Premium Finance Obligations, and (III) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies and Insurance Premium Financing Agreements

8. **Taxes**: Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Taxes and Related Obligations

9. **Utilities**: Motion of Debtors for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for

Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Authorizing Debtors to Honor Obligations to Payment Processors in the Ordinary Course of Business

10. **Resident Programs and Practices**: Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to Continue Resident Programs and Practices and Honor Certain Prepetition Obligations Related Thereto

11. **DIP Financing**: Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Granting Senior Liens And Superpriority Administrative Expense Status; (II) Scheduling Final Hearing; And (III) Granting Related Relief