**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CMC II, LLC,[1] | Case No. 21-10461 (xxx) |
| Debtors. | (*Joint Administration Pending*) |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT
SYSTEM, BANK ACCOUNTS, AND BUSINESS FORMS; (II) MODIFYING CERTAIN
REQUIREMENTS OF BANKRUPTCY CODE SECTION 345(b); AND (III)
AUTHORIZING CONTINUANCE OF INTERCOMPANY TRANSACTIONS AND
HONORING CERTAIN RELATED PREPETITION OBLIGATIONS**

CMC II, LLC ("**CMC II**" or the "**Manager Debtor**") and certain of its affiliates, the

debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**" or the

"**Company**"), hereby move (this "**Motion**") this Court for entry of interim and final orders,

substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "**Interim Order**" and

the "**Final Order**," respectively), granting the relief described below.  In support thereof, the

Debtors refer to the contemporaneously filed *Declaration of Paul Rundell in Support of Chapter

11 Petitions and First Day Papers* (the "**First Day Declaration**")[2] and further represent as follows:

**RELIEF REQUESTED**

1.      By this Motion, the Debtors respectfully request entry of an Interim Order and Final

Order (a) authorizing, but not directing, the Debtors to (i) maintain their existing cash management

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: CMC II, LLC (6973), Salus Rehabilitation, LLC (4037), 207 Marshall Drive Operations LLC (8470), 803 Oak Street Operations LLC (3900), Sea Crest Health Care Management, LLC (2940), and Consulate Management Company, LLC (5824).  The address of the Debtors' corporate headquarters is 800 Concourse Parkway South, Maitland, Florida 32751.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

system and bank accounts, (ii) pay related prepetition obligations, and (iii) continue use of their existing checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence, including existing templates thereof (collectively, the "**Business Forms**"); (b) modifying certain operating guidelines relating to bank accounts set forth in the U.S. Department of Justice, Office of the United States Trustee: Guidelines for Debtors-in-Possession (the "**U.S. Trustee Guidelines**"); (c) modifying certain requirements under section 345(b) of the Bankruptcy Code; and (d) authorizing, but not directing, the Debtors to continue engaging in, and according administrative expense priority status to, postpetition intercompany transactions arising in the ordinary course of business (the "**Intercompany Transactions**"), and the accordance of administrative-expense priority status to all claims arising postpetition in the ordinary course of business as a result of an Intercompany Transaction (such postpetition claims, the "**Intercompany Claims**").

2.      The Debtors further request that the Interim Order and the Final Order, (a) authorize all applicable banks and other financial institutions (collectively, the "**Banks**"), when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of the Cash Management System (*as defined below*), whether such checks or other requests were submitted before, on, or after the Petition Date; (b) authorize the Banks to rely on the representations of the Debtors as to which checks and fund transfers are subject to this Motion, provided that no such Bank shall have any liability to any party for relying on such direction and representations by the Debtors; (c) provide that the Banks shall, at the direction of the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Cash Management System that had not been honored and paid as of the Petition Date; and (d) authorize the Debtors to issue

new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts, and other forms of payment which may be inadvertently dishonored or rejected.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The legal predicates for the relief requested herein are sections 105(a), 363, and 503(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2015-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

5.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

**A.    THE CHAPTER 11 CASES.**

6.      On March 1, 2021  (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

7.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

8.     To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

9.     The Debtors in these Chapter 11 Cases manage and operate skilled nursing facilities ("**SNFs**"), providing a variety of services to mostly elderly residents that include short-term rehabilitation, comprehensive post-acute care, long-term care, and physical, occupational, and speech therapies.  Debtor CMC II provides management and support services to approximately 140 SNFs, each of which is operated by an affiliate of the Debtors (such SNFs, the "**Managed SNFs**", and such operators, the "**Managed SNF Operators**") under the common ownership of non-Debtor LaVie Care Centers, LLC ("**LVCC**"), doing business as Consulate Health Care.  Two of the Managed SNF Operators are Debtors in these Chapter 11 Cases: 207 Marshall Drive Operations LLC ("**Marshall**") and 803 Oak Street Operations LLC ("**Governor's Creek**" and, together with Marshall, the "**Operator Debtors**"). Each of the Operator Debtors operates a 120-bed SNF located in Northern Florida.  The remaining Debtors, Salus Rehabilitation, LLC, Sea Crest Health Care Management, LLC, and Consulate Management Company, LLC, are no longer operational but historically provided rehabilitation and management services, respectively.

10.     Additional factual background regarding the Company's business operations, corporate and capital structures, and restructuring efforts are described in greater detail in the First Day Declaration, which is incorporated in this Motion by reference.

**B.     OVERVIEW OF THE CASH MANAGEMENT SYSTEM.**

11.     In the ordinary course of their businesses, the Debtors maintain a complex cash management system (the "**Cash Management System**").  The Cash Management System is integral to the Debtors' operations as it enables them to, among other things, (i) accurately forecast

and report their cash flow requirements, (ii) monitor and control all of their cash receipts and disbursements, and (iii) track intercompany cash transfers and transactions with other Debtors and non-Debtor affiliates.

12.    As of the Petition Date, the Debtors maintained 24 bank accounts (the "**Bank Accounts**") and a cash management system that utilizes different mechanics across Operator Debtor bank accounts and Manager Debtor bank accounts.  A list of the Bank Accounts is attached hereto as **Exhibit C**.  A diagram reflecting the flow of funds through the Bank Accounts in the Cash Management System is annexed hereto as **Exhibit D**.

C.    THE BANK ACCOUNTS.

13.    The Cash Management System consists of the following categories of Bank Accounts:

(a)    Deposit Accounts: Each of the two Operator Debtors maintains four deposit accounts (for a total of eight deposit accounts) (the "**Deposit Accounts**"), which are swept daily into each Operator Debtor's Operating Account (as defined below). Each of the Operator Debtors has two Deposit Accounts with CIBC U.S. ("**CIBC**") and two Deposit Accounts with Wells Fargo Bank, N.A. ("**Wells Fargo**").[3]

(i)    The Deposit Accounts at the Operator Debtors are generally divided into two broad categories: government fund deposit accounts (*i.e.,* accounts established to receive funds from government programs such as Medicare, Medicaid) and non-government fund deposit accounts (*i.e.,* accounts established to receive funds from private payors).  Payments are deposited directly into the Deposit Accounts in various ways, including credit card, check, direct deposit, and cash.

(b)    Operating Accounts: Each of the Debtors has one primary operating account (the "**Operating Accounts**").  Funds from the Operator Debtors' Deposit Accounts are swept on a daily basis into the respective Debtor's Operating Account.  In addition, because the Manager Debtor does not have Deposit Accounts, amounts payable to

---

[3]    The Deposit Accounts were historically maintained at Wells Fargo.  Prior to the Petition Date, the Operator Debtors transitioned the Deposit Accounts to CIBC.  In connection with this transition, the Operator Debtors have requested that the parties that pay funds into the Deposit Accounts pay such funds into the CIBC Deposit Accounts.  As of the Petition Date, not all such parties have transitioned their payments to the CIBC Accounts.  The Wells Fargo Deposit Accounts will remain in use following the transition for petty cash funding.

the Manager Debtor (namely, the amounts owning on account of Management Fees (as defined below)) are deposited directly into the Manager Debtor's Operating Account.  Each of the Operating Accounts are maintained at CIBC.  Once in its respective Operating Account, funds held by the applicable Debtor are transferred into the applicable Payroll Disbursement Account or Accounts Payable Disbursement Account (each as defined below) to fund payments to employees or trade vendors, as applicable.  In addition to funding the Payroll Disbursements Account and Accounts Payable Disbursement Accounts, the Operating Accounts process direct wire payment to certain vendors and the Debtors permit certain vendors and government agencies to withdraw funds directly from the Operating Accounts (including with respect to sales tax payments and certain other local taxing authorities that require payment in this manner).

(c)     Payroll Disbursement Account: As needed, funds from a Debtor's Operating Account are transferred into a payroll account for each Debtor held at CIBC (the "**Payroll Disbursement Accounts**") to fund payroll for such Debtor's employees.  Automatic Data Processing, Inc. ("**ADP**") then withdraws the funds from the Payroll Disbursement Accounts, administers the Debtors' payroll, processes the Debtors' payroll taxes owed with respect to each employee, and makes the direct deposits to the Debtors' employees.[4]

(d)     Accounts Payable Disbursement Account: Each Debtor maintains an accounts payable disbursement account with CIBC (the "**Accounts Payable Disbursement Accounts**").  When a Debtor makes a payment from the Accounts Payable Disbursement Account, the funds necessary to make such payment are automatically withdrawn from such Debtor's Operating Account on an as-needed basis.  Each of the Accounts Payable Disbursement Accounts is a "zero balance account" that maintains no cash balance at the end of each day.

(e)     Resident Trust Accounts: The Debtors maintain two resident trust accounts (one for each Operator Debtor) (collectively, the "**Resident Trust Accounts**") for the residents of the SNFs operated by the Operator Debtors (the "**Residents**").  The Resident Trust Accounts are escrow accounts that hold funds belonging to those Residents who have elected to have the Operator Debtors manage certain of the Residents' funds, such as social security payments.  The Resident Trust Accounts are administered by National Datacare, which tracks the balances of each resident's funds that are included in the Resident Trust Accounts.  A Resident may direct a draw from the Resident Trust Account upon request.  Funds in Resident Trust Accounts are disbursed in two ways, in each case at the direction of the resident.

(i)     *First*, a Resident may direct an Operator Debtor to use such Resident's funds from the applicable Resident Trust Account to pay for care services

---

[4]     A further description of the Debtors' payroll is set forth in the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Prepetition Employee Obligations and (B) Continue Employee Benefit Programs and (II) Granting Related Relief*, filed contemporaneously herewith.

provided by that Operator Debtor.  In this case, the Operator Debtor will transfer such funds from the Resident Trust Account to a care cost account (the "**Care Cost Account**") for such Operator Debtor.  The funds in the Care Cost Account are then swept daily into the corresponding Operator Debtor's Deposit Account.

(ii)    *Second*, a Resident may direct an Operator Debtor to use such Resident's funds from the applicable Resident Trust Account to pay funds to third parties.[5]  In this case, the Operator Debtor will transfer funds from the Resident Trust Account to a petty cash account (the "**Resident Petty Cash Account**") for such Operator Debtor.  Checks, wires, or other transfers will then be drawn from the Resident Petty Cash Account and the funds will be issued to the third-party payee on behalf of the Resident.

14.    The Company also has a purchase card program (the "**Purchasing Card Program**") through Elan Financial Services ("**Elan**").  The Purchasing Card Program has two principal components.  First, approximately 22 employees of the Manager Debtor have active purchase cards (the "**Purchasing Cards**").  These cards are issued to employees and are typically used for pre-approved employee travel and other miscellaneous expenses at the SNFs (*e.g.*, an item that cannot otherwise be purchased through the Company's procurement system).[6]  Second, the Purchasing Card Program also includes a corporate credit card that is used to pay for airfare expenses (the "**Airfare Card**").

15.    To fund the Purchasing Cards and the Airfare Card, the Debtors maintain a cash balance with Elan to cover any outstanding amounts under the Purchasing Card Program.  This cash amount fluctuates based on the Debtors' projected use of the Purchasing Card Program, however, the cash amount typically does not fall below $70,000 and, as of January 31, 2021, was approximately $85,000.00.  Every week, the cash supporting the Purchasing Card Program

---

[5]    By way of example, a Resident may direct an Operator Debtor to use funds from a Resident Trust Account to pay an insurance bill, or for a dental visit.

[6]    By way of example, certain of the Purchasing Cards have been used by the Debtors' employees to purchase personal protective equipment from available suppliers during the COVID-19 pandemic.

(including the Purchasing Cards and Airfare Card) is replenished by the Manager Debtor.  In turn, the Manager Debtor recoups this cash from the Managed SNF Operators through either (a) reimbursement by the applicable Managed SNF Operator, in the case of expenses incurred under the Purchasing Card Program that are attributable to facility-specific expenses, or (b) Management Fees (as defined herein), in the case of expenses incurred under the Purchasing Card Program that are attributable to the Manager Debtor's provision of management services.

16.    While the Bank Accounts are held at various financial institutions, the majority of the Bank Accounts are held at Wells Fargo, CIBC, and PNC.  These financial institutions appear on the U.S. Trustee's list of authorized bank depositories (the "**Authorized Depositories**").

**D.    THE BUSINESS FORMS.**

17.    The Debtors use various Business Forms, such as checks, invoices, and letterhead, in the ordinary course of business.  Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors-in-possession.  Nonetheless, most parties doing business with the Debtors will be aware of the Debtors' status as debtors-in-possession as a result of the publicity surrounding the Chapter 11 Cases, including the notice of commencement served on parties-in-interest.

**E.    THE INTERCOMPANY TRANSACTIONS**

18.    In the ordinary course of business, the Debtors engage in various Intercompany Transactions relating to expenses and obligations that the Debtors and their affiliates incur in the course of operations.  The Intercompany Transactions are at the heart of the Cash Management System because they enable the Debtors to ascertain, trace, and account for the revenue and expenses at the Debtors and their affiliates.

19.     In the ordinary course of business, there are continuous Intercompany Transactions among the two Operator Debtors and the Manager Debtor.  As described in greater detail in the First Day Declaration, the Manager Debtor's sole function is providing management services, including regulatory, information technology, and accounting services (among other services) to each of the Managed SNFs.  In exchange, each of the Managed SNF Operators pay a management fee (the "**Management Fee**") to the Manager Debtor each month.

20.     The Manager Debtor calculates the amount of the Management Fee by calculating the cost of operating the Manager Debtor as a percentage of the aggregate adjusted revenue of all of the Managed SNF Operators.  For example, in 2020 the Manager Debtor's cost of operation was $61 million, and the combined adjusted revenue of the Managed SNF Operators was $1.32 billion, leading to a management fee of 4.6%. The Management Fee of each of the Managed SNF Operators is calculated by multiplying this percentage against the individual operator's revenue. As the Manager Debtor provides management services to the Managed SNF Operators, an intercompany payable is generated from the applicable Managed SNF Operator to the Manager Debtor.  Those Intercompany Claims are satisfied through the payment of Management Fees, which are paid monthly in arrears.

21.     In addition, and in order to take economic advantage of efficiencies that arise due to the number of Managed SNF Operators, certain of the Debtors' obligations are contracted on an omnibus basis.  In these instances, either LVCC or one of its affiliates contracts with a third party on behalf of itself and each of the Managed SNFs (or, in some instances, solely with all Managed SNFs, or with all Managed SNFs and the Manager Debtor) (such contracts, the "**Omnibus Contracts**").  In certain instances, LVCC then pays the obligation on behalf of the

applicable Managed SNF Operators. [7]   In such instances, an intercompany payable from the applicable Managed SNF Operators is generated.  In other instances, notwithstanding the existence of an Omnibus Contracts, the Debtors pay their obligations to the counterparty to the Omnibus Contracts separately from the other Managed SNF Operators.

22.     When LVCC pays an obligation under an Omnibus Contract on behalf of multiple Managed SNF Operators, the allocation method used to determine the amount of the Intercompany Claims allocated to a particular Managed SNF Operator depends on the characteristics of the Omnibus Contracts.  Generally speaking, LVCC will allocate the amount payable by each Managed SNF Operator based on such entity's use of the good or service (or based on a proxy for use).  For example, the cost of certain insurance programs afforded to the employees of the Managed SNF Operators is allocated based on either headcount (in the case of workers' compensation insurance) or the number of employees participating in the insurance program (in the case of health insurance).  In these cases, LVCC charges an intercompany receivable to the applicable Managed SNF Operator based on the portion of the applicable good or service utilized by the Managed SNF Operator.

23.     In the three months prior to the Petition Date, each of the Operator Debtors engaged in an average of $57,000.00 in Intercompany Transactions per month, and the Manager Debtor engaged in an average of $685,000.00 in Intercompany Transactions per month.

---

[7]   Like the Manager Debtor, LVCC maintains two credit card programs to fund certain of its purchases.  LVCC has a credit card account with Comdata Inc. for booking hotel travel that is similar to the Manager Debtor's Airfare Card program.  LVCC also has a temporary purchasing card program with Elan, whereby LVCC issues temporary credit card numbers that LVCC then uses to pay vendors.  Charges to these cards are allocated to CMC II, in the case of expenses incurred under such credit card programs that are attributable to the Manager Debtor's provision of management services, or to a Managed SNF Operator, in the case of expenses incurred under such credit card programs that are attributable to facility-specific expenses.

24.     The Intercompany Transactions will continue postpetition in the ordinary course of business.  Such transactions are necessary to the efficient operation of the Debtors' business and their Cash Management System.  Because the Debtors engaged in the Intercompany Transactions on a regular basis prepetition and such transactions are common for enterprises like the Debtors, the Debtors believe that they may continue the Intercompany Transactions in the ordinary course under section 363(c)(1) of the Bankruptcy Code, without court approval.  Nonetheless, out of an abundance of caution, the Debtors seek express authority, but not direction, to continue engaging in the Intercompany Transactions.  Consistent with their prepetition practice, the Debtors will maintain records of all transfers and can ascertain, trace, and account for all of the Intercompany Transactions.

## BASIS FOR RELIEF REQUESTED

I.      **THE COURT SHOULD AUTHORIZE THE DEBTORS TO MAINTAIN THEIR EXISTING BANK ACCOUNTS AND USE THEIR EXISTING CASH MANAGEMENT SYSTEM.**

25.     Although the Debtors maintain the Bank Accounts as part of an established Cash Management System, the U.S. Trustee Guidelines require that the Debtors, as debtors-in-possession, take certain actions with respect to their prepetition Bank Accounts in order for the U.S. Trustee to supervise the administration of the Chapter 11 Cases.  These requirements are designed to draw a clear line of demarcation between prepetition and postpetition transactions and operations and prevent the inadvertent postpetition payment of prepetition claims.  The Debtors submit, however, that a modification of certain requirements is warranted.

26.     To require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose significant administrative burdens, and cause undue disruption.  Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value.  Moreover, such a

disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the Bank Accounts are held at well-capitalized financial institutions and all are insured in the United States by the Federal Deposit Insurance Corporation ("**FDIC**"). For the foregoing reasons, maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Bank Accounts.

27. Moreover, any new account that the Debtors open will (a) be with a bank that (i) is organized under the laws of the United States or any state therein, (ii) is insured by the FDIC, and (iii) has executed, or is willing to immediately execute, a Uniform Depository Agreement with the U.S. Trustee; (b) be designated a "Debtor-in-Possession" account by the relevant Bank; and (c) comply with applicable provisions of any financing order entered in these Chapter 11 Cases. Additionally, the Debtors will provide the U.S. Trustee with notice of any new accounts or the closing of any existing Bank Accounts.

28. In each instance in which the Debtors hold an Account at a Bank that is party to a Uniform Depository Agreement with the U.S. Trustee, within 15 days of the date of entry of the order granting this Motion, the Debtors will (a) contact such Bank, (b) provide such Bank with the Debtors' employer identification numbers, and (c) identify each of their accounts held at such bank as held by a debtor-in-possession in a bankruptcy case.

29. Enforcement of the U.S. Trustee's requirements without modification would significantly disrupt the Debtors' business. Indeed, certain of the Bank Accounts are required to be separated from the Debtors' other Bank Accounts, such as certain of the Deposit Accounts (for

Medicare and Medicaid receipts).  As the foregoing demonstrates, the Bank Accounts comprise an established Cash Management System that the Debtors must maintain to ensure that collections and disbursements occur.  The Cash Management System allows the Debtors to manage cash centrally and includes the necessary accounting controls to enable the Debtors to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  While the Chapter 11 Cases are pending, the Debtors will continue to maintain detailed records consistent with ordinary course practices and reflecting all transfers of funds.

30.    Accordingly, to ensure a smooth transition into chapter 11, the Debtors submit that (a) they should be permitted to continue to maintain their existing Bank Accounts and open new and close existing accounts provided herein and as needed; and (b) unless provided otherwise, the requested relief should extend to any new accounts by providing that the new accounts are deemed to be Bank Accounts and are similarly subject to the rights, obligations, and relief granted by this Court.

31.    Courts in this district have routinely granted the same or similar relief as requested in this Motion to chapter 11 debtors.  *See, e.g.*, *In re AAC Holdings, Inc.*, Case No. 20-11648 (JTD) (Bankr. D. Del. Jul. 15, 2020); *In re Quorum Health Corp.*, Case No. 20-10766 (KBO) (Bankr D. Del. May 1, 2020); *In re Melinta Therapeutics, Inc.*, Case No. 19-12748 (LSS) (Bankr. D. Del. Dec. 30, 2019); *In re Argos Therapeutics, Inc.,* Case No. 18-12714 (KJC) (Bankr. D. Del. Jan. 23, 2019).

## II.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO THE CASH MANAGEMENT SYSTEM.

32.    In connection with the Cash Management System, the Debtors may incur fees and other charges (collectively, all such fees and charges, the "**Bank Account Claims**") in connection

with (a) checks that have been dishonored or returned for insufficient funds in the applicable account, (b) any reimbursement or other payment obligations, such as overdrafts, arising under any agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements (the "**Bank Account Agreements**"), and (c) amounts due to payment processors, such as WorldPay Inc., the Debtors' credit card payment processor, on account of fees arising from receiving and processing credit card payments from private payors.  As of the Petition Date, the Debtors owed Banks on account of their Bank Account Claims approximately $2,500.00.   The Debtors seek authority pursuant to Bankruptcy Code sections 105(a) and 363(b), in their sole discretion, to pay and/or reimburse the Banks in the ordinary course of business for any Bank Account Claims arising prior to, on, or after the Petition Date.

33.     Furthermore, both as part of the Motion and in other motions that have been concurrently filed, the Debtors are requesting authority to pay, in their sole discretion, certain prepetition obligations, including, *inter alia*, certain employee, insurance, tax, customer, and vendor obligations.  With respect to certain of these obligations, the Debtors may have issued checks or initiated payments prior to the Petition Date that have yet to clear the banking system. In other instances, the Debtors will create the relevant check or initiate the appropriate payment once this Court enters an order permitting the Debtors to do so.  The Debtors intend to inform the Banks which such checks and payment orders should be honored.  Therefore, the Debtors request that the Banks be authorized and directed to rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored.  The Debtors further request that the Interim Order and Final Order specify that the Banks shall not have any liability to any party for relying on such representations.

This relief is reasonable and appropriate because the Banks are not in a position independently to verify or audit whether a particular prepetition check may be honored in accordance with an order by the Court or otherwise.

### III. THE COURT SHOULD AUTHORIZE THE DEBTORS TO CONTINUE TO USE EXISTING BUSINESS FORMS AND CHECKS.

34. To minimize expenses to their estates, the Debtors also seek authorization to continue using the Business Forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors-in-possession. Modifying existing Business Forms would be burdensome and expensive and would confer no corresponding benefit upon those dealing with the Debtors, most of whom, as noted above, will be aware of the commencement of the Chapter 11 Cases. Additionally, requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts. After depleting their current check stock, the Debtors will obtain new check stock bearing the designation "Debtor-in-Possession". The Debtors, therefore, request authorization, but not direction, to use their existing Business Forms without adding "Debtor-in-Possession" or a similar legend.

### IV. CAUSE EXISTS TO MODIFY THE REQUIREMENTS OF SECTION 345(b) OF THE BANKRUPTCY CODE.

35. The Debtors further request a waiver of the deposit and investment requirements of section 345 of the Bankruptcy Code to the extent any Bank Account does not strictly comply therewith. Section 345(a) of the Bankruptcy Code authorizes a debtor-in-possession to make deposits or investments of estate money in a manner "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit

of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety, "unless the court for cause orders otherwise." *Id*. § 345(b). Alternatively, the debtor may require the entity to deposit governmental securities pursuant to section 9303 of title 31 of the United States Code.[8]

36.     To help debtors comply with section 345(a) of the Bankruptcy Code, the U.S. Trustee has promulgated the U.S. Trustee Guidelines as well as a list of Authorized Depositories at which debtors may maintain bank accounts. Under the U.S. Trustee Guidelines, debtors-in-possession must, among other things, close prepetition bank accounts and open new "debtor-in-possession" operating, payroll, and tax accounts at an Authorized Depository.

37.     To the extent the Cash Management System and the Bank Accounts do not strictly comply with section 345 of the Bankruptcy Code, the Debtors request that they be permitted to maintain their Bank Accounts in accordance with their existing practices, for a 45-day period commencing upon entry of the Interim Order, or otherwise reach agreement with the U.S. Trustee. Congress recognized that strict compliance with the requirements of section 345(b) in large chapter 11 cases such as these is not only unnecessary, but may indeed be inconsistent with section 345(a), which permits a debtor-in-possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause." 140 Cong. Rec. H10767 (daily ed. Oct. 4, 1994) (statement of Rep. Brooks).

---

[8]   Section 9303 of title 31 of the United States Code provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may instead provide an eligible obligation, designated by the Secretary of the Treasury, as an acceptable substitute for a surety bond. *See* 31 U.S.C. § 9303.

38.     Courts may waive compliance with section 345(b) of the Bankruptcy Code, and, ultimately, the U.S. Trustee Guidelines, for "cause."  In evaluating whether "cause" exists, courts have considered a number of factors, including, among others, the (i) sophistication and size of a debtor's business, (ii) the amounts of the investments involved, (iii) bank ratings, (iv) the complexity of the case, (v) the debtor's safeguards for the funds, (vi) the debtor's ability to reorganize in the face of failure of one or more of the financial institutions, (vii) the benefit to the debtor of a waiver of the section 345(b) requirements, (viii) the potential harm to the estate, and (ix) the reasonableness of such a waiver under the circumstances. *See In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

39.     Here, these factors warrant a modification of the requirements of section 345 of the Bankruptcy Code to the extent the Cash Management System does not already comply with its requirements.  The Company relies on a complex, centralized Cash Management System implicating multiple Bank Accounts on a daily basis.  Because the Bank Accounts are vital to the Debtors' Cash Management System, the Debtors submit that requiring the Debtors to transfer these funds to other banks would be unduly burdensome to the Debtors' operations.  Such burdens would be particularly difficult for the Debtors given the heightened demand on the Debtors and their employees caused by COVID-19.  Therefore, the Debtors submit that ample cause exists to waive the U.S. Trustee Guidelines and allow the Debtors to continue to maintain the Bank Accounts.

40.     Courts in this district have routinely granted the same or similar relief as requested in this Motion to chapter 11 debtors.  *See, e.g., In re GNC Holdings, Inc.*, No 20-11662 (KBO) (Bankr. D. Del. June 25, 2020); *In re Paragon Offshore PLC,* No. 16-10383 (CSS) (Bankr. D. Del. April 6, 2016); *In re Verso Corporation,* No. 16-10163 (KG) (Bankr. D. Del. Feb. 23, 2016); *In re The Standard Register Company,* Case No. 15-10541 (BLS) (Bankr. D. Del. Mar. 13, 2015).

41.     For the foregoing reasons, the Court should authorize, but not direct, the Debtors to continue to deposit funds in the Bank Accounts and to the extent that section 345(b)'s requirements are inconsistent with these practices, the Debtors request an initial 45-day period to come into compliance with their obligations under section 345(b) of the Bankruptcy Code or otherwise reach agreement with the U.S. Trustee, without prejudice to the Debtors' right to seek an extension of such period.

## V.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO CONTINUE INTERCOMPANY TRANSACTIONS AND GRANT ADMINISTRATIVE EXPENSE PRIORITY STATUS TO THE RELATED INTERCOMPANY CLAIMS.

42.     The Bankruptcy Code affords debtors-in-possession the freedom to obtain unsecured credit and incur unsecured debt in the ordinary course of business without notice and a hearing.  *See* 11 U.S.C. § 364(a).  The Debtors therefore seek authority, to the extent necessary, to obtain unsecured credit and incur unsecured debt in the ordinary operation of their Cash Management System, including in connection with the Intercompany Transactions.

43.     If the Debtors cannot continue the Intercompany Transactions, their ordinary-course operations would be unnecessarily and severely hindered, and, in the case of the Manager Debtor will be even further jeopardized.  The Manager Debtor's operations are funded entirely by Intercompany Transactions from the Managed SNF Operators.  The Manager Debtor's value is dependent on its ability to provide management services under the Management Agreements.  These Management Agreements are terminable, both for cause or convenience, by the Managed SNF Operators.  Therefore, if the Manager Debtor is unable to continue to engage in Intercompany Transactions, its sole source of income, namely the Management Agreements, will be placed at risk.

44.     Moreover, continuation of the Intercompany Transactions related to the Omnibus Contracts is in the Debtors' best interest.  Allowing the Debtors to engage in Intercompany Transactions related to the Omnibus Contracts permits the Debtors to take advantage of the economies-of-scale afforded by the number of Managed SNF Operators.  Additionally, in some cases, the Managed SNF Operators are jointly and severally liable for the total amount of all obligations under the Omnibus Contracts.  For this reason, the failure by the Debtors to engage in Intercompany Transactions to satisfy obligations under the Omnibus Contracts could lead to the assertion by the counterparties to the Omnibus Contracts of outsized claims against the Debtors, thus diluting recovery to the Debtors' other stakeholders.

45.     Finally, the cessation of the Intercompany Transactions would require an increase in management expenses and overhead, because the Debtors would not be able to consolidate their management and administration.  Indeed, if the Intercompany Transactions cannot continue, the Debtors would be virtually unable to operate their business during the Chapter 11 Cases and the likelihood of a successful reorganization would decrease dramatically.  Avoiding such hindrances by continuing the Intercompany Transactions is, therefore, in the best interests of the estates.

46.     Accordingly, the Debtors request that this Court authorize, but not direct, the Debtors to continue engaging in Intercompany Transactions in the ordinary course of business and in connection with their continued use of the Cash Management System.  As with the Cash Management System, authorizing the Debtors to continue the Intercompany Transactions is appropriate under sections 363(b) or 363(c) of the Bankruptcy Code and is an appropriate exercise of the Court's equitable powers under section 105(a) of the Bankruptcy Code.  *See, e.g.*, *In re Gen. Growth Props.*, 412 B.R. 609, 610 (Bankr. S.D.N.Y. 2009) (authorizing debtors to continue prepetition cash management practices, including intercompany transactions, pursuant to sections

105(a) and 363(c) of the Bankruptcy Code); *In re the Charter Co.*, 778 F.2d 617, 621 (11th Cir. 1985) (indicating that order authorizing continued use of cash management system that involved fund transfers to non-debtor affiliates was "entirely consistent" with section 363(c)(1) because the practice was "usual and customary in the past").

47.     Additionally, pursuant to sections 105(a) and 503(b) of the Bankruptcy Code, the Debtors request that Intercompany Claims incurred in the ordinary course of business, be granted administrative expense priority status.  If the Intercompany Claims are accorded such status, each entity using funds that flow through the Cash Management System will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby protecting the interests of the Debtors' creditors.

48.     Authorization to engage in, and accordance of administrative expense treatment to, intercompany transactions, similar to the relief requested here, is routinely granted in complex chapter 11 cases.  *See, e.g., In re GNC Holdings, Inc.*, No 20-11662 (KBO) (Bankr. D. Del. June 25, 2020); *In re Paragon Offshore PLC,* No. 16-10383 (CSS) (Bankr. D. Del. April 6, 2016); *In re Verso Corp.,* No. 16-10163 (KG) (Bankr. D. Del. Feb. 23, 2016); *In re Samson Res. Corp.,* No. 15-11934 (CSS) (Bankr. D. Del. Sept. 22, 2015).

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

49.     The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  In the context of preliminary injunctions, the Third Circuit has interpreted the language "immediate and irreparable harm" to refer to a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages are inadequate.  *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d

Cir. 1977)).  The harm also must be actual and imminent, not speculative or unsubstantiated.  *See, e.g.*, *Acierno v. New Castle County*, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

50.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## **RESERVATION OF RIGHTS**

51.     Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party-beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

## **NOTICE**

52.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Internal Revenue Service; (c) the Securities and Exchange

Commission; (d) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (e) the Office of the United States Attorney for the District of Delaware; (f) counsel to the proposed DIP Lender; (g) the Banks; (h) all known holders of liens in the Debtors' assets; (i) counsel to the plaintiffs in the case captioned *U.S.A. ex rel. Angela Ruckh v. CMC II, LLC et al.*, and (j) the Debtors' landlords (collectively, the "**Notice Parties**"). As this Motion is seeking "first day" relief, notice of this Motion and any order entered in connection with the Motion will be served on all parties as required by Local Rule 9013-1(m). Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

## <u>NO PRIOR REQUEST</u>

53.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that this Court enter the Interim Order and the Final Order, each substantially in the form annexed hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: March 2, 2021          **CHIPMAN BROWN CICERO & COLE, LLP**
       Wilmington, Delaware

                              */s/ Mark D. Olivere*

                              William E. Chipman, Jr. (No. 3818)
                              Robert A. Weber (No. 4013)
                              Mark L. Desgrosseilliers (No. 4083)
                              Mark D. Olivere (No. 4291)
                              Hercules Plaza
                              1313 North Market Street, Suite 5400
                              Wilmington, Delaware 19801
                              Telephone:    (302) 295-0191
                              Facsimile:    (302) 295-0199
                              Email:        chipman@chipmanbrown.com
                                            weber@chipmanbrown.com
                                            desgross@chipmanbrown.com
                                            olivere@chipmanbrown.com

                              *Proposed Counsel to the Debtors and*
                              *Debtors-In-Possession*