## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CMC II, LLC,[1] | Case No. 21-10461 (xxx) |
| Debtors. | (*Joint Administration Pending*) |

## MOTION OF DEBTORS FOR ENTRY OF
## INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
## TO (A) PAY CERTAIN PREPETITION EMPLOYEE OBLIGATIONS AND
## (B) CONTINUE EMPLOYEE BENEFIT PROGRAMS AND
## (II) GRANTING RELATED RELIEF

CMC II, LLC ("**CMC II**" or the "**Manager Debtor**") and certain of its affiliates, the

debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**" or the

"**Company**"), hereby move (this "**Motion**") this Court for entry of interim and final orders,

substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "**Interim Order**" and

the "**Final Order**," respectively), granting the relief described below.  In support thereof, the

Debtors refer to the contemporaneously filed *Declaration of Paul Rundell in Support of Chapter

11 Petitions and First Day Papers* (the "**First Day Declaration**") and further represent as follows:

### RELIEF REQUESTED

1.     By this Motion, the Debtors respectfully request entry of an Interim Order and a

Final Order under sections 105(a), 363(b), 507(a), 541, 1107(a), and 1108 of title 11 of the United

States Code (the "**Bankruptcy Code**") authorizing, but not directing, the Debtors to:

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: CMC II, LLC (6973), Salus Rehabilitation, LLC (4037), 207 Marshall Drive Operations LLC (8470), 803 Oak Street Operations LLC (3900), Sea Crest Health Care Management, LLC (2940), and Consulate Management Company, LLC (5824).  The address of the Debtors' corporate headquarters is 800 Concourse Parkway South, Maitland, Florida 32751.

(a) pay and/or perform, as applicable, prepetition obligations to current employees (collectively, the "**Employees**"), including accrued prepetition wages, salaries, processing services related thereto, and other cash and non-cash compensation claims, except as otherwise set forth herein (collectively, the "**Employee Claims**");

(b) pay obligations to or on account of independent contractors (collectively, the "**Contractor Claims**");

(c) honor and continue in the ordinary course of business, until further notice, and pay (but not assume) the prepetition amounts associated with the Debtors' employee benefit plans and programs, insurance programs, paid time off, holiday time, and leave policies (collectively, "**Leave Time**"), savings and retirement plans, tuition reimbursement plans, and workers' compensation plans and programs (collectively, the "**Employee Benefit Programs**"), the most significant of which are described below, and to pay all fees and costs in connection therewith, except as otherwise set forth herein (collectively, the "**Employee Benefit Obligations**");

(d) reimburse Employees for prepetition Reimbursable Expenses (as defined below), consisting of out-of-pocket expenses incurred in the ordinary course of business and pay business expenses charged to corporate credit cards; and

(e) pay over to the appropriate parties all prepetition withholdings from Employees (including any union-related withholdings) and payroll-related taxes associated with the Employee Claims and the Employee Benefit Obligations (the "**Employee Withholdings**" and, together with the Employee Claims, the Contractor Claims, the Employee Benefit Obligations, the Reimbursable Expenses, the "**Prepetition Employee Obligations**").

2.     The following chart sets forth the various categories and approximate outstanding amounts of the Prepetition Employee Obligations that the Debtors are seeking authority, but not direction, to pay under this Motion during the period of time following the entry of the Interim Order and prior to entry of the Final Order (the "**Interim Period**"), as well as amounts that the Debtors are seeking to pay after entry of the Final Order.

| CATEGORY | APPROX. AMOUNT SEEKING TO PAY DURING INTERIM PERIOD | APPROX. AMOUNT SEEKING TO PAY ON FINAL BASIS |
|---|---|---|
| Employee Claims | $1,500,000.00 | $1,500,000.00 |
| Contractor Claims | $550,000.00 | $1,300,000.00 |
| Payroll Processing Expenses | $900.00 | $900.00 |
| Corporate Bonus Plans, Spot Awards, Compassion Pay, and Shift Pick-Up Bonuses | $17,000.00 | $17,000.00 |
| Employee Benefit Plans | $21,250.00 | $85,000.00 |
| Workers' Compensation Programs | $12,500.00 | $58,500.00 |
| Reimbursable Expenses | $185,000.00 | $740,000.00 |
| Relocation Expenses | $35,000.00 | $35,000.00 |
| **Total** | **$2,321,650.00** | **$3,736,400.00** |

3.      During the Interim Period, none of the Debtors' Employees will receive payments on account of Prepetition Employee Obligations in excess of the amount entitled to priority under section 507(a)(4) or 507(a)(5) of the Bankruptcy Code, as applicable.

4.      In addition, the Debtors request entry of orders (a) authorizing all applicable banks and other financial institutions (collectively, the "**Banks**"), when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of the Prepetition Employee Obligations, whether such checks or other requests were submitted before, on, or after the Petition Date; (b) authorizing the Banks to rely on the representations of the Debtors as to which checks are subject to this Motion, provided that any such Bank shall not have any liability to any party for relying on such direction and representations by the Debtors; (c) providing that the Banks shall, at the direction of

the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Prepetition Employee Obligations that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and that any such Bank shall not have any liability to any party for relying on such direction by the Debtors; and (d) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts and other forms of payment which may be inadvertently dishonored or rejected.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

6.      The legal predicates for the relief requested herein are sections 105(a), 363(b), 507(a), 541, 1107(a), and 1108 of the Bankruptcy Code, Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

7.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

8.      On March 1, 2021 (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

9.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

10.     To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

11.     The Debtors in these Chapter 11 Cases manage and operate skilled nursing facilities ("**SNFs**"), providing a variety of services to mostly elderly residents that include short-term rehabilitation, comprehensive post-acute care, long-term care, and physical, occupational, and speech therapies.  Debtor CMC II provides management and support services to approximately 140 SNFs, each of which is operated by an affiliate of the Debtors (such SNFs, the "**Managed SNFs**", and such operators, the "**Managed SNF Operators**") under the common ownership of non-Debtor LaVie Care Centers, LLC ("**LVCC**"), doing business as Consulate Health Care.  Two of the Managed SNF Operators are Debtors in these Chapter 11 Cases: 207 Marshall Drive Operations LLC ("**Marshall**") and 803 Oak Street Operations LLC ("**Governor's Creek**" and, together with Marshall, the "**Operator Debtors**"). Each of the Operator Debtors operates a 120-bed SNF located in Northern Florida.  The remaining Debtors, Salus Rehabilitation, LLC, Sea Crest Health Care Management, LLC, and Consulate Management Company, LLC, are no longer operational but historically provided rehabilitation and management services, respectively.

12.     Additional factual background regarding the Company's business operations, corporate and capital structures, and restructuring efforts are described in greater detail in the First Day Declaration, which is incorporated in this Motion by reference.

## THE DEBTORS' WORKFORCE AND RELATED OBLIGATIONS

### I.     THE DEBTORS' WORKFORCE.

#### A.     Employees

13.     As of the Petition Date, the Debtors employ approximately 654 Employees that can generally be separated into two categories: employees of the Operator Debtors (the "**Operator Employees**") and employees of the Manager Debtor (the "**Manager Employees**"[2] and, together with the Operator Employees, collectively, the "**Employees**").  The Operator Employees are employed by the applicable Operator Debtor and provide services at the SNF owned by the respective Operator Debtor.  The Operator Employees' responsibilities are largely (approximately 80%) nursing and nursing administration, but also include local administration, social services and activities, and facility maintenance.  There are approximately 170 Operator Employees, consisting of 137 full-time Employees, 30 part-time Employees, and 3 Employees who work for the Debtors on an as-needed or *pro re nata* ("**PRN**") basis.

14.     The Manager Employees are employed by the Manager Debtor.  The services performed for the Manager Debtor relate to the management of the Managed SNFs, including the two SNFs operated by the Operator Debtors.  The Manager Employees' responsibilities include clinical and regulatory support, marketing, operations, IT services, human resources, finance and accounting, general management, and executive leadership.  As described in further detail in the

---

[2]   While the Manager Employees are, overwhelmingly, employed by the Manager (as defined below), two of the Employees of each Operator Debtor (the Executive Director and the Director of Clinical Services) receive many of the same benefits as the Employees of the Manager.  Thus, for the purposes of this Motion and the Orders, these Employees are considered Manager Employees, despite being employed by the respective Operator Debtor.

First Day Declaration, the costs of funding the Prepetition Employee Obligations owed to the Manager Employees is shared among the various Managed SNFs through the payment of management fees by the Managed SNF Operators to the Manager Debtor.[3]    There are approximately 484 Manager Employees, consisting of 477 full-time Employees, 3 part-time Employees, and 4 PRN Employees. The Manager Employees are employed in Florida, Alabama, Arkansas, California, Georgia, Kentucky, Louisiana, Maryland, Mississippi, Minnesota, North Carolina, Ohio, Pennsylvania, South Carolina, Virginia, Tennessee, and West Virginia.

15.    The Debtors pay salaries to approximately 355 of their Employees (including 347 Manager Employees and 8 Operator Employees), and pay hourly wages to approximately 299 Employees (including 137 Manager Employees and 162 Operator Employees).[4]

16.    Of the 170 Operator Employees, 43 Operator Employees employed by Debtor Marshall are members of the United Food & Commercial Workers Union, Local 1625 (such Employees, the "**Union Employees**").[5] The Union Employees include certified nursing assistants, restorative aides, activity aides, and drivers.  The Union Employees' relationship with Marshall is governed by that certain collective bargaining agreement (the "**Collective Bargaining Agreement**") dated July 1, 2020 and expiring on June 30, 2023.  The Collective Bargaining

---

[3]    Additional information on the calculation of these fees can be found in the Debtors' Cash Management Motion (*as defined herein*).

[4]    Operator Employees who are paid hourly wages are entitled to "Report Pay."  The Operator Debtors' Report Pay program provides a minimum of two hours of wages to any Employee who is scheduled to work or is called in to work, but is sent home before working two hours because of changes to conditions requiring fewer staff (such as a decline in resident census).  For example, if an Operator Employee is scheduled to work from 3:00 p.m. to 11:00 p.m., begins work at 3:00 p.m., and is dismissed at 4:45 p.m., the Operator Employee will receive two hours of wages.  If the same Operator Employee is dismissed at 6:00 p.m., the Operator Employee will receive three hours of wages, and will not receive additional Report Pay.

[5]    Various Employee Obligations described herein vary depending on whether or not an Employee is a Union Employee.  As such, Employees who are not Union Employees are, in certain instances, described as "Non-Union Employees."

Agreement specifically excludes from Union Employees registered nurses and licensed practical nurses as well as housekeeping employees, guards, and supervisors.

17.    Given the service-intensive nature of the senior care industry in which the Debtors operate and the importance of recruiting new residents and maintaining current residents, the Debtors' Employees are the lifeblood of the Company.  The Debtors' Employees are directly involved in providing services to members of the senior community, including those needing assisted living services, memory care, and hospice care.  Further, the Debtors' Employees have been particularly vital given the ongoing COVID-19 pandemic, during which they have been going above and beyond their typical roles to do everything possible to ensure the health and well-being of the Company's residents, most of whom are in a particularly high-risk population with respect to the COVID-19 pandemic, given its disproportionate effects on individuals of advanced age. Now, more than ever, maintaining Employee morale is of paramount importance to the Company's continued ability to provide the highest-quality service, care, and living accommodations for residents without interruption or compromises in safety.

**B.**    **Contractors**

18.    In addition to the Employees, the Debtors also use the services of a variety of individuals and firms engaged by the Company through various agreements as contractors, consultants, and third-party service providers (collectively, the "**Contractors**").  In all, the Company has relationships with approximately 11 Contractors.  The Contractors serve a variety of necessary functions for the Debtors, including health rehabilitation services, dietary, housekeeping and laundry services, medical oversight, administrative services, and temporary IT services.

19.     With respect to the Operator Debtors, Contractors consist mostly of parties who provide rehabilitation services, dietary, housekeeping, and laundry services, with the cost of such services fluctuating based on changes in resident census and corresponding utilization levels.  Due to fluctuations in resident volume with respect to the services provided by Contractors, it is not cost-effective for the Debtors to commit salary or guarantee hours to individual Employees.  Utilizing the Contractors—who do not have a fixed salary or schedule—permits the Debtors to match the availability of Contractors with demand for their services.  Other Contractors provide more specialized services, such as executive consulting, temporary IT services, or medical direction.  Given the value that Contractors provide to the Debtors' business operations, and the essential nature of their services, the Debtors believe it is important to maintain existing arrangements with the Contractors.

20.     As noted above, the role of the Contractors is of particular import given the ongoing COVID-19 pandemic.  The COVID-19 pandemic has resulted in the Debtors needing more skilled staff to provide care to residents at its SNFs and adhere to heightened safety measures.  Further, continuity of care is essential to the health and welfare of the residents at the SNFs, particularly in light of COVID-19 pandemic.  To continue providing the highest-quality service and care for residents during these Chapter 11 Cases, the Debtors must be able to use Contractors to continue to fill these sometimes unpredictable vacancies and increased staffing needs.  The Debtors submit that, without the flexibility to retain Contactors as needed at their SNFs, the health, safety, and well-being of residents may suffer.

II.     **THE DEBTORS' EMPLOYEE COMPENSATION PROGRAMS**

   A.      <u>**Wages and Salaries**</u>

   21.     Consistent with industry practice, the Debtors pay their Employees' salaries, wages, and other compensation for their services.  The Manager Employees and the Operator Employees are paid once every two weeks; however, there are different pay days for Operator Employees and Manager Employees.  In total, the average payroll for the Debtors' Employees is approximately $2,100,000 per two-week pay period, including payroll taxes.

   22.     The Debtors made their most recent payroll with respect to certain Employees on February 18, 2021 for Manager Employees and on February 11, 2021 for Operator Employees. The Debtors estimate that, as of the Petition Date, approximately $1,500,000.00 is owed and outstanding on account of accrued and unpaid wages, salaries, and related payroll taxes and withholdings all of which will come due in the interim period.  The first postpetition payday for Manager Employees will be March 4, 2021 and the first postpetition payday for Operator Employees will be March 11, 2021.

   23.     In addition, the Debtors estimate that in the second half of 2020, they spent approximately $370,000.00 per month paying Contractors at the Operator Debtors, and approximately $12,500.00 per month paying Contractors hired by CMC II.  As of the Petition Date, the Debtors estimate that they owe a total of approximately $790,000.00 to the Contractors. This Debtors anticipate that $450,000.00 of this amount will be due and payable in the Interim Period.

   24.     The Debtors' calculate, track and process their payroll internally, and transmit the information to Automatic Data Processing, Inc. or ADP (the "**Payroll Processor**") to administer and pay their payroll.  As of the Petition Date, the Debtors estimate they owe approximately

$900.00 to the Payroll Processor in payroll processing expenses (the "**Payroll Processing Expenses**").

25.     The Debtors request authorization, but not direction, to pay any Employee Claims and Contractor Claims up to the priority cap pursuant to the Interim Order, and, pursuant to the Final Order, to pay such claims in the ordinary course of business, including any amounts that were not paid under the Interim Order on account of the priority cap, if any.[6]  The Debtors further request authority to pay, in their sole discretion, any prepetition amounts owing with respect to the Payroll Processing Expenses and to continue paying the Payroll Processing Expenses in the ordinary course of business.

### B.     Other Cash and Non-Cash Compensation

#### (i)     *Overtime*

26.     As of the Petition Date, approximately 162 of the Debtors' Employees, who are classified as non-exempt Employees, are eligible to earn overtime.[7]  Such Employees earn overtime at one and one-half times the regular rate of pay, unless otherwise required by applicable state law, if they work more than 40 hours in a work week (or, if applicable, more than eight hours per day or 80 hours per 14-day period).  As a general matter, such overtime is typically preapproved by a supervisor.  During the fourth quarter of 2020, the Debtors spent approximately $97,500.00 per month on overtime wages.

27.     The Debtors' Employees who work overtime are often healthcare personnel such as nurses and therapists who do so to maintain the quality and continuity of care for residents and

---

[6]    As provided in the proposed Interim Order, the Debtors seek the authority, but not direction, to pay only those portions of the Contractor Claims related to services.  The Debtors are requesting breakdowns from applicable Contractors of any invoice containing costs for goods, which the Debtors will share with the U.S. Trustee prior to issuing any payment.

[7]    The remainder of the Debtors' Employees, who are classified as exempt Employees, are not eligible to receive overtime compensation, except for the Shift Pick-Up Bonuses described (and defined) herein.

help ensure the Debtors' compliance with applicable staffing regulations.  Paying overtime to

Employees also avoids the added expense of hiring staffing agencies.  Maintaining the Debtors'

ability to provide overtime to Employees is especially important given the COVID-19 pandemic

that has given rise to the need for heightened levels of care and safety measures.

### (ii)  *Corporate Bonus Plans*

28.    The Debtors have historically maintained a number of annual and quarterly bonus

plans and programs for certain Employees (the "**Corporate Bonus Plans**").  Approximately 88

Employees are eligible to participate in the discretionary Corporate Bonus Plans.  Payments under

the Corporate Bonus Plans are typically paid based on metrics that reflect a combination of

individual and Company-wide performance.  Generally, payment under certain of the Corporate

Bonus Plans is contingent upon the ability of the applicable Managed SNFs to generate sufficient

cash flow to support payment of the amounts under the Corporate Bonus Plans.

29.    The criteria for the Corporate Bonus Plans vary on a position-by-position basis.  A

non-exhaustive summary of the criteria for certain Corporate Bonus Plans is below:

(a)    **Regional Director of Business Development**: Certain regional directors of
business development may be eligible for a bonus of up to $2,000 per month, in the event that the
SNFs they serve achieve over 101% of budgeted census and Medicare reimbursement.

(b)    **Care Liaisons and Business Development Coordinators:** Certain care liaisons
and business development coordinators may be eligible for bonuses, which, depending on the
position, are based on total census, Medicare census, and/or achievements of other business
development metrics (as applicable).

(c)    **Regional Vice President of Operations**: The Debtors' regional vice presidents of
operations may be eligible for a bonus of up to 20% of such Employee's salary if the SNFs they
serve meet certain health and safety, EBITDAR[8], and Employee turnover targets.

---

[8]    "**EBITDAR**" means earnings before interest, taxes, depreciation, amortization and rent (or rent-adjusted
EBITDA).  EBITDAR is a metric that is common in the skilled nursing industry.

(d)     **Division Vice President of Business Development**: The Debtors' division vice presidents of business development may be eligible for a bonus of up to $2,500 per month, if the SNFs they serve meet certain health and safety and business development targets.

(e)     **Executive Director and Director of Nursing**: The Debtors' executive directors and directors of nursing may be eligible for a bonus of up to 20% of such Employee's salary, if the SNFs they serve meet certain health and safety, EBITDAR, and Employee turnover targets.

30.     Many of the Debtors' bonus programs have performance targets that are calculated monthly, but all bonuses are either paid on a quarterly or annual basis.  In addition, as part of the Corporate Bonus Plans, the Debtors' senior management team that is employed by the Manager Debtor may be eligible for non-discretionary bonuses ranging from 30% to 60% of their annual salaries that are intrinsically tied to various performance and business metrics linked to (and impacted by) their respective positions.  The Company also pays annual discretionary bonuses to non-insider Manager Employees based on the performance of the individual Employee and the Debtors.  Such bonuses are paid on an annual basis after the close of the calendar year following substantial completion of the Debtors' annual audit of their financial statements.  Quarterly bonuses are typically paid within 45 days of the end of the quarter.

31.     The Debtors' Corporate Bonus Plans are critical to the Debtors' financial well-being and ability to provide quality and safe services to their residents.  The Debtors' Corporate Bonus Plans incentivize those Employees responsible for the financial success and safety record by linking compensation to achievement of related metrics.  Employees who participate in the Debtors' Corporate Bonus Plans consider bonuses part of their compensation packages, and, as such, the Debtors' Corporate Bonus Plans are critical to their ability to retain and attract key talent. The Debtors believe that the Corporate Bonus Plans are reflective of industry standards.

32.     Between December of 2020 and February of 2021, the Debtors paid an average of $515,000.00 per month under the Corporate Bonus Plans—$320,000.00 to insiders and $185,000.00 to non-insiders.  The Debtors estimate that under the Corporate Bonus Plans,

approximately $2,000.00 would be payable to a single executive director approximately 45-days from the end of the First Quarter.  The Debtors seek authorization, but not direction, to pay any quarterly bonus Corporate Bonus Plans as they come due in the ordinary course of business, regardless of whether such amounts arose prepetition or postpetition.

### (iii)    *Spot Awards, Compassion Pay and Shift Pick-Up Bonuses*

33.    The Operator Debtors have also historically awarded discretionary bonuses to non-insider Employees who exhibit exceptional performance (the "**Spot Awards**").  The Spot Awards typically range from $50 to $1,500 per grant, although the amount of the Spot Awards can be higher in instances of an Employee's extraordinary effort.  The Spot Awards include, for instance, a $225 payment for perfect attendance, or a $100 payment for picking up open shifts.  The Spot Awards are awarded on an *ad hoc* basis, based on performance of certain tasks.  In addition to the Spot Awards, in light of the increased demands placed on the Operator Debtors' employees by the outbreak of COVID-19, the Operator Debtors have adopted a policy of increasing hourly Employees' wages by $3 per hour worked, for Operator Employees in COVID-19 active environments (such pay increase, "**Compassion Pay**").[9]  The Debtors believe that the Compassion Pay is reasonable in light of the increased demand and stress placed on the Operator Employees by the COVID-19 pandemic.  Compassion Pay was instituted at Governor's Creek from April 16, 2020 to August 19, 2020.

34.    Additionally, the Operator Debtors typically offer certain of their nurse Employees a bonus for picking up additional shifts (the "**Shift Pick-Up Bonuses**") above their 40-hour work week.  The amount of the Shift Pick-Up Bonus depends on the length of the shift that is picked up:

---

[9]    The Compassion Pay program is instituted when at least one resident at a care center is diagnosed with COVID-19.  If implemented, all hourly employees in the care center will be eligible for the Compassion Pay bonus on every hour worked.

with nurses receiving $250 for each shift picked up that is six or more hours and $125 for each shift picked up that is greater than 2 hours and fewer than six hours.  The Shift Pick-Up Bonuses are reasonable and necessary to incentivize the Operator Debtors' nurse Employees, and help to ensure that the Debtors' SNF residents— many of whom require nearly constant assistance to be able to live fulfilling lives—are provided continuous care.

35.     The Spot Awards and Shift Pick-Up Bonuses are paid during the next payroll date following the decision to award any such Spot Award or Shift Pick-Up Bonus.  During the fourth quarter of 2020, the Company paid approximately $35,000.00 in Spot Awards.  There were no payments or accruals during the quarter for Compassion Pay or Shift Pick-Up Bonuses.

36.     As of the Petition Date, the Debtors estimate that there are approximately $15,000.00 in liabilities owed under the Spot Awards that will become due within the first 21-days of these cases.  By this Motion, the Debtors request authority to make any payments and remittances for amounts attributable to the prepetition period and related to the Spot Awards, Compassion Pay, and Shift Pick-Up Bonuses up to $15,000.00, and to continue such programs in the ordinary course of business and in their sole discretion.

**(iv)     *Paid Time Off, Holiday, Leaves of Absence, and Business Expenses***

37.     In addition to the foregoing, the Debtors offer their Employees other forms of compensation, including paid time off, paid holidays, other time off, and reimbursement of certain business expenses.  These forms of compensation are usual, customary, and necessary for the Debtors to retain qualified employees during the reorganization process, particularly given the challenging environment caused by the COVID-19 pandemic.  Without these forms of compensation, Employee morale would suffer, which could directly have a negative impact on the health and well-being of residents.

38.     All full-time Employees are eligible to receive paid time off ("**PTO**").  PTO accrual

varies by Employee type and years of service.  PTO accruals begin after the successful completion

of 90 days of employment, and, except as noted below, are calculated using a 40-hour work week

and 2,080 work year.  A summary of PTO accrual is set forth in the tables below:

| Operator Employees (Non-Union Employees) | | | | | | |
|---|---|---|---|---|---|---|
| | Vacation Accrual / Year | | Sick Leave Accrual / Year | | Total PTO Accrual / Year | |
| Years of Service | *Vacation Hours* | *Vacation Days* | *Sick Leave Hours* | *Sick Leave Days* | *Total PTO Hours* | *Total PTO Days* |
| 0 – 1 Year | 72 | 9 | 24 | 3 | 96 | 12 |
| 1 – 5 Years | 80 | 10 | 40 | 5 | 120 | 15 |
| Over 5 Years | 120 | 15 | 40 | 5 | 160 | 20 |

| Manager Employees (Non-Exempt / Non-Union Employees) | | | | | | |
|---|---|---|---|---|---|---|
| | Vacation Accrual / Year | | Sick Leave Accrual / Year | | Total PTO Accrual / Year | |
| Years of Service | *Vacation Hours* | *Vacation Days* | *Sick Leave Hours* | *Sick Leave Days* | *Total PTO Hours* | *Total PTO Days* |
| 0 – 1 Year | 80 | 10 | 24 | 3 | 96 | 13 |
| 1 – 5 Years | 80 | 10 | 40 | 5 | 120 | 15 |
| Over 5 Years | 120 | 15 | 40 | 5 | 160 | 20 |

| Operator Employees (Union Employees) | | | | |
|---|---|---|---|---|
| | 8 Hour / Day or 2,040 Hours / Year PTO Accrual / Year | | 7.5 Hour / Day or 1,912.5 Hours / Year PTO Accrual / Year | |
| Years of Service | *PTO Hours* | *PTO Days* | *PTO Hours* | *PTO Days* |
| 0 – 1 Years | 72 | 9 | 67.5 | 9 |
| 1 – 5 Years | 176 | 22 | 165 | 22 |
| 5 – 10 Years | 208 | 26 | 195 | 26 |
| 10 or More Years | 248 | 31 | 232.5 | 31 |

39.     Non-Union Employees (except for exempt Manager Employees, as described

below) can carry over unused PTO from year to year, but PTO banks are capped at a maximum of

120 PTO hours.  In light of the COVID-19 pandemic, the Debtors have temporarily suspended this

cap on unused PTO.  Except as required by applicable law, accrued PTO is not paid out upon

termination of a Non-Union Employee.  Union Employees can carry over up to either 375 (for

Employees having 7.5 paid hours per day) or 400 (for Employees having 8 paid hours per day) total PTO hours.  Union Employees' PTO is paid out upon resignation at the following levels:

| Years of Continuous Full-Time Service | Percentage of PTO Paid at Resignation |
|---|---|
| Less than 2 years | 0% |
| 2 or more years and fewer than 11 years | 60% |
| 11 years or more | 80% |

40.    The PTO of exempt Manager Employees is governed by the Company's work-life balance program (the "**WLBP**").  PTO accruing under the WLBP does not accrue and is considered unlimited, although there are limitations on how much PTO a Manager Employee can use at any given time.  Because PTO under the WLBP is considered "unlimited," it does not roll over and there is no payout of this PTO.

41.    Employees accrue and use PTO constantly, making it difficult to quantify the potential cost of accrued PTO as of the Petition Date.  However, no Employee has more than $6,500.00 worth of accrued PTO as of the Petition Date, and the average Employee has approximately $1,100.00 worth of accrued PTO as of the Petition Date.

42.    The Debtors provide holiday time ("**Holiday Time**") in accordance with an approved holiday schedule.  The Debtors have designated six holidays during calendar year 2020 consistent with their historical practice.  The Company does not pay out amounts for unused Holiday Time.

43.    The Debtors also provide Employees with various other forms of paid and unpaid leaves of absence, including jury duty leave, bereavement and funeral leave, military leave, medical leave, and family leave.  While the Debtors pay wages and salaries for certain of these

leaves of absence, these leave programs do not give rise to any additional payment obligations by the Debtors.

44.     By this Motion, the Debtors seek authority to continue to their leave and time off policies in the ordinary course of business after the Petition Date, including honoring all prepetition PTO liabilities to their Employees.  The Debtors anticipate that their Employees will use their PTO in the ordinary course of business, which should result in the Debtors having to make no material cash flow adjustments to their normal payroll obligations.

## III.   EMPLOYEE BENEFIT PLANS.

45.     The Debtors provide benefit packages to eligible Employees, including, *inter alia*, medical plans, dental plans, a vision plan, and life insurance plans, AD&D, disability insurance plans, and savings and retirement plans, which are described in more detail below.  Eligibility to participate in these benefit plans generally requires that an Employee be regularly scheduled to work at least 20 hours per week.  Certain of the programs described below are available only for full-time Employees.

### A.   Medical Plans

46.     The Debtors provide their Employees with medical benefits pursuant to three different medical plans through Benefit Administrative Systems ("**BAS**").  Full-time Union Employees are eligible to participate in the BAS HDHP Plan (the "**HDHP Plan**").  Non-Union full-time Operator Employees are eligible to participate in either the HDHP Plan or the BAS MEC Plan ("**MEC Plan**")[10], which provides certain essential health coverage.  In addition, full-time Manager Employees are eligible to participate in either the HDHP Plan or the BAS HSA Plan (the "**HSA Plan**" and, together with the HDHP Plan and the MEC Plan, the "**Medical Plans**").  As of

---

[10]   Part-time Operator Employees are also eligible to participate in the MEC Plan.

the Petition Date, approximately 414 Employees have elected coverage under the Medical Plans, with 320 Employees covered by the HDHP Plan, 86 Employees covered by the HSA Plan, and 8 Employees electing coverage under the MEC Plan. The Debtors self-insure the Medical Plans.

47.    The Medical Plans are funded through contributions by participating Employees and by the Debtors. The Debtors pride themselves on providing quality healthcare coverage to their Employees, and, as such, the Debtors fund up to approximately 72% of the cost of the Medical Plans for full-time Employees.[11]  Employees contribute to the Medical Plans through payroll deductions to pay for the balance of the Medical Plan cost. The Debtors collect Employee contributions as a prorated amount each payroll period. The total cost of the Medical Plans to the Debtors was approximately $835,000.00 for the fourth quarter of 2020. For 2021, the Debtors estimate that the total annual cost of the Medical Plans will be approximately $3,020,000.00.

48.    As of the Petition Date, the Debtors estimate that there are approximately $750,000.00 in liabilities owed under the Medical Plans for first quarter of 2021. By this Motion, the Debtors request authority to make any payments and remittances for amounts attributable to the prepetition period and related to the Medical Plans, including administrative fees, in the ordinary course of business and in their sole discretion.

**B.    Dental and Vision Plan**

49.    The Debtors also offer eligible Employees dental benefits pursuant to two separate dental plans (the "**Dental Plans**") through the Unum Group ("**Unum**"). The Dental Plans are the basic dental plan (the "**Basic Dental Plan**"), which includes coverage for ordinary dental services and the advanced dental and orthodontia plan (the "**Advanced Dental Plan**"), which, in addition

---

[11]    The percentage of the cost of the Medical Plans covered by the Debtors depends on multiple factors, including the Medical Plan selected, the type and union status of a particular Employee, whether an Employee is a tobacco user, and whether an Employee has elected Health Plan coverage for their spouse and/or children.

to the services covered by the Basic Dental Plan, covers crowns, implants, and orthodontia services. As of the Petition Date, approximately 425 Employees have elected coverage under the Dental Plans, with approximately 144 Employees electing coverage under the Basic Dental Plan and 281 Employees electing coverage under the Advanced Dental Plan.

50.     The Debtors also offer their Employees vision benefits pursuant to a vision plan (the "**Vision Plan**") through EyeMed, which provides coverage for eye examinations, glasses and contact lenses. As of the Petition Date, approximately 371 Employees participate in the Vision Plan.

51.     The Dental Plans and the Vision Plan are funded entirely through contributions by participating Employees. Employee contributions are collected through payroll deductions each pay period, and the Debtors believe that such funds may constitute monies held in trust and therefore may not be property of the Debtors' bankruptcy estates.[12] Thus, the Debtors believe they have authority to direct such funds to the appropriate parties, including by making payments or remittances for amounts attributable to the prepetition period and relating to the Dental Plans and Vision Plan, including administrative fees, in the ordinary course of business and in their sole discretion. Nonetheless, out of an abundance of caution, the Debtors request authority to make such payments and remittances by this Motion.

C.     **Additional Medical Benefits**

52.     The Debtors provide Employees who participate in the HSA Plan the opportunity to use tax-advantaged healthcare spending accounts ("**HSA**"), administered through Optum Bank ("**Optum Bank**"). The HSA allows Employees to use pre-tax dollars towards the payment of medical prescription, dental, and vision expenses. Dollars in each Employee's HSA accounts can

---

[12]   The total annual payments made with respect to the Dental Plans in 2020 was approximately $210,000.00, and the total annual payments made with respect to the Vision Plan in 2020 was approximately $45,000.00.

be rolled over year-after-year and are not forfeited at year's end.  The Debtors have historically not made any matching contributions under the HSA.  As of the Petition Date, the Debtors estimate that no prepetition amounts are owed to Employees or Optum Bank under the HSA.  The Debtors seek authority to pay administrative fees and continue the HSA program in the ordinary course of business.

        D.      **Life, AD&D, and Disability Insurance**

53.      The Debtors provide eligible Employees with, or, in some cases, give Employees the option of purchasing, certain types of life and disability insurance, including basic life, accidental death and dismemberment, short-term disability insurance, long-term disability insurance, supplemental life, and related programs (collectively, the "**Other Insurance Plans**") pursuant to policies issued by Unum.

54.      The Debtors provide each full-time Employee accidental death and dismemberment insurance ("**Basic Life and AD&D Insurance**") through Unum.  Generally, such Employees receive Basic Life and AD&D Insurance coverage in the amount of $10,000 for Operator Employees and one times annual salary for Manager Employees.  If a participating Employee dies as the result of an accident, his or her beneficiary will receive this amount.  The Debtors cover the full cost of the Basic Life and AD&D Insurance.

55.      The Debtors also provide each full-time Manager Employee with long-term disability coverage ("**Long-Term Disability**") through Unum.  Long-Term Disability covers disabilities lasting longer than 180 days.  The Debtors' Long-Term Disability Plan, which is fully funded by the Debtors in the case of the Manager Employees, provides 60% of an eligible Employee's salary, up to $7,000 per month.  Full-time Operator Employees are also eligible to participate in the Long-Term Disability Plan at the Employee's expense.

56.     Eligible Employees may elect to obtain certain types of supplemental life and AD&D insurance coverage for themselves and their spouses and dependents ("**Supplemental Life and AD&D Insurance**") at their own expense through Unum.  In particular, at their own expense, eligible Employees may obtain Supplemental Life and AD&D Insurance coverage for themselves of up to $500,000.  Employees who elect Supplemental Life and AD&D Insurance coverage for themselves may also obtain, at their own expense, coverage of up to $250,000 for their spouse and up to $10,000 per child.  Eligible Employees may also obtain other supplemental insurance, including permanent life insurance, critical illness insurance, accident insurance, hospital indemnity programs, home and auto insurance, and legal insurance (collectively, the "**Miscellaneous Insurance Programs**").  Premiums under the Miscellaneous Insurance Programs are funded entirely by Employee contributions.

57.     The Debtors pay a portion of the aggregate cost of the Basic Life and AD&D Insurance, and Long-Term Disability, with the remaining cost being borne by Employees who elect such coverage.  The Debtors pay approximately $7,800.00 per month to Unum on account of the Basic Life and AD&D Insurance and Long-Term Disability.  As of the Petition Date, the Debtors estimate that there is approximately $7,800.00 in outstanding obligations under the Basic Life and AD&D Insurance and the Long-Term Disability Insurance.  By this Motion, the Debtors seek authority to make all payments or remittances for amounts attributable to the prepetition period and relating to the Other Insurance Plans, including administrative fees, in the ordinary course of business and in their sole discretion and to continue the Other Insurance Plans in the ordinary course of business postpetition.

E.    **Savings and Retirement Plans**

58.    The Debtors offer Employees a savings and retirement plan.    Specifically, Employees each year may contribute pre-tax or post-tax compensation, consistent with IRS regulations, for investment in a 401(k) plan (the "**401(k) Plan**").  The 401(k) Plan is administered by Blue Star Retirement Services, Inc. ("**Blue Star**").  The Debtors do not make any matching contributions under the 401(k) Plan.  Blue Star withholds funds for the approximately 128 Employees participating in the 401(k) Plan.

59.    By this Motion, the Debtors seek authority, but not direction, to continue the 401(k) Plan in the ordinary course of business and pay any amounts due thereunder.

F.    **Workers' Compensation**

60.    As required under the laws of the various jurisdictions in which they operate and maintain offices, the Debtors maintain a number of different policies and programs to provide Employees with workers' compensation benefits (the "**Workers' Compensation Programs**") in all such jurisdictions.  The workers' compensation benefits provided by the Debtors are covered under a large-deductible workers' compensation plan insured by XL Specialty Insurance Company ("**XL**").  The Workers' Compensation Programs are primarily administered by Alternative Service Concepts, LLC ("**ASC**") which pays under-deductible claims from an escrow account that is replenished by the Debtors on a monthly basis (the "**Claims**").[13]  The Debtors, on average pay approximately $12,500.00 of Claims each month and anticipate approximately $58,500.00 in Claims will be paid during the anticipated duration of the Chapter 11 Cases.  The Debtors also pay

---

[13]    Non-Debtor LVCC provides a letter of credit in support of the Workers' Compensation Programs of the Debtors, as well as similar programs for the other non-Debtor Managed SNF Operators. This letter of credit is funded by LVCC and held at CIBC Bank. As of the Petition Date, the amount of this letter of credit is approximately $675,000.

ASC a monthly administrative fee of approximately $350.00 of which approximately $350.00 remains unpaid.

61.     The Debtors must maintain workers' compensation insurance to legally operate their businesses.  Accordingly, the Debtors seek authority, but not direction, to continue paying all obligations under the Workers' Compensation Programs as they become due in the ordinary course of the Debtors' business, regardless of whether the claim arose prepetition.

G.     **Tuition Reimbursement**

62.     The Debtors provide a tuition reimbursement program (the "**Tuition Reimbursement Program**") to eligible full-time Employees to assist Employees with the cost of completing courses or programs through accredited educational institutions at the vocational/technical or college level.  In order to be eligible, an Employee must have completed six months of continuous satisfactory service.  Participating Employees must maintain a "C" average in the course or courses, and the course or courses must be related to the Employee's present position, or a position for which the Employee could reasonably be expected to qualify. The Debtors reimburse 75% of the tuition costs for successfully completed qualifying courses, up to $1,000 annually.

63.     The Debtors estimate that, as of the Petition Date, there were no outstanding obligations under the Tuition Reimbursement Program.  By this Motion, the Debtors seek authority to continue the Tuition Reimbursement Program postpetition in the ordinary course.

H.     **Relocation Reimbursement, Sign-On, and Referral**

64.     The Debtors, from time-to-time and in their discretion, elect to reimburse eligible full-time Employees for the cost of relocation.  In order to be eligible, the Employee must satisfy both duration of service and proximity of location requirements.  In addition, if the Employee

voluntarily leaves the Company within 24 months of the hiring or transfer giving rise to the relocation reimbursement, the Employee must repay all or a portion of the reimbursed expenses.

65.     Under this program, the Employee generally pays for his/her relocation expenses, and then submits a form to the Debtors, and the Debtors reimburse the Employee at the Debtors' discretion.  The Debtors estimate that, as of the Petition Date, there were $35,000.00 in outstanding reimbursable relocation expenses.

66.     In addition, the Operator Debtors provide certain sign-on and referral payments upon certain Employees starting work at an Operator Debtor, or for referring an eligible Employee to work at an Operator Debtor.  These payments vary depending on the role that the applicable Employee will play at the Operator Debtor, and range from $250 to $1,000.  In the fourth quarter of 2020, the Operators made approximately $10,000.00 in sign-on and referral payments.

67.     By this Motion, the Debtors seek authority, but not direction, to pay any such prepetition obligations, and to continue the relocation reimbursement program postpetition in the ordinary course.

## IV.   REIMBURSABLE EXPENSES.

68.     The Debtors routinely reimburse Employees for travel, meals, and other business expenses (collectively, the "**Reimbursable Expenses**").  There are currently approximately 23 active corporate credit cards held by Employees through a credit card program with Elan Financial Services ("**Elan**"), which credit cards are used to pay for certain Reimbursable Expenses.  Amounts charged to the corporate credit cards are subject to a weekly review and approval process.  The Debtors pay approximately $100,000 directly each month on the corporate credit card program.   Employees may also incur out-of-pocket Reimbursable Expenses and seek

reimbursement for their Reimbursable Expenses from the Debtors.  Accordingly, Employees incur Reimbursable Expenses with the expectation that they will be reimbursed by the Debtors.

69.     Charges, credits, and payments for Reimbursable Expenses are administered by the Debtors, and flow through Concur ("**Concur**").  An Employee must submit expense reports through Concur, which are approved by the Employee's manager through a workflow enabled by Concur.  The Debtors do not reimburse Employees for Reimbursable Expenses until a manager has approved such Reimbursable Expenses.  Following such approval, the Debtors reimburse Employees directly through their ordinary payroll system.

70.     The Debtors need to be able to pay out amounts on account of the Reimbursable Expenses to avoid disruption to the Company's business operations.  The Debtors' Employees cannot be expected to undertake personal financial expenditures on the Company's behalf without the expectation of reimbursement.  Because the Debtors' business necessitates Employees occasionally spending money on the Debtors' behalf, the Debtors must be able to provide the appropriate remuneration.  Moreover, the Reimbursable Expenses represent a relatively minimal cost to the Debtors' estates in light of the overall benefits achieved.

71.     Certain prepetition Reimbursable Expenses may not have been reimbursed as of the Petition Date because, among other reasons, Employees had not yet submitted a request for reimbursement or approval of an expense report was still pending.  Thus, as is customary, there may be a lag time between the time expenses are incurred and the time expenses are reimbursed and, as such, it is difficult for the Debtors to determine with precision the actual amount of incurred, but not reported, Reimbursable Expenses as of any particular time.  The average aggregate monthly amount paid out by the Debtors for Reimbursable Expenses varies and can be up to $185,000.00.

72.     By this Motion, the Debtors seek authority, but not direction, to reimburse all Reimbursable Expenses accrued and outstanding as of the Petition Date in their sole discretion and to continue paying the Reimbursable Expenses as they accrue in the ordinary course of business in their sole discretion.

## V.     SOCIAL SECURITY, INCOME TAXES, UNION DUES, AND OTHER WITHHOLDING.

73.     The Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties.  Examples include Social Security, FICA, federal and state income taxes, union dues, garnishments, charitable donations, health care payments, other insurance payments, 401(k) contributions, and certain other voluntary payroll deductions.[14] In addition, the Debtors provide Employees with access to a program called Wallet, administered by PayActiv, Inc. ("**PayActiv**").  Under this program, Employees may, prior to their pay day, access earned wages for hours that have been worked but have not yet been paid.  PayActiv charges each participating Employee a fee for accessing these funds, which the applicable Debtor withholds from the Employee's paycheck and then pays over to PayActiv (thus the Employees bear any PayActiv fees).

74.     The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, may constitute monies held in trust and therefore may not be property of the Debtors' bankruptcy estates.  Thus, the Debtors believe they have authority to direct such funds to the appropriate parties in the ordinary course of business.  Nonetheless, out of an abundance of caution, the Debtors request authority to do so.

---

[14]   Under the Coronavirus Aid, Relief, and Economic Security Act of 2020, the Company may elect to defer payment of the employer portion of social security payroll taxes incurred from March 27, 2020 to December 31, 2020.  One-half of such deferral amount will become due on each of December 31, 2021 and December 31, 2022.  The Company intends to utilize this deferral program to delay payment of approximately $2,150,000 of the employer portion of payroll taxes estimated to be incurred between March 27, 2020 and December 31, 2020.

## VI.   SHARED EMPLOYEE OBLIGATIONS.

75.     As set forth in greater detail in the motion of the Debtors seeking entry of an order authorizing, among other things, the continued use of the Debtors' cash management system (the "**Cash Management Motion**") filed contemporaneously herewith, in order to take economic advantage of efficiencies that arise due to the number of Managed SNF Operators, certain of the Debtors' Prepetition Employee Obligations to their Employees are paid through non-Debtor LVCC (such Prepetition Employee Obligations, the "**Shared Employee Obligations**").  For instance, while each Debtor's wages are paid through its own separate payroll account, the Debtors' obligations under the Workers' Compensation Programs are paid through LVCC.[15]

76.     As of the Petition Date, there are two Shared Employee Obligations that were paid by LVCC: the Debtors' obligations under the Workers' Compensation Programs and the Debtors' obligations under the Medical Plans for the Operator Employees.  After LVCC pays a Shared Employee Obligation, it allocates the cost of such Shared Employee Obligation among the Managed SNF Operators who participate in the Shared Employee Obligation based on a methodology that appropriately reflects the entities' respective proportionate share.  The specific method underlying this allocation depends on the Shared Employee Obligation.  With respect to the Workers' Compensation Programs, LVCC allocates each Managed SNF Operator's cost based on employee headcount.  With respect to the Medical Plans for Operator Employees, LVCC allocates the cost based on the number of employees of each Managed SNF Operator participating in the applicable Medical Plan.

---

[15]   In addition, for other Employee Benefit Programs, while the Debtors pay their obligations separately from LVCC and the rest of the Managed SNF Operators, the employees across all Managed SNF Operators (including the Employees of the Operator Debtors) participate in the same employee benefit plans (including, for example the 401(k) Plan and the Dental and Vision Plans).  As such, certain of the Debtors' Employees participate in the same employee benefit plans and programs as employees of non-Debtor affiliates.

77.     As set forth in the Cash Management Motion, participating in the Shared Employee

Obligations allows the Debtors to avail themselves of the increased efficiency, "bulk pricing," and

decreased administrative expense that is attributable to the number of Managed SNFs.  Should the

Debtors cease to participate in the Shared Employee Obligations, they would be required to spend

substantial time and effort establishing separate accounts and payment practices for the Shared

Employee Obligations.  As such, the Debtors request authority to pay any Prepetition Employee

Obligations that constitute Shared Employee Obligations in the ordinary course of business, and

to continue such Shared Employee Obligations postpetition.

## VII.    POSTPETITION CONTINUATION OF ORDINARY COURSE EMPLOYEE PROGRAMS.

78.     Finally, the Debtors seek Interim and Final Orders authorizing, but not directing,

the Debtors to continue their ordinary course Employee compensation (including, wages, salaries,

and cash and non-cash compensation), Employee Benefit Programs, Reimbursable Expenses, and

related programs during the postpetition reorganization process in their sole discretion.  Though

the Debtors believe that such programs constitute ordinary course of business expenses authorized

under the Bankruptcy Code and applicable law without notice or a hearing, out of an abundance

of caution, the Debtors request authority to continue such programs during the pendency of the

Chapter 11 Cases.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

## I.    PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS IS APPROPRIATE BECAUSE SUBSTANTIAL PORTIONS OF SUCH OBLIGATIONS ARE ENTITLED TO PRIORITY UNDER SECTIONS 507(a)(4) AND 507(a)(5) OF THE BANKRUPTCY CODE.

79.     The Debtors believe that a substantial portion of the amounts they seek

authorization to pay hereunder are entitled to priority under sections 507(a)(4) and (a)(5) of the

Bankruptcy Code.  Section 507(a)(4) of the Bankruptcy Code grants priority to employee claims

for "wages, salaries, or commissions, including vacation, severance and sick leave pay" earned

within 180 days before the Petition Date up to $13,650 per employee.  11 U.S.C. § 507(a)(4).

Similarly, section 507(a)(5) of the Bankruptcy Code provides that the claims for contributions to

certain employee benefit plans are also afforded priority treatment to the extent of the number of

employees covered by each plan multiplied by $13,650, less any amounts paid pursuant to section

507(a)(4) of the Bankruptcy Code.  *Id.* § 507(a)(5).  To the extent that the Prepetition Employee

Obligations are entitled to priority under section 507(a)(4) of the Bankruptcy Code, the relief

requested herein affects only the timing of payment, and not the amount, and will not prejudice

general unsecured creditors.

80.    Any amounts in excess of the priority cap represent necessary compensation for

retaining the Debtors' Employees and preserving the value of the Debtors' estates and are therefore

justified by the doctrine of necessity, as set forth more fully below.  As such, by this Motion, the

Debtors seek authority pursuant to the Interim Order to pay the Prepetition Employee Obligations

up to $13,650 per Employee and, pursuant to the Final Order, authority to pay any amounts that

exceed the priority cap, except as otherwise set forth herein.

II.    **PAYMENT OF EMPLOYEE WITHHOLDINGS IS APPROPRIATE UNDER SECTION 541 OF THE BANKRUPTCY CODE BECAUSE SUCH FUNDS ARE NOT PROPERTY OF THE DEBTORS' ESTATES.**

81.    As described herein, a portion of the Prepetition Employee Obligations constitute

funds held in trust for payment to third parties.  The payment of the Employee Withholdings will

not prejudice the Debtors' estates because such withholdings are held in trust for the benefit of the

related payees and, thus, do not constitute property of the Debtors' estates under section 541 of the

Bankruptcy Code.  *See* 11 U.S.C. § 541(d); *Begier v. IRS*, 496 U.S. 53, 58–59 (1990).  Further,

failure to pay these amounts could subject the Debtors and their officers and directors to liability.

*See, e.g.*, *In re Sheppard*, 253 B.R. 397 (Bankr. D.S.C. 2000) (officer responsible for a company

not paying its federal employment tax liabilities found personally liable for such tax liabilities); *In*

*re Geise*, 151 B.R. 432 (Bankr. N.D. Ohio 1992) (same); *see also* 26 U.S.C. § 6672(a) ("Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to . . . pay over such tax . . . shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.").

### III. PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS IS APPROPRIATE UNDER SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND THE DOCTRINE OF NECESSITY.

#### A. The Court May Authorize the Prepetition Satisfaction of a Claim When Payment Is Critical to the Debtors' Business.

82.     Section 363 of the Bankruptcy Code empowers the bankruptcy court to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business.  11 U.S.C. § 363. Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." *Id.* § 363(b)(1).  To obtain approval for the use of estate assets outside the ordinary course of business, a debtor must articulate a valid business justification for the requested use.  *See In re Filene's Basement*, No. 11-13511, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (noting that under Section 363(b), "'[w]here the debtor articulates a reasonable basis for its business decisions . . . courts will generally not entertain objections to the debtor's conduct'" (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986))); *In re Landsource Cmtys. Dev. LLC*, No. 108-BK-11111, 2009 WL 4874670, ¶ 15 (Bankr. D. Del. Nov. 25, 2009); *U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, No. 022854, 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) ("To approve a transaction under § 363(b), the Bankruptcy Court must find that there is a good business reason to allow the transaction."); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) ("[A] § 363 application requires

a showing that there is a 'good business reason to grant such an application." (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983))); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990) ("Where valid business justification exists, a presumption exists 'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.")

83.     Further, the bankruptcy court's power to authorize the pre-plan satisfaction of prepetition claims whose payment is critical to the debtor's business is firmly established under section 105(a) of the Bankruptcy Code and the "doctrine of necessity," which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).  "The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11." *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (Bankr. D. Del. 1999).

84.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.  *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Motor Coach Indus. Int'l, Inc.*, No. 08-12136, 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (denying a stay pending appeal on the grounds that there is not a serious basis to challenge the doctrine of necessity in the Third

Circuit); *In re Just for Feet, Inc.*, 242 B.R. at 824–25 (noting that the Third Circuit permits debtors to pay prepetition claims that are essential to continued operation of business).

85.     If the Debtors' Employees are not promptly paid, it will cause an immediate and harmful impact to Employee morale, which may directly translate to decreased quality of care for the Debtors' residents.  In the longer term, not promptly paying the Debtors' Employees will likely cause serious reputational damage to the Debtors' businesses and may impact their ability to attract skilled Employees in the future.

**B.     Payment of All Prepetition Employee Obligations Is a Sound Exercise of the Debtors' Business Judgment and Necessary to Prevent Irreparable Harm.**

86.     The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.  Payment of the Prepetition Employee Obligations is critical to maintaining the Debtors' business operations and ensuring stability within the Debtors' workforce.  Continuity of the Debtors' business operations is essential to preserving and maximizing the value of the Debtors' estate in these Chapter 11 Cases.  The Debtors' Employees possess knowledge unique to the Debtors' operations, and many of them have worked in the senior care industry for many years and are specifically attuned to respond to the particular needs of the Debtors' residents, which include general assisted living, care for memory- and mobility-impaired residents, and hospice care.  Other Employees have specialized expertise in sales, marketing, or administration that is specific to the senior care industry.  Replacing the Employees' institutional knowledge would require the Debtors' and their remaining Employees to expend significant time, capital, and effort, all of which would distract the Debtors from the task at hand in these Chapter 11 Cases.  Further, the loss of valuable Employees would diminish the Debtors' ability to execute their value-maximizing strategy and

would harm the Debtors' stakeholders.  By this Motion, the Debtors, in sound exercise of their

business judgment, seek to prevent such harm.

87.     A stable workforce is critical to ensuring uninterrupted business operations and is

required to maximize the value of Debtors' estates.  If amounts owed are not received, insurance

reimbursements are not made, or other benefits delayed, the Debtors risk losing Employees to

attrition and distracting Employees from the requirements of their jobs.  These concerns are

especially important in light of the COVID-19 pandemic, which has negatively affected the

Debtors' Employees' morale, and increased demands on the Employees.  Moreover, in some

instances, the Employees may suffer substantial personal hardship and, in some cases, will be

unable to meet their basic needs, potentially making it difficult or impossible for them to continue

working for the Debtors.  To avoid Employee resignations and to maintain Employee morale, it is

critical that the Debtors be authorized to pay each of their Employees all compensation amounts

that have been earned under the Debtors' prepetition contractual obligations or practices, subject

to the limitations described herein.

88.     Finally, as noted above, the Debtors are obligated to maintain and discharge their

obligations under the Workers' Compensation Programs under the applicable laws of certain of

the states in which the Employees are employed.

**IV.     THE PROPOSED PAYMENT PROCESSING PROCEDURES ARE APPROPRIATE.**

89.     As set forth above, the Debtors request that all Banks be authorized and directed to

honor and process payments on account of the Prepetition Employee Obligations as directed by

the Debtors.  The Debtors have sufficient liquidity to pay the amounts delineated in this Motion in

the ordinary course of business and have implemented controls to ensure that prepetition claims

will not be paid except as authorized by this Court.  The Debtors therefore submit that the payment processing procedures described in the Motion are appropriate.

### IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

90.     The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  In the context of preliminary injunctions, the Third Circuit has interpreted the language "immediate and irreparable harm" to refer to a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages are inadequate.  *See, e.g.*, *Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).  The harm also must be actual and imminent, not speculative or unsubstantiated.  *See, e.g.*, *Acierno v. New Castle County*, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

91.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

92.     Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party-beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

## NOTICE

93.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Internal Revenue Service; (c) the Securities and Exchange Commission; (d) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (e) the Office of the United States Attorney for the District of Delaware; (f) counsel to the proposed DIP Lender; (g) the Banks; (h) the Payroll Processor; (i) all known holders of liens in the Debtors' assets; (j) counsel to the plaintiffs in the case captioned *U.S.A. ex rel. Angela Ruckh v. CMC II, LLC et al.*, and (k) the Debtors' landlords. As this Motion is seeking "first day" relief, notice of this Motion and any order entered in connection with the Motion will be served on all parties as required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

## NO PRIOR REQUEST

94.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that this Court enter the Interim Order and

the Final Order, each substantially in the form annexed hereto, granting the relief requested herein

and such other and further relief as may be just and proper.

Dated:  March 2, 2021
       Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**


*/s/ Mark D. Olivere*
William E. Chipman, Jr. (No. 3818)
Robert A. Weber (No. 4013)
Mark L. Desgrosseilliers (No. 4083)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:    chipman@chipmanbrown.com
        weber@chipmanbrown.com
        desgross@chipmanbrown.com
        olivere@chipmanbrown.com

*Proposed Counsel to the Debtors and*
*Debtors-In-Possession*