## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CMC II, LLC,[1] | Case No. 21-10461 (JTD) |
| Debtors. | (Joint Administration Pending) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(e), (B) GRANTING SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (II) SCHEDULING FINAL HEARING; AND (III) GRANTING RELATED RELIEF**

CMC II, LLC ("**CMC**") and certain of its affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**" or the "**Company**"), hereby file this motion (the "**Motion**"), pursuant to sections 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(e) and 507 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**"), and a final order (the "**Final Order**," and the Final Order together with the Interim Order, the "**DIP Orders**") (a) authorizing Debtors CMC II, LLC **("CMC II"**), 207 Marshall Drive Operations LLC, ("**Marshall**"), and 803 Oak Street Operations LLC ("**Governor's**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: CMC II, LLC (6973), Salus Rehabilitation, LLC (4037), 207 Marshall Drive Operations LLC (8470), 803 Oak Street Operations LLC (3900), Sea Crest Health Care Management, LLC (2940), and Consulate Management Company, LLC (5824). The address of the Debtors' corporate headquarters is 800 Concourse Parkway South, Maitland, Florida 32751.

Creek" and, together with CMC II and Marshall, each, a "**Borrower**"), to obtain secured postpetition financing (the "**DIP Financing**" or the "**DIP Facility**") from CPSTN Operations, LLC, an affiliate of the Debtors, (the "**DIP Lender**") pursuant to that certain *Secured Superpriority Debtor-in-Possession Financing Term Sheet* (the "**DIP Term Sheet[2]**," and with the DIP Orders, the "**DIP Documents**"), (b) modifying the automatic stay, (c) scheduling a final hearing (the "**Final Hearing**"), and (d) granting related relief.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Paul Rundell in Support of Chapter 11 Petitions and First Day Papers* (the "**First Day Declaration**") filed with the Court concurrently with this Motion.  In further support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors require immediate access to liquidity to ensure that they are able to continue operating their businesses and continue to provide for the uninterrupted care, welfare and safety of their residents.  To that end, prior to filing these chapter 11 cases, the Debtors secured the DIP Facility consisting of a multi-draw term loan facility with a maximum credit amount of $5,000,000.00.

2.      The DIP Facility is subject to the terms and conditions of the DIP Term Sheet, the Interim Order, the Final Order, and all other security documents, guarantees and other legal documentation entered into in connection with the DIP Facility.  The DIP Facility will ensure that ongoing business operations and critical resident care can continue without disruption.  Among other things, the proceeds from the DIP Facility, together with anticipated cash flow from operations, will be used to honor employee wages and benefits, procure goods and services integral

---

[2]    A copy of the DIP Term Sheet is attached to the Interim Order as **Exhibit 1**.

to the Debtors' ongoing business operations, fund certain operational expenses, and allow the Debtors to maintain favorable relationships with their vendors, suppliers, employees and residents, and satisfy working capital needs in the ordinary course of business.  The DIP Facility will enhance the value of the Debtors' estates, by enabling a value-maximizing restructuring process, and providing the Manager Debtor with sufficient liquidity to continue performing its contractual obligations during these Chapter 11 Cases.

3.      The Debtors believe that the DIP Facility represents the best and only source of financing available to the Debtors after conducting a marketing process and generally provides for:

- •      a $5,000,000.00 million multiple draw DIP Facility secured by first priority liens on the DIP Collateral (subject only to certain Prior Permitted Existing Liens);

- •      borrowings and disbursements to be made pursuant to the terms of an agreed Budget, a copy of which is attached to the Interim Order (the **"Budget"**); and

- •      a scheduled maturity date of the DIP Facility of the earlier of (a) 180 days from the Petition Date; (b) the effective date of a plan of reorganization or liquidation; (c) the consummation of a sale(s) of all or substantially all of the assets of the Debtors; (d) the occurrence of an Event of Default; (e) the entry of an order by the Court approving or authorizing any alternative or additional debtor-in-possession financing; and (f) such later date as the DIP Lender may agree in its sole and absolute discretion to in writing with the Borrower.

4.      Absent interim approval of the DIP Facility, there is a significant risk that the Debtors will not have sufficient cash flow, thereby potentially threatening the health safety and welfare of the Debtors' residents.

5.      As more fully set forth below, substantially all the Operator Debtors' (as defined below) assets are encumbered by the liens of the Operator Debtors' landlord.  After reaching out to forty (40) other potential sources, the Debtors do not believe debtor-in-possession financing would be reasonably available from any other party and have determined that the proposed DIP

Facility provides the best path forward under the circumstances to address their liquidity needs and fund administration of these chapter 11 cases.

## JURISDICTION

6.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over these Chapter 11 Cases, the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Pursuant to Local Rule 9013-1(f) the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.      Venue of these cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested in the Motion are sections 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3) and 507 of the Bankruptcy Code.  The relief is also appropriate under Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 and Local Rules 4001-2 and 9013-1.

## BACKGROUND

9.      On March 1, 2021 (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

10.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

11.    To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

12.    The Debtors in these Chapter 11 Cases manage and operate skilled nursing facilities ("**SNFs**"), providing a variety of services to mostly elderly residents that include short-term rehabilitation, comprehensive post-acute care, long-term care, and physical, occupational, and speech therapies.  Debtor CMC II provides management and support services to approximately 140 SNFs, each of which is operated by an affiliate of the Debtors (such SNFs, the "**Managed SNFs**", and such operators, the "**Managed SNF Operators**") under the common ownership of non-Debtor LaVie Care Centers, LLC ("**LVCC**"), doing business as Consulate Health Care.  Two of the Managed SNF Operators are Debtors in these Chapter 11 Cases: Marshall and Governor's Creek (together with Marshall, the "**Operator Debtors**").  Each of the Operator Debtors operates a 120-bed SNF located in Northern Florida.  The remaining Debtors, Salus, Sea Crest Health Care Management, LLC, and Consulate Management Company LLC (collectively, the **"Guarantors"**), are no longer operational, but historically provided rehabilitation and management services, respectively.

13.    Additional factual background regarding the Company's business operations, corporate and capital structures, and restructuring efforts are described in greater detail in the First Day Declaration, which is incorporated in this Motion by reference.

## THE DEBTORS' CAPITAL STRUCTURE

14.    As of the Petition Date, the Debtors are not party to any credit facilities (secured or otherwise).  Prior to the Eleventh Circuit's partial reinstatement of the verdicts in the Ruckh Litigation (as more fully described in the First Day Declaration), CMC II and the Operator Debtors

were party to LVCC's secured revolving credit facility with MidCap Financial ("**MidCap**", and such facility, the "**MidCap Facility**").  As a result of the Eleventh Circuit's decision, MidCap required the removal of these entities as borrowers or guarantors of the MidCap Facility, which removals were effective as of August 26, 2020.

15.    Also prior to the Eleventh Circuit's partial reinstatement of the verdicts in the Ruckh Litigation, the Operator Debtors subleased their respective SNFs from affiliated master tenants under a master lease (the "**Original Master Lease**") with certain affiliates of Omega Healthcare Investors ("**Omega**") that covered the Marshall and Governor's Creek SNFs and 42 other facilities.  Following the Eleventh Circuit's decision, Omega required removal of the Operator Debtors' SNFs from the Original Master Lease and the creation of a new master lease (the "**New Master Lease**") between the Operator Debtors and the Omega affiliates that own the real estate for the Operator Debtors' SNFs (the "**Omega Landlords**").  Accordingly, the Original Master Lease and certain ancillary documents were amended as of August 26, 2020 to remove the real estate occupied by the Operator Debtors' SNFs from the lease and modify a judgment default provision to ensure that it would not be triggered by entry of a judgment in the Ruckh Litigation. Contemporaneously therewith, the Operator Debtors and the Omega Landlords entered into the New Master Lease.

16.    The initial term of the New Master Lease expires on March 31, 2031 and is subject to two successive ten-year renewal options.  Annual base rent under the Master Lease is $1,522,066.92.  The Operator Debtors granted a security interest in substantially all of their assets to the Omega Landlords.

17.    Prior to the Petition Date, certain of the Debtors entered into various secured equipment and personal property leases (the "**Equipment Lessors**").  The Equipment Lessors

have liens on specific pieces of equipment and/or personal property identified in their lease agreements and UCC-1s.

## ALTERNATIVE FINANCING EFFORTS

18.    Prior to the Petition Date, Evans Senior Investments ("**ESI**"), the Debtors' broker and Paul Rundell ("**Mr. Rundell**"), the Debtors' Chief Restructuring Officer (the "**CRO**"), evaluated options for obtaining unsecured debtor in possession financing ("**DIP**") or alternative DIP financing.  ESI solicited forty (40) third party-lenders and received no indications of interest for financing the Debtors during these Chapter 11 Cases.  The Debtors only received the proposed DIP Term Sheet from the DIP Lender.  The DIP Lender is an affiliate of the Debtors.

19.    Ultimately, the Debtors, in conjunction with their advisors, determined that the terms and conditions of the proposed DIP Financing was and remains the best available under the circumstances and adequately addresses the Debtors' financing needs during these Chapter 11 Cases.  Importantly, the DIP Financing was negotiated at arms' length among the proposed DIP Lender, the Debtors' proposed counsel, and the CRO, and was vetted and approved by Alan Carr, the Debtors' independent manager (the "**Independent Manager**").

20.    The DIP Financing provides the best and only path forward to address the Debtors immediate liquidity needs to ensure that they are able to continue operating their businesses and provide for the care, welfare and safety of their residents.

## RELIEF REQUESTED

21.    By this Motion, the Debtors seek entry of the DIP Orders (a) authorizing the Debtors to borrow funds under the DIP Facility in an aggregate principal amount of up to $1,000,000.00 on an interim basis and up to $5,000,000.00 on a final basis (collectively, the "**DIP Loans**"), pursuant to the terms and conditions of the DIP Term Sheet; (b) modifying the automatic

stay to the extent necessary to grant the DIP Lender the security interests, superpriority claims, liens, and secured claims set forth under the DIP Facility; (c) scheduling the Final Hearing, and (d) granting related relief.

## SUMMARY OF PRINCIPAL TERMS OF THE DIP FACILITY[3] AND HIGHLIGHTED PROVISIONS UNDER LOCAL RULE 4001-2(A)(1)

22.     Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following is: (i) a concise summary of the proposed material terms of the DIP Facility and the DIP Term Sheet; and (ii) certain terms that constitute material provisions requiring explicit disclosure under the Local Rules:

| | |
|---|---|
| **Borrowers** | CMC II, LLC, 207 Marshall Drive Operations LLC, and 803 Oak Street Operations LLC |
| **Guarantors** | Salus Rehabilitation, LLC, Sea Crest Health Care Management, LLC, and Consulate Management Company, LLC |
| **DIP Lender** | CPSTN Operations, LLC (together with such lender's successors and permitted assigns) |
| **DIP Facility/Borrowing Limits** *Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(A)* | Subject to the terms and conditions set forth in the Term Sheet, the Interim Order, the Final Order, and the other DIP Documents, the DIP Lender will make loans to the Borrowers under a secured superpriority debtor-in-possession multi-draw term loan facility, in an aggregate principal amount not to exceed $5,000,000 for all DIP Loans made by the DIP Lender plus all capitalized interest thereon (such amount, the **"Principal Amount"**). Until the date on which the Final DIP Order is entered, the Borrowers shall not be permitted to borrow DIP Loans exceeding an aggregate principal amount of $1,000,000 plus all capitalized interest (the **"Interim Amount"**). <br><br> Subject to the terms and conditions of the Term Sheet and satisfaction of the Advance Conditions, the DIP Facility shall be made available to the Borrowers in advances (each an **"Advance"**) to be extended from time to time by the DIP Lender.  The Amount of each such Advance |

---

[3]   The below is intended to be a summary only and the terms of the DIP Term Sheet and the DIP Documents control in all respects.  Capitalized terms set forth in this summary shall have the meaning ascribed to them in the DIP Term Sheet.

| | |
|---|---|
| | shall be based on the funding needs of the Borrowers as set forth in the Budget as agreed to by the DIP Lender.<br><br>*See* Interim Order at paragraphs A(ii), A(viii), and 3; Term Sheet at pages 1 and 2. |
| **Interest Rate**<br><br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(B)* | All amounts outstanding under the DIP Facility will PIK interest at a rate equal to 8% per annum, compounded monthly.  Upon the occurrence and during the continuation of an Event of Default, all overdue amounts shall bear interest at the applicable interest rate plus 2% per annum.  All interest shall be computed on the basis of a 360-day year of twelve 30-day months.<br><br>*See* DIP Term Sheet at page 4. |
| **Fees**<br><br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(B)* | A fee equal to 2% of the outstanding DIP Obligations, payable at maturity.<br><br>*See* DIP Term Sheet, page 8. |
| **Budget**<br><br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(E)* | The 13-week budget from time to time in effect as approved by the Lender in its sole and absolute discretion (the "**Budget**"). The Debtors may request changes to the then-approved Budget, which changes shall be subject to the DIP Lender's approval (in its sole and absolute discretion).  Compliance with the Budget will be measured every week (commencing on the date that is two weeks after the Petition Date) on a trailing four-week basis (or, with respect to the first test date, on a trailing two-week basis and, with respect to the second test date, on a trailing three-week basis).  The Debtors agree to provide such additional budgeting and cash forecasting documents as the DIP Lender may reasonably request.<br><br>Debtors shall adhere to the Budget, subject to Permitted Variances. "Permitted Variances" means (i) all favorable variances, (ii) an unfavorable variance of no more than 10% for (A) total disbursements paid by the Debtors, and (B) total receipts of the Debtors, in each case from the amounts set forth in the applicable Budget on a weekly and cumulative basis (each such period, the "**Testing Periods**").<br><br>*See* Interim Order at paragraph 15; Term Sheet at pages 3 and 4. |
| **Closing Date** | Subject to the terms and conditions of the Term Sheet, the Interim DIP Order, the Final DIP Order, the other DIP Documents and satisfaction of the Advance Conditions, the DIP Facility shall be made available to |

| | |
|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)* | the Borrowers in advances (each an **"Advance"**) to be extended from time to time by the DIP Lender.<br><br>*See* Term Sheet at page 2. |
| **Conditions Precedent to the Initial Extension of Credit and Each Loan**<br><br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(E)* | The DIP Lender shall have no obligation to fund any Advance, unless the Debtors have executed and submitted a valid Advance Request Certificate and each of the following conditions (collectively, the **"Advance Conditions"**) is satisfied:<br><br>1.   If the Advance Request Certificate is issued within the first 30 days after the Petition Date, an order approving the DIP Facility on an interim basis shall have been entered in the form attached hereto as Exhibit A and otherwise acceptable to the DIP Lender in its sole and absolute discretion (the "Interim DIP Order"), and such Interim DIP Order shall be in full force and effect, and not subject to any stay or appeal;<br><br>2.   If the Advance Request Certificate is issued on or after the 30th day following the Petition Date, an order approving the DIP Facility on a final basis shall have been entered substantially in the form of the Interim Order and otherwise in form and substance acceptable to the DIP Lender in its sole and absolute discretion (the "Final DIP Order"), and such Final DIP Order shall be in full force and effect, and not subject to any stay or appeal;<br><br>3.   All other "first-day" and, if such Advance Request Certificate is issued after the second-day hearing, "second-day" orders shall have been entered in form and substance reasonably acceptable to the DIP Lender by the Court and shall be in full force and effect, and not subject to any stay or appeal;<br><br>4.   Receipt and acceptance of the Budget by the DIP Lender (in its sole and absolute discretion) and compliance in all respects with the Budget by the Debtors;<br><br>5.   All representations and warranties contained in the DIP Documents shall be true as if each such representation or warranty was made as of the date of such Advance Request Certificate, and the Debtors shall be in compliance with all affirmative and negative covenants contained herein in each Advance Request Certificate and all Milestones;<br><br>6.   There shall be no existing or continuing Event of Default or Termination Event (both before and after giving effect to the draw); |

| | |
|---|---|
| | 7.    Receipt of the Advance Request Certificate; and |
| | 8.    No change in circumstances has occurred that has had or could reasonably be expected to have a material and adverse impact on the Debtors, the Debtors' business, or the Debtors' ability to pursue and implement a Restructuring. |
| | The Debtors' compliance with the Advance Conditions will be determined by the DIP Lender. |
| | *See* Term Sheet at page 4-5. |
| **Maturity**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Facility shall be paid in full in cash or otherwise satisfied in a manner agreed to by the DIP Lender in its sole discretion on the date (the "**Maturity Date**") which is the earliest of (a) 180 days from the Petition Date; (b) the effective date of a plan of reorganization or liquidation; (c) the consummation of a sale(s) of all or substantially all of the assets of the Debtors; (d) the occurrence of an Event of Default; (e) the entry of an order by the Court approving or authorizing any alternative or additional debtor-in-possession financing; and (f) such later date as the DIP Lender may agree in its sole and absolute discretion to in writing with the Borrower.<br><br>*See* Interim Order at paragraph 45; Term Sheet at page 4. |
| **Collateral**<br><br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(J)* | Each Debtor shall grant to the DIP Lender continuing valid, binding, enforceable, non-avoidable, and automatically and properly perfected, *nunc pro tunc* to the Petition Date, post-petition security interests in and liens (collectively, the "**DIP Liens**") on any and all of each Debtors' right, title and interest in all real and personal property of the Debtors and their estates existing as of the Petition Date or acquired after the Petition Date (the "**DIP Collateral**"), including, without limitation, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all permits, contracts, management agreements, general intangibles, permits, licenses, statutory entitlements, instruments, equipment, accounts, and documents, all goods, inventory and fixtures, all documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, claims (including commercial tort claims and any claims against affiliates of the Debtors), causes of action, money, insurance, receivables, receivables record, deposit accounts, contract rights, payment intangibles, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, tradenames and other intellectual property, all equity interests, all books and records relating to the foregoing, all other personal and real property of the Debtors, and all other collateral pledged under the DIP Documents, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are |

| | |
|---|---|
| | defined in the Uniform Commercial Code as in effect from time to time in the State of Delaware (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)). For the avoidance of doubt, the DIP Collateral shall not include Avoidance Actions (as defined below), but shall, upon entry of a Final DIP Order, include the proceeds of Avoidance Actions.<br><br>*See* Interim Order at paragraphs 11 and 12; Term Sheet at page 6. |
| **DIP Liens/Superpriority Administrative Claim Status**<br><br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(J)* | The DIP Obligations, pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code:<br><br>(i)  shall constitute (without the need to file a proof of claim) joint and several superpriority claims against each Debtor, with priority over any and all administrative expenses of the Debtors, whether now existing or hereafter arising or incurred, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final DIP Order), 507, 546(c), 552(b) (subject to entry of the Final DIP Order), 726, 1113, 1114, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual lien, levy or attachment, whether now in existence or hereafter incurred by the Debtors, and shall at all times be senior to the rights of any Debtor, any Debtor's estate, and any successor trustee, estate representative, or any creditor, in any of the Chapter 11 Cases or any successor case;<br><br>(ii)  shall be secured by valid, enforceable, non-avoidable, and fully perfected first priority security interests in and liens and mortgages upon (in favor of the DIP Lender) all DIP Collateral that is not otherwise subject to any Existing Lien as of the Petition Date, subject only to the Carve Out; and<br><br>(iii)  shall be secured by valid, enforceable, non-avoidable, and fully perfected security interests in and liens and mortgages upon (in favor of the DIP Lender) all DIP Collateral that is subject to an Existing Lien as of the Petition Date, subject only to (a) any such Existing Lien and (b) the Carve Out.<br><br>*See* Interim Order at paragraphs A(iii), 10, 11; Term Sheet at pages 6 and 7. |

| | |
|---|---|
| **Prepayments**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Loans may be permanently prepaid in full by the Debtors at any time.<br><br>*See* Term Sheet at page 4. |
| **DIP Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(H)* | The Loan Parties shall achieve the following milestones (the "**Milestones**"):<br><br>1. Commencement of the Chapter 11 Cases (the "Petition Date") no later than March 2, 2021;<br><br>2. Not later than the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking approval of the DIP Facility, this Term Sheet, the DIP Loans, and all fees, interest, indemnification and other obligations and the security interests and superpriority claims contemplated hereby;<br><br>3. The Court shall enter the Interim DIP Order, in form and substance satisfactory to the DIP Lender in its sole and absolute discretion no later than three (3) business days after the Petition Date;<br><br>4. The Court shall enter the Final DIP Order, in form and substance satisfactory to the DIP Lender in its sole and absolute discretion no later than thirty (30) days after the Petition Date;<br><br>5. Not later than eight (8) business days after the Petition Date, the Debtors shall file with the Bankruptcy Court a sale motion and bid procedures motion, which shall be in form and substance reasonably acceptable to the DIP Lender and shall approve such stalking horse agreements and arrangements as are acceptable to the Debtors and the DIP Lender (the "Bidding Procedures Motion");<br><br>6. Not later than twenty-five (25) days after the Debtors file the Bidding Procedures Motion, a hearing to consider approval of the Bidding Procedures Motion shall be held in the Bankruptcy Court and the Bankruptcy Court shall have entered a final order, approving the bid procedures for a section 363 sale of the Debtors' assets, which order shall be in form and substance reasonably acceptable to the DIP Lender and approving such stalking horse agreements and arrangements as are acceptable to the Debtors and the DIP Lender (the "Bidding Procedures Order"); |

| | |
|---|---|
| | 7.  The deadline for bidding under the Bidding Procedures Order shall be a date not later than 65 days following the Petition Date; |
| | 8.  Any auction contemplated by the Bidding Procedures Order, if necessary, shall be conducted not later than 70 days following the Petition Date; |
| | 9.  Not later than 75 days following the Petition Date, a sale hearing shall be held in the Bankruptcy Court and the Bankruptcy Court shall enter a sale order in form and substance reasonably acceptable to the DIP Lender; and |
| | 10.  The repayment in full of the DIP Obligations shall occur on the Maturity Date.<br><br>*See* Interim Order at paragraphs 15(d) and 24; Term Sheet at Exhibit C. |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(M)* | The following shall constitute Events of Default under the DIP Facility:<br><br>1.  The Final DIP Order shall not be entered by the Court in form and substance acceptable to the DIP Lender in its sole and absolute discretion by no later than 30 days after the Petition Date;<br><br>2.  Failure by the Debtors to comply with the terms and conditions of the DIP Documents (including the affirmative covenants, negative covenants, and other covenants and agreements contained herein or in any Advance Request Certificate);<br><br>3.  Cessation of the full force and effect of the DIP Documents or the contesting of the same by the Debtors;<br><br>4.  The granting or incurrence of any claim that is senior in priority to the DIP Superpriority Claims;<br><br>5.  The incurrence of any debt obligations by the Debtors, except as provided in the Approved Budget and approved by the applicable orders of the Court;<br><br>6.  The granting or incurrence of any lien that is senior in priority to the DIP Liens, except as expressly permitted herein;<br><br>7.  The making of payments in contravention of the DIP Documents and the Approved Budget, subject only to the Permitted Variances;<br><br>8.  The Debtors shall fail to be in compliance with the Approved Budget, subject only to the Permitted Variances; |

| | |
|---|---|
| | 9.  Dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, or failure by the Debtors to contest any proposed dismissal or conversion;<br><br>10.  Any modification, appeal, or reversal of the Interim Order or the Final Order;<br><br>11.  Appointment of any trustee or examiner with expanded powers in the Chapter 11 Cases;<br><br>12.  Entry of an order modifying or lifting the automatic stay seeking to recover from the assets of the Debtors an amount in excess of $250,000 (or multiple such orders which, in the aggregate, seek to recover an amount in excess of $250,000);<br><br>13.  Entry of an unstayed judgment over $500,000 or a non-monetary judgment that would have a material and adverse impact on the Debtors, the Debtors' business, or the Debtors' ability to pursue and implement a Restructuring;<br><br>14.  The Interim Order or Final Order being amended or modified without the consent of the DIP Lender;<br><br>15.  Any representation or warranty made by any Debtor herein or in any other DIP Facility Document shall prove to be untrue in any material respect on the date as of which made or deemed made; and<br><br>16.  Failure by the Debtors to comply with the Milestones set forth on Exhibit C to the DIP Term Sheet.<br><br>*See* Interim Order at paragraph 24; Term Sheet at pages 10 and 11. |
| **Parties with an Interest in Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | As set forth above, the Operator Debtors granted a security interest in substantially all of their assets to the Omega Landlords. |
| **Purposes for Use of DIP Proceeds**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)* | All advances under the DIP Facility shall be used by the Debtors solely to (i) fund (x) the Debtors' post-petition operating expenses and general corporate and working capital requirements, and (y) the expenses of the Chapter 11 Cases, (ii) make any prepetition payments expressly permitted by the Term Sheet and permitted by orders of the Court, and (iii) pursue, negotiate, document, and implement a sale process, to be |

| | |
|---|---|
| | completed pursuant to section 363 of the Bankruptcy Code, and/or a plan of reorganization or liquidation as applicable (the "**Restructuring**"), each of the above in accordance with and to the extent provided for in the Budget.<br><br>*See* Interim Order at paragraph 8; Term Sheet at page 3. |
| **Carve-Out**<br><br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(F)* | Carve-Out. As used in this Interim Order and the other DIP Documents, the term "Carve-Out" shall mean an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses of up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "**Allowed Fees**") incurred by persons or firms retained by the Debtors or any official committee of unsecured creditors in the Chapter 11 Cases (the "**Creditors' Committee**"), if appointed, whose retention is approved by the Court pursuant to section 327, 328, and 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**"), in all cases subject to the terms of the Interim Order, the Final Order and any other interim or other compensation order entered by the Court that are incurred or earned (A) at any time before delivery of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, less the amount of any prepetition retainers of such Professional Persons not previously applied to fees and expenses, subject to any limits imposed by the Budget, the Interim Order, the Final Order or otherwise on Allowed Fees, including with respect to any Allowed Fees permitted to be incurred in connection with any permitted investigations of claims and defenses against the DIP Lender; and (B) starting on the first day following delivery of a Carve-Out Trigger Notice (as defined below), in an aggregate amount not to exceed $150,000, less the amount of any prepetition retainers of such Professional Persons not previously applied to fees and expenses (the amount set forth in this clause (iii)(B) being the "**Post-EoD Carve-Out Amount**"); provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds. For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or any other means permitted under the DIP Documents) by the DIP Lender to the Debtors, the Debtors' restructuring counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, which notice may be delivered upon the Trigger Date and during the continuation of a Termination Event, stating that the Post-EoD |

| | |
|---|---|
| | Carve-Out Amount has been invoked. **"Trigger Date"** means the date upon which a Termination Event occurs.<br><br>*See* Interim Order at paragraph 14; Term Sheet at page 7. |
| **Modification of Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The automatic stay shall be modified as necessary to effectuate all of the terms and provisions of the Interim Order and Final Order, including, without limitation, to permit the Debtors to grant the DIP Liens.<br><br>*See* Interim Order at paragraph 18. |
| **Section 506(c) Waiver**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(x) and Local Rule 4001-2(a)(i)(V)* | Subject to the entry of the Final Order, the DIP Facility includes a waiver of the Debtors' right to assert any claims to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code.<br><br>*See* Interim Order at paragraph 32. |
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | Debtors shall indemnify and hold harmless the DIP Lender and its affiliates and officers, directors, employees, agents and advisors from and against all losses, liabilities, claims, damages or other expenses arising out of or relating to the DIP Facility Documents and Debtors' use of the financing provided thereunder.<br><br>*See* Interim Order at paragraph 13; Term Sheet at page 11 |
| **Liens on Avoidance Actions**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi) and Local Rule 4001-2(a)(i)(U)* | Subject to entry of a Final Order, the obligations of the Debtors under the DIP Facility shall, subject to the Carve-Out, grant a first priority lien to the DIP Lender, on any proceeds (the **"Avoidance Action Proceeds"**) of the Debtors' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (each, an **"Avoidance Action"**).<br><br>*See* Interim Order at paragraphs A(iii)(d) and 11; Term Sheet at page 6. |
| **Cross Collateralization**<br><br>*Local Rule 4001-2(a)(i)(N)* | The Interim Order provides for the guaranty of the DIP Obligations by the non-Borrower Debtors.<br><br>*See* Interim Order at paragraphs A(i), 5 and 6; Term Sheet at page 5. |
| **Section 552 and Marshalling Waivers** | Subject to the entry of the Final Order, the DIP Facility includes a waiver of (a) "equities of the case" claims under section 552(b) of the Bankruptcy Code; and (b) authorization for the waiver of the Debtors' |

| | |
|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)(viii) and Local Rule 4001-2(a)(i)(W) and (X)* | right to assert the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.<br><br>*See* Interim Order at paragraph 33 and 34. |

## BASIS FOR RELIEF

I.   THE DIP FACILITY SHOULD BE APPROVED.

**A.   Entering into the DIP Documents is an Exercise of the Debtors' Sound Business Judgment.**

23.   The Court should authorize the Debtors to enter into the DIP Documents and obtain access to the DIP Facility.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re L.A.  Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

24.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

25.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the debtor offered by a proposed postpetition facility.

26.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arms' length process and careful evaluation of their lack of alternatives. Specifically, as more fully set forth above, prior to the Petition Date, ESI ran a process to solicit offers from third parties to provide DIP financing for these Debtors. Ultimately, ESI received no indications of interest from third parties to provide a DIP Facility. The Debtors only received a proposal from the DIP Lender, an affiliate of the Debtors.

27.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arms' length process and careful evaluation of

their lack of alternatives.  Specifically, as more fully set forth above, prior to the Petition Date, ESI ran a process to solicit offers from third parties to provide DIP financing for these Debtors. Ultimately, ESI received no indications of interest from third parties to provide a DIP Facility. The Debtors only received a proposal from the DIP Lender, an affiliate of the Debtors.

28.    The terms of the DIP Facility were negotiated in good faith at arms' length by the proposed DIP Lender, the Debtors' proposed counsel, and the CRO, and were vetted and approved by the Debtors' Independent Manager.  The result of these arm's length negotiations resulted in a DIP Facility that has a reasonable interest rate, PIK interest, reasonable sale milestones and other terms and conditions that are at or below market.  The Debtors believe that they have obtained the best and only financing available on commercially reasonable terms.  Entry into the DIP Facility is in the best interests of the Debtors' estates and is an exercise of the Debtors' sound business judgment and should be approved.

**B.    The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.**

28.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to section 364 of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

29.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

(a)    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

(b)      the credit transaction is necessary to preserve the assets of the estate; and

(c)      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Ames Dep't Stores*, 115 B.R. at 37-39; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02

(Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

30.      Prior to negotiating the DIP Facility, the Debtors, together with their advisors, considered other sources of postpetition financing to determine whether they could obtain debtor-in-possession financing on better terms. As set forth above, prior to the Petition Date, ESI reached out to numerous third parties to obtain debtor in possession financing, but received no indications of interest. Absent sufficient financing to operate the Debtors' businesses during these Chapter 11 Cases, the Debtors will be unable to continue to provide services at their facilities and manage their properties to the detriment of all residents and other stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Documents, are fair, reasonable and adequate, all as more fully set forth herein.

31.      In the event that a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving the superpriority claim in favor of the DIP Lender is reasonable and appropriate. Further, subsections 364(c)(2) and (c)(3) of the Bankruptcy Code provides that a debtor may obtain credit that is secured by lien on property of the estate that is not otherwise subject to a lien or secured by a junior lien on property of the estate that is subject to a lien. As the Debtors are unable to obtain the critical financing that they need to administer these

Chapter 11 Cases from any other source, the Debtors respectfully represent that granting DIP Liens to the DIP Lender on unencumbered property and/or on a junior lien basis is warranted under the circumstances.

      **C.**      **The DIP Financing is Necessary to Preserve the Value of the Debtors' Estates.**

      32.    The Debtors have liquidity needs and require financing to fund the administration of these bankruptcy cases. The DIP Facility will ensure that ongoing business operations and critical resident care can continue without disruption pending a sale of the businesses as a going concern. Among other things, the proceeds from the DIP Facility, together with anticipated cash flow from operations, will be used to honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund certain operational expenses, and allow the Debtors to maintain favorable relationships with its vendors, suppliers, employees, residents, and satisfy working capital needs in the ordinary course of business. In addition, the DIP Financing provides CMC II with sufficient liquidity to continue performing its contractual obligations under its management agreements with the other Managed SNFs. Moreover, the DIP Facility provides for a value-maximizing sale process, as contemplated by the Milestones.

      33.    The Debtors have determined that the DIP Facility provides the best and only option under the circumstances to fund these Chapter 11 Cases, continue to operate their facilities for the benefit of the residents, and provide a clear path towards a going concern sale to maximize the value of the Debtors' assets for all stakeholders. Approval of the DIP Facility will avoid immediate and irreparable harm to the Debtors' Estates.

**D.      The Terms of the DIP Financing are Fair, Reasonable, and Appropriate.**

34.      After appropriate investigation and analysis, the Debtors have concluded that the DIP Facility presents the best terms available under the circumstances.   Bankruptcy courts routinely defer to a debtor's business judgment on substantive business decisions, including the decision to borrow money, unless such decisions fail the arbitrary and capricious standard. *See Ames*, 115 B.R. at 40 (court should approve borrowings pursuant to § 364(c) and (d) if the debtor was within its business judgment); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58–59 (Bankr. N.D.N.Y. 2005) (same); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of an interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgement… [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors."). Indeed, "more exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interference with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (*citations omitted*).

35.      The terms and conditions of the DIP Facility are fair and reasonable.   As discussed above, the Debtors properly assessed their financing needs and the DIP Term Sheet, and in the sound exercise of the Debtors' business judgment, the DIP Facility represents the best and only option available under the circumstances.   The DIP Lender has agreed to provide DIP Financing on favorable terms that are below or at market.   The Debtors' advisors, the CRO, and the Independent Manager, on the one hand, and the DIP Lender and its advisors on the other hand, negotiated the terms of the DIP Facility at arm's length.   The outcome of those negotiations resulted in, among other things, PIK interest, more favorable milestones, a revised maturity date

and a higher facility amount.  Indeed, the DIP Facility provides narrowly tailored relief.   The Dip Facility does not contain a "roll-up" of any pre-petition debt and contains a limited release of the DIP Lender, solely for claims and cause of action related to the DIP Facility.

36.    The proposed DIP Facility subjects the security interests and secured claims of the DIP Lender to the Carve-Out, thereby ensuring that, in the event of a default under the DIP Documents, the Debtors' estates and other parties-in-interest are not directly or indirectly deprived of possible rights and powers by restricting the services for which professionals may be paid in these cases.  In *Ames*, the Court found such carve-outs for professional fees not only reasonable, but necessary to ensure that official committees and the debtors' estate could retain assistance from counsel. *See Ames*, 115 B.R. at 38–40 ("Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").

37.    Further, the negotiated DIP Milestones are a crucial element of the terms of the DIP Facility, and their inclusion in the Interim Order is important to ensure that the Chapter 11 Cases proceed in a strategic, value-maximizing fashion for the benefit of all parties-in-interest, including the residents.  In similar contexts, this Court has entered interim financing orders that included express milestones for the progress of a debtor's case.  *See, e.g.*, *In re Horsehead Holding*, Case No. 16-10287 (CSS) (Bankr. D. Del. Feb. 4, 2016) [Docket No.81] (approving case milestones in the interim DIP financing order); *In re Verso Corp.*, Case No. 16-10163 (KG) (Bankr. D. Del. Jan. 27, 2016) [Docket No.105] (same); *In re Cal Dive Int'l*, Case No. 15-10458 (CSS) (Bankr. D. Del. Mar. 9, 2015) [Docket No.74] (same); *In re ADI Liquidation, Inc. (f/k/a AWI Delaware, Inc.)*, Case

No. 14-12092 (KJC) (Bankr. D. Del. Sept. 10, 2014) [Docket No.58] (same); *In re Handy Hardware Wholesale, Inc.*, Case No. 13-10060 (MFW) (Bankr. D. Del. Jan. 14, 2013) (same).[4]

38.      Finally, this Court has previously approved DIP facilities where the parties to the financing had entered into a binding term sheet rather than a full credit agreement. *See, e.g.*, *Consolidated Infrastructure Group, Inc.*, Case No. 19-10165 (BLS) (Bankr. D. Del. Jan. 31, 2019); *In re Alcor Energy, LLC*, Case No. 18-12839 (CSS) (Bankr. D. Del. Dec. 21, 2018) [Docket No.27] (authorizing DIP financing pursuant to a binding term sheet); *In re ABT Molecular Imaging, Inc.*, Case No. 18-11398 (LSS) Bankr. D. Del. June 15, 2018) [Docket No.33] (same); *In re Outer Harbor Terminal, LLC*, Case No. 16-10283 (LSS) (Bankr. D. Del. Feb. 9, 2016) [Docket No.52]. Thus, for these reasons and the reasons set forth above, the DIP Facility on the terms set forth in the DIP Term Sheet should be approved.

### E.      Modification of the Automatic Stay is Appropriate.

39.      Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The DIP Documents require a modification of the automatic stay to implement the terms of the DIP Financing.

40.      Stay modification provisions of this kind are ordinary and standard features of postpetition DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available. Further, the Debtors have not been able to obtain DIP financing on terms more favorable than those proposed herein. The terms and conditions of the

---

[4]      The referenced orders are voluminous in nature and are not attached to this Motion. However, in light of the requirements of Local Rule 7007-2(a)(vii), undersigned counsel has retained copies of each order and will make them available to the Court, if requested, or to any party that requests them.

DIP Financing, including the modification of stay provisions, are fair and reasonable, and were negotiated in good faith and at arms' length by parties represented by sophisticated counsel. Accordingly, in light of the circumstances and the material benefits afforded to the Debtors by the DIP Financing, the modification of the automatic stay is warranted and appropriate.

**F.    The DIP Lender Should be Deemed a Good-Faith Lender Under Section 364(e).**

41.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

42.    Here, the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing, and of extended arms' length, good-faith negotiations between the Debtors and the DIP Lender.  The terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**G.    The Debtors Should be Authorized to Pay the Fee Required by the DIP Lender Under the DIP Documents.**

43.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay a commitment fee to the DIP Lender.  In particular, the Debtors have agreed to pay a fee equal to 2% of the outstanding DIP Obligations, payable at maturity.  The fee associated with obtaining the DIP Facility is usual and customary and within the range of reasonableness.  Indeed, courts routinely authorize debtors to pay fees similar to those the Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtor's estate. *See, e.g.*, *In re EveryWare Global Inc.*, No. 15-10743 (LSS) (Bankr. D. Del. April 8, 2015) (approving 1.0% backstop fee, 2.0% original issue discount, and exit conversion fee payable in the form of common stock in an amount equal to 10% of the pro forma common stock); *In re Aleris Int'l.  Inc.*, No. 09-10478 (BLS) (Bankr. D. Del. Mar.  18, 2009) (approving 3.5 percent exit fee and 3.5 percent front-end net adjustment against each lender's initial commitment); *In re Dura Auto.  Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Jan.  30, 2008) (approving 2.5 percent fee related to refinancing and extending a postpetition financing facility).[5]  Accordingly, the Court should authorize the Debtors to pay the fee provided under the DIP Documents in connection with entering into those agreements.

**H.    A Final Hearing Should be Set.**

44.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing as soon as practicable, but in no event later than thirty (30) days following the Petition Date.

---

[5]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

45.     The Debtors request authorization to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties set forth below.  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

**I.      The Requirements of Bankruptcy Rule 6003 are Satisfied.**

46.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one (21) days after the petition date "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed above, authorizing the Debtors to obtain postpetition secured financing under the DIP Facility and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Interim Order and the DIP Facility, as well as granting the other relief requested herein, is integral to the Debtors' ability to  continue operations and paying their obligations as they become due, thereby avoiding any threat to the health safety and welfare of the Debtors' residents.  Failure to receive such authorization during the first twenty-one (21) days of these Chapter 11 Cases would severely hamper the Debtors' ability to ensure a smooth entry into chapter 11 at this critical juncture, destroying value and irreparably harming all parties in interest.

47.     For the reasons discussed herein, this relief is necessary in order for the Debtors to maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**J.      Bankruptcy Rule 6004(a) Should be Waived.**

48.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a).

49.    The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent potentially irreparable damage to the Debtors.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## RESERVATION OF RIGHTS

50.    Nothing contained herein is, is intended to be, or should be construed as an admission regarding the validity of any claim against the Debtors, a waiver of the Debtors' right to dispute any claim, or an approval or assumption of any agreement, contract, or policy under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, should the Court grant the relief sought herein, any payment made pursuant to an order of the Court is not, is not intended to be, and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

51.    Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney for the District of Delaware; (iii) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) counsel to the proposed DIP Lender; and (vii) all known holders of liens in the Debtors' assets; (viii) counsel to the plaintiffs in the case captioned *U.S.A. ex rel. Angela Ruckh v. CMC II, LLC et al.*, and (ix) the

Debtors' landlords.  As this Motion is seeking "first day" relief, notice of this Motion and any order entered in connection with the Motion will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

  **WHEREFORE**, the Debtors respectfully request that the Court enter: (i) the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein on an interim basis; (ii) the Final Order granting the relief requested herein on a final basis; and (iii) grant such other and further relief as the Court may deem just and proper.

Dated:   March 2, 2021      **CHIPMAN BROWN CICERO & COLE, LLP**
      Wilmington, Delaware

        */s/ William E. Chipman, Jr.*
        William E. Chipman, Jr. (No. 3818)
        Robert A. Weber (No. 4013)
        Mark L. Desgrosseilliers (No. 4083)
        Mark D. Olivere (No. 4291)
        Hercules Plaza
        1313 North Market Street, Suite 5400
        Wilmington, Delaware 19801
        Telephone:    (302) 295-0191
        Facsimile:    (302) 295-0199
        Email:        chipman@chipmanbrown.com
              weber@chipmanbrown.com
              desgross@chipmanbrown.com
              olivere@chipmanbrown.com

        *Proposed Counsel to the Debtors and*
        *Debtors-In-Possession*