# EXHIBIT A

## SETTLEMENT AGREEMENT

This agreement (this "**Agreement**") sets forth the terms of a settlement (the "**Settlement**") among CPSTN Operations, LLC ("**CPSTN**"), the Non-Debtor Affiliates identified on the signature pages hereto, the Debtors (as defined below), the United States, acting through the Department of Justice on behalf of the agencies and departments described herein (the "**United States**"), the official committee of unsecured creditors (the "**Committee**") appointed in the chapter 11 cases jointly administered under the caption of *In re CMC II, LLC*, Case No. 21-10461 (Bankr. D. Del.) (the "**Chapter 11 Cases**" and the debtors and debtors-in-possession in the Chapter 11 Cases, the "**Debtors**")[1], and Angela Ruckh ("**Ms. Ruckh**" or the "**Relator**" and, together with the Debtors, the Non-Debtor Affiliates, the Committee, and the United States, the "**Parties**").

## RECITALS

WHEREAS, on March 1, 2021 (the "**Petition Date**"), the Debtors commenced the Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware; and

WHEREAS, on February 9, 2021, the United States District Court for the Middle District of Florida, on remand from the Eleventh Circuit Court of Appeals, *United States ex rel. Ruckh v. Salus Rehab., LLC, et al.*, 963 F.3d 1089 (11th Cir. 2020), entered a $240,914,900 False Claim Act ("**FCA**") judgment against Sea Crest and CMC II jointly and severally, a $6,266,424 FCA judgment against Marshall, and a $10,055,961 FCA judgment against Governor's Creek, and a $484,000 FCA judgment against Salus Rehabilitation Inc. (collectively, the "**FCA Judgments**" against the "**FCA Debtors**" and the litigation giving rise to the FCA Judgments, the "**FCA Litigation**" and any and all Claims and Causes of Action arising out of the FCA Judgments, the FCA Litigation, and the conduct giving rise thereto[2], the "**FCA Claims**"). *United States ex rel. Ruckh v. Salus Rehabilitation, Inc., et al.*, No. 8:11-cv-1303-23-TBM (M.D. Fla. Feb. 9, 2021); and

WHEREAS, each of the FCA Judgments is held by the United States; and

WHEREAS, the FCA Litigation was commenced by Ms. Ruckh, as relator, and Ms. Ruckh has asserted pursuant to 31 U.S.C. § 3730(d)(2), (a) a joint and several Claim against the FCA Debtors in the amount of $23,950,865.35 on account of the fees, costs, and expenses that she asserts were incurred in connection with the FCA Litigation (the "**Ruckh Expense Claim**") and (b) a Claim for a share of the United States' recovery on account of the FCA Judgments (the "**Relator Share Claim**"); and

---

[1]   The Debtors are CMC II, LLC ("**CMC II**"), Salus Rehabilitation, LLC ("**Salus**"), 207 Marshall Drive Operations LLC ("**Marshall**"), 803 Oak Street Operations LLC ("**Governor's Creek**" and, together with Marshall, the "**SNF Debtors**"), Sea Crest Health Care Management, LLC ("**Sea Crest**"), and Consulate Management Company, LLC ("**Consulate Management**").

[2]   The conduct giving rise to the FCA Litigation shall be referred to as the "**FCA Litigation Conduct**."

**Working Draft – Subject to Approvals**

WHEREAS, the Non-Debtor Affiliates have been the direct and indirect equity owners of, and/or are under common equity ownership, with the Debtors; and

WHEREAS, on May 3, 2021, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered that certain *Final Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364 (c)(2), 364(c)(3) And 364(e), (B) Grant Senior Liens And Superpriority Administrative Expense Status; and (II) Granting Related Relief* [Docket No. 239] (the "**Final DIP Order**"), which, among other things, authorized the Debtors to borrow from CPSTN a post-petition financing facility (the "**DIP Facility**") in an aggregate principal amount of up to $5,000,000; and

WHEREAS, the Debtors have filed the *Motion for Entry of Orders (I)(A) Establishing Bidding Procedures for the Sales of the SNF Assets and Manager and Remaining Assets; (B) Establishing Procedures Relating to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (C) Approving Form and Manner of Notice; (D) Scheduling a Hearing to Consider Any Proposed Sale; and (E) Granting Certain Related Relief; and (II)(A) Approving Sales of the SNF Assets and Manager and Remaining Assets; (B) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (C) Granting Related Relief* [Docket No. 54] (the "**Sale Motion**") seeking approval of the sale of (a) the SNF Assets (as defined in the Sale Motion) and (b) the Manager and Remaining Assets (as defined in the Sale Motion); and

WHEREAS, the Court bifurcated the sales of the SNF Assets ("**SNF Sale Motion**") and the Manager and Remaining Assets ("**Manager Sale Motion**"), with the SNF Assets scheduled to have been sold before the sale of the Manager and Remaining Assets.

WHEREAS, the Manager and Remaining Assets include certain potential Causes of Action (including estate Causes of Action) against the Non-Debtor Affiliates and certain parties related to the Non-Debtor Affiliates; and

WHEREAS, Ms. Ruckh, and the Committee have filed objections to the SNF Sale Motion and have alleged various potential Claims against the Non-Debtor Affiliates (the "**Non-Debtor Affiliates Claims**"); and

WHEREAS, neither the United States, Ms. Ruckh, nor the Committee have filed an objection to the sale of the Manager and Remaining Assets due to multiple adjournments of the sale hearing and corresponding extensions of the objection deadline (which remains held in abeyance for such parties) and the Parties' agreement that approval of the 9019 Motion shall be sought in conjunction with the Manager Sale Motion and, if the 9019 Motion is not approved, the relief sought in the Sale Motion shall be further adjourned with the Parties' rights to object reserved; and

WHEREAS, the Non-Debtor Affiliates deny any and all liability with respect to the Non-Debtor Affiliates Claims and this Agreement does not constitute an admission or acknowledgment by any Party as to (a) any alleged or asserted Non-Debtor Affiliates Claim, or (b) the validity or amount of the Ruckh Expense Claim or the Relator Share Claim; and

WHEREAS, the Parties have negotiated in good faith and at arm's length concerning the terms of this Settlement, resolution of the FCA Claims, asserted Non-Debtor Affiliates Claims, and the objections filed, asserted, or anticipated to the Sale Motion in the absence of this Settlement by the United States, Committee and Relator; and

WHEREAS, the Debtors have determined, in the exercise of their independent business judgment, that the Settlement, and the transactions contemplated by this Agreement, represent the most value-maximizing transaction that has been proposed to the Debtors, and is in the best interest of the Debtors, their estates, and their creditors; and

WHEREAS, this Agreement sets forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof and thereof, to implement the Settlement.

NOW, THEREFORE, to avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above Claims and objections, and in consideration of the mutual promises and obligations of this Agreement, the Parties agree to the following Settlement terms:

1. **Definitions.**

   1.1. **Annual Payment Date.** Annual Payment Date means the first Monday of the month that is twelve months following the Effective Date and the first Monday of such month in each applicable successive year.

   1.2. **Bankruptcy Court.** Bankruptcy Court means the Bankruptcy Court for the District of Delaware.

   1.3. **CAAP.** CAAP means the COVID-19 Accelerated and Advance Payments.

   1.4. **CARES Act.** CARES Act means the Coronavirus Aid, Relief, and Economic Security Act.

   1.5. **Cause of Action.** Cause of Action means any and all Claims, obligations, rights, liabilities, actions, causes of action, choses in action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of setoff, third party Claims, subrogation Claims, contribution Claims, reimbursement Claims, indemnity Claims, counterclaims, and crossclaims (including all Claims and any avoidance, recovery, subordination, or other actions against any other Persons under the Bankruptcy Code, including avoidance actions) whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, based in law, equity or otherwise, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise.

3

1.6. **Claim**. Claim means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether against the Debtor or any other Person.

1.7. **CMS.** CMS means the Centers for Medicare & Medicaid Services.

1.8. **CMS Agreements.** CMS Agreements means those agreements between (a) Marshall and/or Governor's Creek and (b) the Secretary of the United States Department of Health and Human Services, and its component agency, CMS, to receive payment for services provided to Medicare beneficiaries pursuant to the provisions of, and regulations promulgated under, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395kkk.

1.9. **DIP Obligations.** DIP Obligations means the Debtors' obligations to repay the DIP Facility (and any other amounts set forth in the DIP Term Sheet) pursuant to the Final DIP Order.

1.10. 

1.11. **Effective Date.** The Effective Date shall be the later of (a) the satisfaction of all of the conditions to the Effective Date in Section 10, unless waived by the Parties, or (b) the United States obtaining authority to enter into this Agreement and executing this Agreement.

1.12. **Effective Date UCC Professionals Amount.** Effective Date UCC Professionals Amount has the meaning ascribed in Section 4.1.2.

1.13. **Estate Funding.** Estate Funding has the meaning ascribed in Section 5.2.4.

1.14. **Excluded GL/PL Liability.** Excluded GL/PL Liability means any GL/PL Liability against the Debtors, the holder of which (a) is listed on Exhibit B as may be amended by agreement of the Parties in accordance with the terms hereof

1.15.

1.16. **Final Order.** Final Order shall mean an order of the Bankruptcy Court or any other court of competent jurisdiction that has been entered on the docket in the Chapter 11 Cases (or the docket of such other court) that is not subject to a stay and has not been modified, amended, reversed, or vacated and as to which (a) the time to appeal, petition

for certiorari, or move for a new trial, reargument, or rehearing pursuant to Bankruptcy Rule 9023 has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was timely and properly appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired.

1.17.    **GL/PL Liability**. GL/PL Liability means any Claim (a) to a resident or patient of the facilities operated by the Debtors or managed by CMC II arising out of the Debtors' and their employees' provision of healthcare services in the treatment or care of a resident and/or patient, including any Claims arising out of statutory or regulatory obligations relating to said care and including Claims for services provided by licensed administrators, beauticians, and barbers, registered nurses, licensed vocational or practical nurses, certified nursing assistants, and dieticians, (b) for bodily injury, property damage, or personal injury resulting from an event at the facilities operated by the Debtors or managed by CMC II which is not related to the provision of healthcare services or (c) of an employee of the Debtors arising out of and in the course of employment by the Debtors.

1.18.    **HUD.** HUD means the U.S. Department of Housing and Urban Development.

1.19.    **IRS.** IRS means the United States Internal Revenue Service.

1.20.    **LVCC.** LVCC means La Vie Care Centers, LLC.

1.21.    **LVCC SNFs**. LVCC SNFs means those skilled nursing facilities operated by the operators the equity interests of which are owned directly or indirectly by LVCC as of the Effective Date.

1.22.    **Manager and Remaining Assets.** Manager and Remaining Assets has the meaning ascribed to it in the Sale Motion.

1.23.    **Medicare Regulations.** Medicare Regulations means regulations promulgated pursuant to the Medicare Statute.

1.24.    **Medicare Statute.** Medicare Statute means Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395kkk.

1.25.    **Non-Debtor Affiliates.** Non-Debtor Affiliates means each of the entities listed on Exhibit C and their successors and assigns.

1.26.    **Non-Debtor Affiliates Claims.** Non-Debtor Affiliates Claims means any and all potential estate Causes of Action against the Non-Debtor Affiliates for, among other

things, intercompany obligations and potential undercharge Claims under certain facility management agreements, as well as any direct Causes of Action against the Non-Debtor Affiliates arising out of or related to the FCA Liabilities, the FCA Claims, the FCA Litigation, and the FCA Litigation Conduct held or alleged by parties other than the Debtors.

1.27.    **Non-Traditional Overpayment Liability.** Non-Traditional Overpayment Liability means the Medicare overpayments which the SNF Debtors owe to CMS arising from or on account of the damages to CMS, as identified in *United States ex rel. Angela Ruckh v. Salus Rehab, et al.*, No. 8:11-cv-1303-23-TBM (M.D. Fla. Feb. 15, 2017) including and as set forth in the judgments rendered in that action against the SNF Debtors.

1.28.    **Payment Date Census Level.** Payment Date Census Level means the average resident census level for the trailing twelve-month period, expressed as a percentage, for all LVCC SNFs as of the last day of the month immediately prior to the date of such payment.

1.29.    **Payment Guarantors.** Payment Guarantors means ███████████████ ███████████████.

1.30.    **Person.** Person means any individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any governmental entity, and including any successor, by merger or otherwise, of any of the foregoing.

1.31.    **Plan.** Plan means a combined disclosure statement and Chapter 11 plan of liquidation, to be filed by the Debtors, that liquidates the Debtors' estates ████████ ████.

1.32.    **Released FCA Parties.** Released FCA Parties means each of (a) CPSTN, (b) the Non-Debtor Affiliates, (c) the Debtors, (d) the Transferee(s), (e) each of the foregoing's assignees and successors and (f) each of the foregoing's Representatives.

1.33.    **Remaining DIP Funds.** The Remaining DIP Funds means any unused portion of the DIP Facility after paying administrative or priority claims or any other payments set forth herein.

1.34.    **Representatives.** Representatives means, with respect to any Person, such Person's officers, managers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives.

1.35.    **Ruckh Expense Claim Annual Payment.** Ruckh Expense Claim Annual Payment means the Ruckh Expense Claim Periodic Payments and any Ruckh Expense Claim Census Adjustment Payment (as applicable).

1.36.    **Ruckh Expense Claim Census Adjustment Payment.** Ruckh Expense Claim Census Adjustment Payment means the payment set forth in section 3.2.2.2.

1.37.    **Ruckh Expense Claim Payment(s).** Ruckh Expense Claim Payment(s) means the Ruckh Expense Claim Annual Payments ██████████████████████ ████ .

1.38.    **Ruckh Expense Claim Periodic Payment.** Ruckh Expense Claim Periodic Payment means the payment set forth in section 3.2.2.1.

1.39.    ███████████████████████████████████████ ████████████████████████

1.40.    **Sale Closing.** Sale Closing means the consummation of the sale of the Debtors' assets pursuant to the Sale Order, and pursuant to the conditions set forth in the Asset Purchase Agreement accompanying the Sale Order.

1.41.    **Sale Order.** Sale Order means a Final Order entered by the Bankruptcy Court granting the relief in the Sale Motion and authorizing the Debtors to sell their assets to CPSTN and its designees.

1.42.    **SNF.** SNF means skilled nursing facility(ies).

1.43.    **SNF Assets.** SNF Assets has the meaning ascribed to it in the Sale Motion.

1.44.    **Traditional Overpayment Liability.** Traditional Overpayment Liability means the debts under the CMS Agreements that CMS has specifically identified for purposes of the CMS Cure Payment, other than overpayments arising from or on account of the lawsuit styled *United States ex rel. Angela Ruckh v. Salus Rehab, et al.*, No. 8:11-cv-1303-23-TBM or any liabilities for the non-final cost report for the 2020 cost year.

1.45.    **Transferee.** Transferee means any Person who, following the Sale Closing, operates the assets of the SNF Debtors or provides the management services provided by CMC II as of the Petition Date.

1.46.    **U.S. Annual Payment.** U.S. Annual Payment means the U.S. Periodic Payments and the U.S. Census Adjustment Payment.

1.47.    **U.S. Census Adjustment Payment.** U.S. Census Adjustment Payment means the payment set forth in section 2.1.2.2.

1.48.    **U.S. Payment(s).** U.S. Payment(s) shall mean the U.S. Annual Payments ████ ██████████ .

1.49.    **U.S. Periodic Payment.** U.S. Periodic Payment means the payment set forth in section 2.1.2.1.

**Working Draft – Subject to Approvals**

1.50. ███████████████████████████████████
███

## 2. Payments to the United States and CMS Agreement Transfer

2.1. **U.S. Claim Payments.** In exchange for the releases granted in Section 8.1.2 and the other commitments set forth herein, the United States shall receive:

2.1.1. **Estate Funds.** The Debtors will propose, and seek confirmation of, a Plan that separately classifies the FCA Claims and that provides that the United States shall receive seventy-three percent (73%) of the Remaining DIP Funds and Estate Funding on account of the FCA Claims.

2.1.2. **U.S. Annual Payments**

2.1.2.1. **U.S. Periodic Payments.** CPSTN or its designee will make four (4) annual payments of $843,750 (totaling $3,375,000) to the United States. CPSTN will pay each U.S. Periodic Payment on its respective Annual Payment Date.

2.1.2.2. **U.S. Census Adjustment Payments**

2.1.2.2.1.    On the Annual Payment Date, CPSTN shall deliver an affidavit via email to the United States, made under penalty of perjury and consistent with census reports provided to CMS (currently CMS Form 672), setting forth the Payment Date Census Level.

2.1.2.2.2.    On the Annual Payment Date, CPSTN shall or its designee pay to the United States ███████ for each percent (1%) that the Payment Date Census Level exceeds



2.1.2.3. **Maximum Aggregate U.S. Annual Payments.** The maximum amount the United States shall receive for all U.S. Periodic Payments and U.S. Census Adjustment Payments shall not exceed $6,000,000 in the aggregate.

███████████████████



2.1.3.4.

2.1.4. **U.S. Payments Guaranty.** On the Effective Date, the Payment Guarantors shall, or CPSTN shall cause the U.S. Payment Guarantors to, enter into a payment guaranty in favor of the United States, to guarantee the full and final payment of the U.S. Payments. CPSTN and the United States shall negotiate in good faith the terms of such a guaranty before the Effective Date.

2.1.5. **U.S. Payments Security.** On the Effective Date, the Transferee(s) shall, or CPSTN shall cause the Transferee(s), to enter into a security agreement granting the United States a security interest in the personal property of the Transferee(s) to secure the full and final payment of the U.S. Payments. CPSTN and the United States shall negotiate in good faith the terms of such security agreement(s) and any necessary inter-creditor agreements before the Effective Date.

2.1.6. **Payment Instructions.**

2.1.6.1. **U.S. Annual Payments.** The United States will provide payment instructions for each U.S. Annual Payment to CPSTN no later than one week

9

before the Annual Payment Date unless CPSTN requests payment instructions earlier through a written request to the United States.

2.1.6.2.  ██████████████████████████████████████

## 2.2. Transfer of CMS Agreements and Transferee Liability.

### 2.2.1.  Transfer of CMS Agreements.

2.2.1.1.    The Debtors shall assume and assign the CMS Agreements to the Transferee(s) of the SNF Assets pursuant to section 365 of the Bankruptcy Code, the Medicare Statute, the Medicare Regulations, and CMS' Medicare policies and procedures.

2.2.1.2.    The Transferee(s) shall, or CPSTN shall cause the Transferee(s) to, accept assignment of the CMS Agreements pursuant to the Medicare Regulations and CMS's Medicare policies and procedures.

### 2.2.2.  Transferee Liability.

2.2.2.1.    As between the SNF Debtors and CPSTN or any Transferee, the SNF Debtors shall bear sole responsibility and the liability for any Claims by or on behalf of CMS or any other Person for any of SNF Debtors' acts, obligations or omissions under or relating to the CMS Agreements on account of or relating to dates of service prior to the Sale Closing, including both Traditional Overpayment Liability and Non-traditional Overpayment Liability.

2.2.2.2.    As between the SNF Debtors and CPSTN or any Transferee, CPSTN or any Transferee shall bear sole responsibility and liability for any Claims on account of or relating to services from and after the closing and shall have no such responsibility or liability to SNF Debtors for any such Claims arising prior to the Sale Closing or for any Claims for Non-Traditional Overpayment Liability for any period.

2.2.2.3.    Upon CMS approval of change of ownership and the Sale Closing, the assignee of any CMS Agreement shall bear sole responsibility and liability for any debts owed to CMS, exclusive of any FCA Claims, including but not limited to, overpayment Claims on account of or relating to services after the Sale Closing and any Traditional Overpayments relating to dates of service prior to the Sale Closing, such as liabilities for the non-final cost report for the 2020 cost year.

2.2.2.4.    Nothing in Sections 2.2.2.1 or 2.2.2.2 prohibits CMS from collecting from, or limits the liability of, the Transferee(s) of the SNF Assets or any assignee of

10

the CMS Agreements for any Claims that Transferee(s) of the SNF Assets or assignee of the CMS Agreements would be liable for under the Medicare Statute and Medicare Regulations, exclusive of any debts due by way of the FCA Claims.

2.2.3.  **Payments on Account of Overpayments, Advances, and Cure.**

2.2.3.1.    The following payments shall constitute cure under 11 U.S.C. §365(b) of any defaults for the CMS Agreements:

2.2.3.1.1.    Within seven (7) days of Sale Closing, and subject to reconciliation with CMS, the Debtors shall pay to CMS, through the proceeds of the DIP Facility, [$292,749.23] for the Traditional Overpayment Liability.[3]

2.2.3.1.2.    Within seven (7) days of Sale Closing, the Debtors shall pay [$•] to CMS for the advances made pursuant to the CAAP under CARES Act that are owed to CMS.

2.2.4.  **CMS Setoff.**

2.2.4.1.    At Sale Closing, CMS shall set off the reimbursements for prepetition services provided to Medicare beneficiaries that have been administratively frozen in the amount of [$458,936.99] against the remaining CAAP under the CARES Act and Traditional Overpayments owed by the Debtors.

2.2.4.2.    The Debtors shall include a provision in the Sale Order lifting the stay imposed by 11 U.S.C. § 362(a) to permit CMS to accomplish the setoff in Section 2.2.4.1.

2.3. **CARES Act Payments.**

2.3.1.  Debtors shall pay the IRS all funds representing cash owed by Debtors for the payment of deferred employment taxes to the IRS shall be paid to the IRS by the Debtors.

2.3.2.  All funds representing CAAP owed to CMS shall be paid as outlined in Section 2.2.3.

3.  **Payments to Relator for Costs, Fees and Expenses (the "Ruckh Expense Claim")**

---

[3]    The amount of the CMS Cure Payment and the amount to be setoff are subject to change.  Up to 14 days before sale closing, CMS shall provide the final amount of the CMS Cure Payment and the final amount to be setoff.

3.1. **Allowance of the Ruckh Expense Claim.** Upon the Effective Date, the Ruckh Expense Claim shall be allowed against each of the FCA Debtors in the amount of $23,950,865.35 on account of Fees, Costs and Expenses incurred in prosecuting the FCA Litigation on Ms. Ruckh's behalf.

3.2. **Ruckh Expense Claim Payments.** In exchange for the releases in Section 8.2.2, and the other commitments set forth herein, Ms. Ruckh and her counsel shall receive, to divide among the components of the Ruckh Expense Claim as they agree:

3.2.1. **Estate Funds.** The Debtor will propose, and seek confirmation of, a Plan that separately classifies the Ruckh Expense Claim and that provides that the Relator shall receive twenty-four percent (24%) of the Remaining DIP Funds and Estate Funding on account of the Ruckh Expense Claim.

3.2.2. **Ruckh Expense Claim Annual Payments.**

3.2.2.1. **Ruckh Expense Claim Periodic Payments.** CPSTN or its designee will make four (4) annual payments of $281,250 (totaling $1,125,000). CPSTN will pay each Ruckh Expense Claim Periodic Payment on its respective Annual Payment Date.

3.2.2.2. **Ruckh Expense Claim Census Adjustment Payments**

3.2.2.2.1. On the Annual Payment Date, CPSTN shall deliver an affidavit via email to the Relator, made under penalty of perjury and consistent with census reports provided to CMS (currently CMS Form 672), setting forth the Payment Date Census Level.

3.2.2.2.2. On the Annual Payment Date, CPSTN or its designee shall pay to the Relator ▓▓▓▓ for each 1% that the Payment Date Census Level exceeds ▓▓▓





3.2.3.4.

3.2.4. **Ruckh Expense Claim Payments Guaranty.** On the Effective Date, the Ruckh Expense Claim Guarantors shall, or CPSTN shall cause the Ruckh Expense Claim Payment Guarantors to, enter into a payment guaranty in favor of the Ruckh Expense Claim Claim, to guarantee the full and final payment of the Ruckh Expense Claim Payments. CPSTN and the Relator shall negotiate in good faith the terms of such a guaranty before the Effective Date.

3.2.5. **Relator Share Claim.** For the avoidance of doubt, (i) no portion of the Relator's allowed Claim for the Ruckh Expense Claim shall include any amounts with respect to the FCA Judgment (including the Relator Share Claim), and (ii) pursuant to 31 U.S.C. § 3730(d)(2), the Relator Share Claim shall be paid and satisfied solely from the payments to the United States on account of the FCA Judgment.

3.2.6. **Payment Instructions.**

3.2.6.1. **Ruckh Expense Claim Annual Payments.** The Ruckh Expense Claim Annual Payments are to be made to Kellogg, Hansen, Todd, Figel & Frederick, PLLC, Attention: Silvija Strikis. Wiring instructions for each Ruckh Expense Claim Annual Payment will be provided to CPSTN at least one week before

the Annual Payment Date unless CPSTN requests payment instructions earlier through a written request to counsel to the Relator.

3.2.6.2. 

# 4. Other Claims.

## 4.1. Administrative and Priority Claims

4.1.1.   The Debtors will pay priority claims and administrative fees and expenses that are not assumed in accordance with Sections 4.2 and 4.3 ████████████████████████ ████████████████████████████████████.

4.1.2.   On the Effective Date, professionals retained by the Committee (the "**UCC Professionals**") shall receive $500,000 of the DIP proceeds (the "**Effective Date UCC Professionals Amount**"), which in addition to (a) the amounts paid the UCC Professionals as of the date hereof, and (b) the amount set forth in Section 5.1.1.2 shall be on account of fees and expenses of the UCC Professionals through July 31, 2021, subject to the same terms and conditions as approved by the Bankruptcy Court with respect to the DIP Budget [Docket No. 239].

4.1.3.   On the Effective Date, professionals retained by the Debtors (the "**Debtors Professionals**") shall receive $1.2 million of the DIP proceeds.

4.1.4.   On the Effective Date, the remaining amount of the DIP proceeds (if any) shall be paid to the Debtors' estates as Remaining DIP Funding.

## 4.2. Trade Vendors General/Resident Liability Claims.

4.2.1.   Subject to the terms and conditions hereof, conditioned upon Sale Closing, CPSTN and/or any Transferee will resume the trade relationships between the Debtors and all trade vendors, except for the trade vendors identified in Exhibit A and assume any agreements governing such relationships, subject to ██ ███████████████████████████████████. The assumption includes both prepetition and post-petition trade payables on terms currently in place subject to any defenses, exclusions, offsets, payment terms and conditions.

4.2.2.   Assumption of trade obligations and resumption of trade liabilities by CPSTN and/or any Transferee will be subject to the applicable counterparty agreeing to payment terms that are acceptable to CPSTN as described in sections 4.2.3 and 4.2.5. To the extent no such agreement can be reached on terms consistent with sections 4.2.3 and 4.2.5, CPSTN reserves the right to not assume such trade obligations, and

(a) such trade relationships and related agreements will not be assumed by the Debtors and (b) the holders of such trade obligations shall be treated as "Other Unsecured Claims" in accordance with Section 4.4, along with the excluded trade claims identified on Exhibit A.

4.2.3.  CPSTN or any Transferee shall make no catch-up payments or cure payments to trade vendors, provided that trade payables will be paid in the ordinary course on a commercially reasonable timeline, subject to the terms and conditions in place prior to the petition date, but in no event later than one year from the Effective Date.

4.2.4.  If a holder of a trade vendor's Claim is assumed pursuant to this Agreement and (such holder, an "**Assumed Creditor**") and such holder holds direct Claims against a Non-Debtor Affiliate or CPSTN, such direct Claims of the Assumed Creditor shall not be impaired or altered by this Agreement.

4.2.5.  Except as otherwise expressly provided in this Section 4.2, trade relationships will be reinstated subject to "reset" (*i.e.,* on the same terms as existed prepetition).

4.2.6.  Those creditors identified in Exhibit A shall be classified and treated as "Other Unsecured Claims" for the purpose of this Agreement.

## 4.3. General/GL/PL Liability.

4.3.1.  CPSTN or any Transferee shall assume the Debtors' ███████ GL/PL Liability except for the Excluded GL/PL Liabilities, subject to the terms hereof and to any defenses, exclusions, offsets, payment terms and conditions as existed ███████.

4.3.2.  CPSTN or any Transferee shall make no catch-up payments or cure payments on account of GL/PL Liabilities, and such claims shall be paid in accordance with any agreement in place with respect to such GL/PL Liability, including any applicable settlement agreement.

4.3.3.  If a holder of a GL/PL Liability that is assumed pursuant to this Agreement holds direct Claims against a Non-Debtor Affiliate or CPSTN, such direct Claims of the Assumed Creditor shall not be impaired or altered by this Agreement.

4.3.4.  Except as provided in Section 4.3, GL/PL Liabilities will be reinstated subject to "reset" (*i.e.,* on the same terms as existed ███████).

4.3.5.  Excluded GL/PL Liabilites shall be classified and treated as "Other Unsecured Claims" in accordance with Section 4.4 for the purpose of this Agreement.

## 4.4. Other Unsecured Claims.

4.4.1.  ***Estate Funds.*** The Debtor will propose, and seek confirmation of, a Plan that separately classifies all other unsecured Claims and that provides that those

15

claimants shall receive three percent (3%) of the Remaining DIP Funds and Estate Funding on account of their Claims.

4.4.2. ***Other Unsecured Annual Payments.*** CPSTN will make three (3) annual payments of $23,000, totaling $69,000, with the first such payment to be made on October 1, 2022, to be shared pro-rata among the other unsecured Claims.

4.4.3. **Other Unsecured Payment Guaranty.** On the Effective Date, the Payment Guarantors shall, or CPSTN shall cause the Payment Guarantors to, enter into a payment guaranty in favor of the Debtors' estates, to guarantee the full and final payment of the unsecured annual payments. CPSTN and the Committee shall negotiate in good faith the terms of such a guaranty before the Effective Date.

5. **Additional CPSTN Obligations.**

5.1. **First Anniversary Payments**

5.1.1. In addition to the settlement payments described herein, CPSTN or its designee shall pay the following no later than 1 year following the Effective Date:

5.1.1.1. Any unpaid prepetition and postpetition trade Claims assumed by CPSTN in accordance with the terms of this Agreement.

5.1.1.2. $790,250 to the UCC Professionals (which amount shall be paid in 12 equal installments over the 12-month period beginning on the Effective Date and ending on the first anniversary of the Effective Date) which, in addition to the $500,000 paid to the UCC Professionals as of the date hereof and the Effective Date UCC Professionals Amount, shall be on account of fees and expenses of the UCC Professionals through July 31, 2021.

5.1.2. The First Anniversary Payments to the professionals retained by the Committee shall be guaranteed by each of the Payment Guarantors. On the Effective Date, the Payment Guarantors shall, or CPSTN shall cause the Payment Guarantors to, enter into a payment guaranty in favor of the UCC Professionals to guarantee the full and final payment to UCC Professionals due under this Agreement. CPSTN and the UCC Professionals shall negotiate in good faith the terms of such a guaranty before the Effective Date.

5.1.3. Should CPSTN default in its payment of the monthly amounts to the UCC Professionals, and such default remains uncured for fifteen (15) business days following notice by such professionals, all remaining unpaid monthly amounts shall become immediately due and owing, and interest on the unpaid balance shall thereafter accrue at the federal judgment rate and the UCC Professionals may exercise all rights and remedies available to it at law or in equity.

5.2. **Estate Funding and DIP Funding**

5.2.1.  CPSTN will fund the full $5 million DIP Facility.

5.2.2.  CPSTN will credit bid the full amount of the DIP Obligations in exchange for the assets of the Debtors' estates, including all accounts receivable owed to the Debtors on or after the Effective Date, and otherwise waives any right to repayment of any portion of the DIP Obligations.

5.2.3.  Following payment of administrative and priority claims, any unused portion of the DIP Facility (the "**Remaining DIP Funds**") shall be paid to unsecured creditors in accordance with the terms hereof.

5.2.4.  CPSTN or its designee will make four annual payments of $125,000 (totaling $500,000) to the estate in cash, or, if payment of administrative and priority claims remain due after payment of DIP proceeds, such payments shall be made for the benefit of those remaining administrative and priority claims ("**Estate Funding**"). For the avoidance of doubt, to the extent applicable, the Estate Funding shall be available for the payment of any administrative claims of the UCC Professionals or the Debtor Professionals; *provided* that, for the avoidance of doubt, CPSTN and the other Non-Debtor Affiliates shall have no independent obligations to fund any administrative claims except as set forth herein.

6.  **Cooperation and Support**

6.1. Each of CPSTN, the Debtors, Ms. Ruckh, and the Committee, acting reasonably, shall cooperate with the other Parties in seeking approval of and implementing this Agreement *in toto*.

6.2. The Debtors, CPSTN, the Committee and Ms. Ruckh and their professionals shall support the terms of this Settlement, including any related motions, applications, declarations, forms of order reasonably acceptable to the Parties, or related filings; *provided* that such obligation shall expire if (a) the Bankruptcy Court denies approval of this Settlement or enters an order or issues a ruling making the terms of this settlement incapable of being implemented or (b) the conditions precedent to the Effective Date set forth herein are not satisfied or waived by CPSTN.

6.3. The Committee, the Debtors, and CPSTN shall cooperate in good faith to determine the appropriate mechanics for a consensual transfer of the SNF Assets to CPSTN and termination of the asset purchase agreement between the Debtors and PLV FL Land Holdco LLC ("**PLV**"). Any termination arrangements with PLV will be acceptable to the Debtors, the Committee, and CPSTN, each acting reasonably.

7.  **Transaction Structure**

7.1. This Settlement will be implemented pursuant to Federal Rule of Bankruptcy Procedure 9019, and a sale of the Manager and Remaining Assets and the SNF Assets pursuant to

the amended asset purchase agreement between CPSTN and/or any Transferee and the Debtors under 11 U.S.C. §363. The Sale contemplated in this Agreement shall be conditioned on the United States obtaining authority to enter into and executing this Agreement.

8. **Releases of Claims against CPSTN and Non-Debtor Affiliates and Withdrawal of Objections**

   8.1. **United States Releases and Satisfaction and Withdrawal of Objections.**

      8.1.1. **Satisfaction.**

         8.1.1.1.    The Estate Funding and the U.S. Payments shall be in exchange for liability that CPSTN, the Debtors, ████████████████, or the Transferee(s) may have with respect to the FCA Claims, as judgment debtors, as successor(s) to the FCA Debtors, or as a non-dischargeable Claim, to the extent applicable.

         8.1.1.2.    The receipt of all the U.S. Payments shall constitute full and final satisfaction of the FCA Claims.

         8.1.1.3.    United States acknowledges that the U.S. Payments and the Estate Funding constitute restitution, remediation, or an amount paid to come into compliance with a law and CPSTN, the Non-Debtor Affiliates and the United States will cooperate in completing the appropriate tax documentation with respect to this Settlement (including Form 1098-F).

      8.1.2. **United States Releases.**

         8.1.2.1.    Subject to the limitations set forth in this Settlement Agreement, upon the Effective Date, the United States releases the Released FCA Parties from any and all Causes of Action related to or arising out of the FCA Liabilities, the FCA Claims, the FCA Litigation, and the FCA Litigation Conduct including, but not limited to any Causes of Action based on successor liability, veil piercing, or alter ego theories.

         8.1.2.2.    The United States does not release: (i) any civil, criminal or administrative liability arising under Title 26 of the United States Code (the Internal Revenue Code); (ii) any criminal liability; (iii) any liability under subchapter III of chapter 37 of Title 31 of the United States Code other than any Claims arising out of or related to the FCA Liabilities, the FCA Claims, the FCA Litigation, and the FCA Litigation Conduct; (iv) any liability that is based on conduct in violation of antitrust laws; and (v) any Claim of any agency of the United States of America not released pursuant to the terms hereof.

      8.1.3. **United States Withdrawal of Objections.**  Upon execution of this Agreement, the United States shall be deemed to withdraw any and all pending objections to the

Sale Motion and 9019 motion.  The United States' withdrawal of the objections listed in this section shall be (a) without prejudice upon execution of this Agreement, and (b) with prejudice, upon Sale Closing.

**8.2. Relator Releases and Satisfaction and Withdrawal of Objections.**

   **8.2.1.  Ruckh Expense Claim Satisfaction**.

      **8.2.1.1.**    The Estate Funding and the Ruckh Expense Claim Payments shall be in exchange for (a) liability that CPSTN, the Debtors, the Non-Debtor Affiliates, or the Transferee(s) may have with respect to the FCA Claims, as a judgment debtor, as successor(s) to the FCA Debtors, or as a non-dischargeable Claim, to the extent applicable, and (b) liability that the Debtors and Non-Debtor Affiliates may have with respect to Non-Debtor Affiliates Claims.

      **8.2.1.2.**    The receipt of all the Ruckh Expense Claim Payments shall constitute full and final satisfaction of the Relator's FCA Claims and Non-Debtor Affiliates Claims.

   **8.2.2.  Ruckh Expense Claim Releases.**

      **8.2.2.1.**    Subject to the limitations set forth in this Settlement Agreement, upon the Effective Date, the Relator, on behalf of herself and each of her representatives, affiliates, agents, attorneys, counsel, and advisors, releases (a) the FCA Released Parties from any and all Causes of Action arising out of or in any way related to any Ruckh Expense Claims, any Relator Share Claim, the FCA Liabilities, the FCA Claims, the FCA Litigation, and the FCA Litigation Conduct, including, without limitation, any claims based on successor liability, veil piercing, or alter ego theories; and (b) any Causes of Action for liability that the Debtors and Non-Debtor Affiliates may have with respect to Non-Debtor Affiliates Claims; *provided* that no party shall be released from its obligations hereunder.

   **8.2.3.  Relator's Agreement to the Agreement's Fairness.**  The Relator and her heirs, successors, attorneys, agents, and assigns shall not object to this Agreement, including any objection that this Agreement is not fair, adequate, or reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).

   **8.2.4.  Relator Withdrawal of Objections.**  Upon execution of this Agreement, Relator shall withdraw or be deemed to withdraw any and all pending objections to the Sale Motion, any requests for discovery, Rule 2004 examinations, and notices of depositions.  The Relator's withdrawal of the filings listed in this section shall be (a) without prejudice upon execution of this Agreement, and (b) with prejudice, upon Sale Closing.

8.3. **Committee Withdrawal.** The Committee shall withdraw and be deemed to withdraw any and all pending objections to the Sale Motion, the Committee's pending motion for the appointment of an examiner, and any requests for discovery, Rule 2004 examinations, and notices of depositions. The Committee's withdrawal of the filings listed in this section shall be ████████████████████████████████████████████.



## 10. Conditions Precedent

10.1.    The following are conditions precedent to the Effective Date:

10.1.1. The United States obtaining authority to enter into and execute this Agreement.

10.1.2. CPSTN and/or its affiliates having obtained all necessary and appropriate approvals from HUD and any other state, local, or federal regulatory agencies for (a) CPSTN or any Transferee to continue to perform its obligations under CMC II's existing management agreements and (b) CPSTN or any Transferee to operate the two SNF Debtors.

10.1.3. Entry of a Final Order (a) approving a Sale Order that is consistent with this Agreement and otherwise acceptable to the Parties, and containing, among other things a no successor liability finding, a finding that 11 U.S.C. §363(m) has been satisfied, and an acceptable free and clear finding, and (b) approving all material terms of the Settlement pursuant to Bankruptcy Rule 9019 in a manner consistent with this Agreement and otherwise acceptable to the Parties, each in their discretion.

10.1.4. No condition precedent contained herein may be waived without mutual agreement by the Parties.

10.1.5. All conditions precedent herein must be satisfied or waived by the Parties prior to or simultaneously with the Sale Closing.

## 11. Default and Cure

11.1.    **U.S. Payment Default and Cure**. In the event that CPSTN, any Transferee, or any Payment Guarantor, fails to make a payment obligation under the Settlement

Agreement to the United States by the date when each such payment is due (a "**U.S. Payment Default**"), then the Party obligated under this Agreement to make such a payment shall be in default. Upon the occurrence of a U.S. Payment Default, the United States shall deliver a notice of payment default in accordance with Section 13 below to CPSTN (a "**Payment Default Notice**") and the Party obligated to make the payment. If within 30 days of CPSTN's receipt of such Payment Default Notice, the U.S. Payment Default is continuing and remains uncured, the United States shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, including under the U.S. Payments Guaranty and U.S. Payments Security, as applicable, as well as all rights and remedies available at law or in equity.

11.1.1. **U.S. Payment Default Acceleration**. If CPSTN, any Transferee, or any Payment Guarantor fails to cure a U.S. Payment Default by making the full payment of the amount subject to the Payment Default Notice within 30 days of CPSTN's receipt of such Payment Default Notice, then the remaining unpaid balance of U.S. Payments shall become immediately due and payable, and interest on the unpaid balance of the U.S. Payments shall thereafter ████████████████████████ the United States may pursue remedies under the U.S. Payments Guaranty and U.S. Payments Security, as well as all rights and remedies available at law or in equity.

11.2.    **Ruckh Expense Claim Payment Default and Cure**. In the event that CPSTN, any Transferee, or any Payment Guarantor fails to make a payment obligation under the Settlement Agreement to the Relator by the date when each such payment is due, *i.e.*, the Annual Payment Date (a "**Ruckh Expense Claim Payment Default**"), then the Party obligated under this Agreement to make such a payment shall be in default. Upon the occurrence of a Ruckh Expense Claim Payment Default, the Relator shall deliver a notice of payment default in accordance with Section 13 below to CPSTN (a "**Payment Default Notice**") and the Party obligated to make the payment. If within 30 days of CPSTN's receipt of such Payment Default Notice, the Ruckh Expense Claim Payment Default is continuing and remains uncured, the Relator shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, including under the Ruckh Expense Claim Payments Guaranty, as applicable, as well as all rights and remedies available at law or in equity and the release provided for in Section 8.2 shall be void and of no further force and effect.

11.2.1. **Ruckh Expense Claim Default Acceleration**. In addition, if CPSTN, any Transferee, or any Payment Guarantor fails to cure such Payment Default by making the full payment of the amount subject to the Payment Default Notice within 30 days of CPSTN's receipt of such Payment Default Notice, then the remaining unpaid balance of the Ruckh Expense Claim Payments shall become immediately due and payable, and interest on the unpaid balance of the Ruckh Expense Claim Payments shall thereafter accrue at the federal judgment rate and the holder of the Ruckh Expense Claim may pursue remedies under the Ruckh Expense

Claim Payments Guaranty and Ruckh Expense Claim Payments Security, as well as all rights and remedies available at law or in equity.

11.3.    

11.4.    **Debtor Plan Default**. If the Debtors fail to incorporate the treatment ████ ██████████████████████ Agreement into a Plan, the Debtors shall be in default of this Agreement ("**Debtor Plan Default**"). Upon the occurrence of Debtor Plan Default, the Parties (other than the Debtors) shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity.

12. **Termination.** Each party has the option to terminate ██████████████████ this Agreement if: (a) the Parties, acting in good faith and reasonably, determine that the Conditions Precedent in section 10 of this Agreement can no longer be satisfied; (b) the court does not approve the Sale Motion and 9019 Motion; (c) the Debtors otherwise liquidate substantially all of their assets before the occurrence of the Effective Date; or (d) the Bankruptcy Case converts to a case under chapter 7 of the Bankruptcy Code before the occurrence of the Effective Date.

13. **Notices**

13.1.    All notices, requests, demands, claims and other communications hereunder shall be in writing and shall be transmitted by an attachment to an electronic mail message, or by (a) hand delivery, (b) first class mail, or (c) overnight mail, using the addresses set forth below (or in any case, to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this Section 13.1):

If to the Debtors:

Chipman Brown Cicero & Cole LLP
1313 N. Market Street
Suite 5400
Wilmington, DE 19801
Attention:      William Chipman and Robert A. Weber
Email:          Chipman@ChipmanBrown.com
                Weber@ChipmanBrown.com

If to the Committee:

Porzio, Bromberg & Newman, P.C.
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
Attention:   Robert M. Schechter
               Rachel A. Parisi
Email:       rmschechter@pbnlaw.com
               raparisi@pbnlaw.com

If to the United States:

Miniard Culpepper
Alastair Gesmundo
U.S. Department of Justice
Civil Division

*By U.S. Mail:*
P.O. Box 875
Ben Franklin Station
Washington, DC 20044

*By Hand Delivery or Overnight:*
1100 L St., N.W.
Room 10004
Washington, DC 20005
E-mail:    miniard.culpepper@usdoj.gov
           alastair.m.gesmundo@usdoj.gov

If to CPSTN or any of the Non-Debtor Affiliates:

Consulate Health Care
800 Concourse Pkwy S., Suite 200
Maitland, FL 32751
Attention:   Daniel E. Dias
               Chief Corporate Counsel
Email: Daniel.E.Dias@consualtehc.com

- and -

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606
Attention:   James J. Mazza, Jr.
E-mail:     James.Mazza@skadden.com

If to the Relator

Silvija Strikis
Joseph Hall
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036
Email:      sstrikis@kellogghansen.com
              jhall@kellogghansen.com

## 14. **Other Provisions**

14.1.      The Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth constitute a contemporaneous exchange for new value given to each other Party (including the Debtors), within the meaning of 11 U.S.C. § 547(c)(1), and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that does not and is not intended to hinder, delay, or defraud any entity to which any other Party (including the Debtors) was or became indebted to on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

## 15. **Miscellaneous**

15.1. ███████████████████████████████████

15.2.      **Arm's Length Transaction**. Each party, with the assistance of competent counsel, has participated in the drafting of this Agreement. The Parties agree that this Agreement has been negotiated at arm's length by parties of equal bargaining power, each of whom was represented by competent counsel of its own choosing. None of the Parties shall be considered to be the drafter of this Agreement or any provision for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter. Each party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

15.3.      **Governing Law & Jurisdiction**. This Agreement is governed by the laws of the United States. The Bankruptcy Court will retain jurisdiction to, among other things, hear and resolve disputes arising under this Agreement, and any other agreements or instruments implementing the transactions contemplated herein, except as otherwise provided in the Medicare Statute for, among other things, the resolution of any payment or overpayment dispute related to a CMS Claim.

By its execution and delivery of this Agreement, each of the signatories to this Agreement irrevocably and unconditionally agrees that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought exclusively in the Bankruptcy Court, but if the Bankruptcy Court does not have or does not choose to exercise jurisdiction over the matter, then the matter shall be brought in a federal court of competent jurisdiction.

15.4.    **Amendments**. Subject to the Conditions Precedent in Section 10, this Agreement and the order approving the Settlement constitutes the complete agreement between the Parties. ████████████████████████████████████████████████████████████████

15.5.    **Complete Agreement.** This Agreement constitutes the complete agreement between the Parties to this Agreement with respect to the subject matter hereof and supersedes all prior and contemporaneous negotiations, agreements and understandings, written or oral, with respect to the subject matter hereof.

15.6.    **Authority**. The undersigned signatories represent and warrant that they are fully authorized to execute this Agreement on behalf of the Persons indicated below.

15.7.    **Counterparts**. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement. Delivery of an executed counterpart of a signature page by telecopy or an attachment to an e-mail shall be effective as delivery of an executed counterpart.

15.8.    **Time.** Time is of the essence in the performance of respective duties of each Party.

15.9.    Upon the Effective Date, this Agreement will be binding upon all of the Parties, their successors, transferees, heirs, and assigns.

*[Signature Pages Follow]*

25

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective representatives thereunto duly authorized, as of this [x] day of September 2021.

*Debtors*

**CMC II, LLC**

By: _____
Name:
Title:

**803 OAK STREET OPERATIONS LLC**

By: _____
Name:
Title:

**207 MARSHALL DRIVE OPERATIONS LLC**

By: _____
Name:
Title:

Guarantors:

**SALUS REHABILITATION, LLC**

By: _____
Name:
Title:

**SEA CREST HEALTH CARE
MANAGEMENT, LLC**

By: _____
Name:
Title:

**CONSULATE MANAGEMENT
COMPANY, LLC**

By: _____
Name:
Title:

*Non-Debtor Affiliates*

**CPSTN Operations, LLC**

By: _____

Name:

Title:

**LaVie Care Centers, LLC**

By: _____

Name:

Title:

*United States*

**The United States of America**

By: _____

Name:

Title:

27

*Committee*

**The Official Committee of Unsecured Creditors**

By: _____

Name:

Title:

*Relator*

**Angela Ruckh, on behalf of herself, her attorneys, counsel, advisors, and representatives**

By: _____

Name:

Title: